1    Kelly M. Dermody (Cal. Bar No. 171716)
     Daniel M. Hutchinson (Cal. Bar No. 239458)
2    Anne B. Shaver (Cal. Bar No. 255928)
     Marc A. Pilotin (Cal. Bar No. 266369)
3    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 29th Floor
4    San Francisco, CA 94111-3339
     Telephone:  (415) 956-1000
5    Facsimile:  (415) 956-1008
     E-Mail: kdermody@lchb.com
6    E-Mail: dhutchinson@lchb.com
     E-Mail: ashaver@lchb.com
7    E-Mail: mpilotin@lchb.com

8    Jahan C. Sagafi (Cal. Bar No. 224887)
     OUTTEN & GOLDEN LLP
9    One Embarcadero Center, 38th Floor
     San Francisco, CA 94111
10   Telephone:  (415) 638-8800
     Facsimile:  (415) 638-8810
11   E-Mail: jsagafi@outtengolden.com

12   Adam T. Klein (admitted *pro hac vice*)
     Juno Turner (admitted *pro hac vice*)
13   OUTTEN & GOLDEN LLP
     3 Park Avenue, 29th Floor
14   New York, New York 10016
     Telephone:  (212) 245-1000
15   Facsimile:   (212) 977-4005
     E-Mail: atk@outtengolden.com
16   E-Mail: jturner@outtengolden.com

17   *Attorneys for Plaintiffs and Proposed Class Members*

18

19                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
20                        SAN JOSE DIVISION

21   ERIC BENEDICT, RICHARD BOWDERS,          Case No.    C 13-0119 BLF
     KILRICANOS VIEIRA, and DAVID
22   MUSTAIN on behalf of themselves and
     classes of those similarly situated,     **PLAINTIFFS' NOTICE OF MOTION
23                                            AND MOTION FOR CLASS
                      Plaintiffs,             CERTIFICATION PURSUANT TO
24                                            RULE 23**
          v.
25                                            Date:     July 30, 2015
     HEWLETT-PACKARD COMPANY,                 Time:     9:00 a.m.
26                                            Judge:    Hon. Beth Labson Freeman
                      Defendant.              Crtrm:    3, 5th Floor
27

28

**REDACTED VERSION**
OF DOCUMENT SOUGHT
TO BE SEALED

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................ 2

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 2

I.      BACKGROUND ........................................................................... 4

    A.    Plaintiffs Are Former TSCs Who Assert Claims under California, Colorado, and Massachusetts Law. ................................................. 4

    B.    HP's Job Architecture Policy Delineates the Primary Job Duties of Technical Solutions Consultants. ..................................................... 5

    C.    Class Members Work In Organizations That Provide Technical Support for HP Hardware and Software Products. ................................ 8

II.     ARGUMENT ............................................................................... 12

    A.    Legal Standard for Class Certification ......................................... 12

    B.    Rule 23(a)(1): Numerosity is Satisfied Because There Are Sufficiently Numerous Class Members Such that Joinder is Impracticable. ......................................................................... 12

    C.    Rule 23(a)(2): Commonality is Satisfied Because There Are Questions of Law and Fact Common to Members of the Proposed Classes. ............................................................................... 14

    D.    Rule 23(a)(3): Typicality is Satisfied Because Plaintiffs' Claims are Reasonably Co-Extensive with Those of the Absent Class Members. ............................................................................... 17

    E.    Rule 23(a)(4), (g): Plaintiffs and Their Counsel will Fairly and Vigorously Represent the Interests of the State Classes. ..................... 17

    F.    Rule 23(b)(3): Plaintiffs Satisfy the Predominance and Superiority Requirements. ....................................................................... 18

III.    CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013) ..................................................... 12, 18

*Benton v. Telecom Network Specialists, Inc.,*
220 Cal.App.4th 701 (2013) ................................................. 22

*Bowerman v. Field Asset Servs., Inc.,*
No. 13-CV-00057-WHO,
2015 WL 1321883 (N.D. Cal. Mar. 24, 2015) ....................... 15

*Boyd v. Bank of Am. Corp.,*
300 F.R.D. 431 (C.D. Cal. 2014) ............................... 22, 23, 25

*Bradley v. Networkers Int'l, LLC,*
211 Cal. App. 4th 1129 (2012) ....................................... 16, 22

*Brinker Rest. Corp. v. Superior Court,*
53 Cal. 4th 1004 (2012) ....................................................... 16

*Brown v. Hain Celestial Grp., Inc.,*
No. C 11-03082 LB,
2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ....................... 17

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.,*
249 F.R.D. 334 (N.D. Cal. 2008) .......................................... 17

*Damassia v. Duane Reade, Inc.,*
250 F.R.D. 152 (S.D.N.Y. 2008) .............................. 19, 22, 23

*Delagarza v. Tesoro Refining & Mktg. Co.,*
No. C–09–5803 EMC,
2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) ......................... 18

*DuFour v. BE LLC,*
291 F.R.D. 413 (N.D. Cal. 2013) .......................................... 13

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ................................................. 17

*Gentry v. Superior Court,*
42 Cal. 4th 443 (2007) ......................................................... 13

*Greko v. Diesel U.S.A., Inc.,*
277 F.R.D. 419 (N.D. Cal. 2011) .......................................... 15

*Grenawalt v. AT&T Mobility,*
No. 11 Civ. 2664 (ALC),
2014 WL 4832318 (S.D.N.Y. Sept. 29, 2014) ....................... 16

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998).................................... 17, 18, 24

*In re Cirrus Logic Secs.,*
155 F.R.D. 654 (N.D. Cal. 1994) .......................................... 12

*In re Rubber Chems. Antitrust Litig.,*
232 F.R.D. 346 (N.D. Cal. 2005) ..................................... 12, 13

- ii -

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  571 F.3d 953 (9th Cir. 2009)................................................................. 19, 23

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014)....................................................................... 14

*Marilley v. Bonham*,
  No. C-11-02418-DMR,
  2012 WL 851182 (N.D. Cal. Mar. 13, 2012)................................................. 13

*Mazza v. Am. Honda Motor Company, Inc.*,
  666 F.3d 581 (9th Cir. 2012).......................................................................... 14

*Morrison v. Ocean State Jobbers, Inc.*,
  290 F.R.D. 347 (D. Conn. 2013)..................................................................... 19

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)............................................................................ 23

*Nat'l Ass'n of Radiation Survivors v. Walters*,
  111 F.R.D. 595 (N.D. Cal. 1986).................................................................... 13

*Nelson v. Avon Prods., Inc.*, No. 13–cv–02276–BLF,
  2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) ....................................... passim

*O'Brien v. Encotech Const. Servs., Inc.*, /
  203 F.R.D. 346 (N.D. Ill. 2001) ............................................................... 13, 14

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014)........................................................................... 14

*Perez v. Allstate Ins. Co.*,
  No 11-CV-1812 (JFB)(AKT),
  2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014)...................................... 16, 19, 22

*Ries v. Ariz. Beverages USA*,
  287 F.R.D. 523 (N.D. Cal. 2012).................................................................... 17

*Romero v. Producers Dairy Foods, Inc.*,
  235 F.R.D. 474 (E.D. Cal. 2006) ................................................................... 14

*Sav-On Drug Stores v. Superior Court*,
  34 Cal. 4th 319 (2004) ................................................................................... 25

*Tierno v. Rite Aid Corp.*,
  No. C 05-02520 TEH,
  2006 WL 2535056 (N.D. Cal. Aug. 31, 2006).............................................. 25

*Torres v. Mercer Canyons, Inc.*,
  No. 1:14–cv–03032–SAB,
  2015 WL 1641519 (E.D. Wash. Apr. 8, 2015) ............................................. 13

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010).......................................................................... 12

*Vasquez v. Coast Valley Roofing, Inc.*,
  670 F. Supp. 2d 1114 (E.D. Cal. 2009).......................................................... 13

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009)............................................................. 19, 22, 23, 25

- iii -

# TABLE OF AUTHORITIES
## (continued)

Page

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ................................................................ 14

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ....................................................... 18

*Wang v. Chinese Daily News, Inc.*,
No. 2:04-cv-01498-CBM(AJWx),
2014 WL 1712180 (C.D. Cal. Apr. 15, 2014) ......................... 16, 22

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ..................................................... 17

*Youngblood v. Family Dollar Stores, Inc.*,
No. 09 Civ. 3176,
2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) ................................ 23

**Rules**

Fed. R. Civ. P. 23(a) ......................................................................... 12

Fed. R. Civ. P. 23(a)(2) ..................................................................... 14

Fed. R. Civ. P. 23(a)(4) ..................................................................... 18

Fed. R. Civ. P. 23(b)(3) ..................................................... 12, 18, 24

Fed. R. Civ. P. 23(g) ......................................................................... 18

**Regulations**

29 C.F.R. § 541.200 ............................................................................ 2

454 Mass. Code Regs. § 27.03(3) ....................................................... 2

7 Colo. Code Regs. § 1103-1(5) .......................................................... 2

8 Cal. Code. Regs. § 11040(1)(A)(2)(a)(i) ......................................... 2

8 Cal. Code. Regs. § 11040(1)(A)(3)(h)(i)-(iii) .................................. 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on July 30, 2015 at 9:00 a.m., before the Honorable Beth Labson Freeman in Courtroom 3 of the U.S. District Court for the Northern District of California – San Jose Division, Plaintiffs Eric Benedict, Kilricanos Vieira, and David Mustain (collectively, "Plaintiffs") will move for an order certifying this case as a class action.

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Plaintiffs move for certification of the classes below ("State Classes"), or such other classes or subclasses that may be appropriate:

**California Class**:  All persons employed in California as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2009 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of California.

**Colorado Class**:  All persons employed in Colorado as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Colorado.

**Massachusetts Class**:  All persons employed in Massachusetts as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Massachusetts.[1]

Plaintiffs also move the Court to appoint Mr. Benedict as class representative for the California Class, Mr. Mustain as class representative for the Colorado Class, and Mr. Vieira as class representative for the Massachusetts Class.  Finally, Plaintiffs move for the appointment of Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") and Outten & Golden LLP ("O&G"), as Class Counsel.

---

[1] Prior to 2012, the Customer Solutions Center was divided into two groups: GCE and TC&E.  In 2012, these groups were combined to form the Customer Solutions Center. The class definition includes Technical Solutions Consultants I, II, or III in the GCE and TC&E groups from 2009 (California) or 2010 (Colorado and Massachusetts) through 2012, and in the Customer Solutions Center from 2012 to the present.

This motion is made pursuant to Rule 23 and is based on this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the accompanying declarations of Kelly M. Dermody ("Dermody Decl."); Jahan C. Sagafi ("Sagafi Decl."); Marc A. Pilotin ("Pilotin Decl."); Eric Benedict ("Benedict Decl."); David Mustain ("Mustain Decl."); Kilricanos Vieira ("Vieira Decl."); the 15 declarations of members of the State Classes, presented in the compendium of Class Member Declarations;[2] and any papers filed in response, the argument of counsel, and all papers and records on file in this matter.

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are:

1. Whether the Court should certify the proposed State Classes identified above pursuant to Rule 23;

2. Whether the Court should appoint Mr. Benedict as the California Class representative, Mr. Mustain as the Colorado Class representative, and Mr. Vieira as the Massachusetts Class representative; and

3. Whether the Court should appoint LCHB and O&G as Class Counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Eric Benedict, David Mustain, and Kilricanos Vieira are former Technical Solutions Consultants ("TSCs") who worked for HP in California, Colorado, and Massachusetts respectively. They seek overtime pay and other relief for themselves and other TSCs, whom HP has uniformly classified as exempt from overtime pay requirements.

Employees may be exempt from state overtime pay requirements pursuant to one or more exemptions, such as the "administrative employee exemption" or the "computer professional employee exemption."[3] Regardless of which exemption HP may assert here, the legal issue of

---

[2] For ease of reference throughout this brief, all Class Member declarations, other than those of the named Plaintiffs, are referred to as "Decl. #," where "#" refers to the corresponding tab number in the concurrently filed compendium of Class Member Declarations.

[3] Each state's administrative employee exemption is substantially similar for purposes of this Motion. For instance, each requires a purportedly exempt employee to perform work "directly related to management policies or general business operations." 8 Cal. Code. Regs. § 11040(1)(A)(2)(a)(i); 7 Colo. Code Regs. § 1103-1(5); 454 Mass. Code Regs. § 27.03(3) (adopting meaning of "administrative" employee under 29 C.F.R. § 541.200). California law also contains a computer professional employee exemption, which requires an employee to engage primarily in work "that is intellectual or creative and that requires the exercise of discretion and independent judgment" and at least one of the following: "[t]he application of systems analysis

whether an employee properly falls within the exemption depends on what an employee does – *e.g.*, her primary job duties.  *See*, *e.g.*, *Nelson v. Avon Prods., Inc.*, No. 13–cv–02276–BLF, 2015 WL 1778326, at *9-10 (N.D. Cal. Apr. 17, 2015) (Freeman, J.).  Certification of a class of employees alleging misclassification is appropriate if the Court can determine, for the class as a whole based on common evidence, what class members do.  *Id.*  Plaintiffs make that showing here.

Previously, the Court[4] found that evidence suggested that TSCs "share common work duties," and therefore conditionally certified this case as a Fair Labor Standards Act ("FLSA") collective action.  Order Granting Pls.' Mot. for Cond'l FLSA Coll. Action Cert. ("FLSA Order") at 16:19-20 (ECF #175).  Based on the limited discovery available at that time, the Court found that,

> under HP's Job Architecture Policy, employees are categorized into job titles based on their *primary job duties* and employees with the same job title *perform the same general job tasks* as identified in a standardized job description.

*Id.* at 15:16-18 (emphases added).  The Policy, the Court explained, provides that "employees performing the same work are assigned the same job title, as the system requires managers to assign job titles based on the nature of the job."  *Id.* at 6:22-24.  These facts, among others, led the Court to hold that TSCs are similarly situated for purposes of the FLSA.

The additional common evidence that Plaintiffs now present shows that TSCs perform the same primary duties, rendering this case appropriate for certification under Rule 23.  As HP's Rule 30(b)(6) witnesses testified and Class Member declarations confirm, TSCs within the State Classes are quintessential "help desk" employees, serving as the first contact HP customers have with HP's technical support.  Various HP process documents, technical documents, service level agreements ("SLAs"), and other instructions define what a TSC does.  Those documents and

techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications," "[t]he design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications," or "the documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems."  8 Cal. Code. Regs. § 11040(1)(A)(3)(h)(i)-(iii).

[4] References to "the Court" encompass actions taken by Judge Koh, to whom this case was previously assigned.

agreements likewise structure and restrict a TSC's role.  For instance, when a customer's problem reveals a bug in the coding of an HP product, TSCs are required to elevate the problem promptly to those in the Engineering or "R&D" department, people outside the State Classes.

Given this evidence common to all Class Members, which reinforces the Court's previous findings that TSCs perform the same work, class certification under Rule 23 is appropriate.  For these reasons and those stated below, the Court should certify the State Classes, appoint Plaintiffs as class representatives, and appoint LCHB and O&G as Class Counsel.

## I.   BACKGROUND

### A.   Plaintiffs Are Former TSCs Who Assert Claims under California, Colorado, and Massachusetts Law.

Mr. Benedict and Mr. Vieira are former TSC IIIs.  Benedict Decl. ¶¶ 2-3; Vieira Decl. ¶¶ 2-3.  Mr. Mustain is a former TSC II.  Mustain Decl. ¶¶ 2-3.

Mr. Benedict filed this action on January 10, 2013, seeking to represent a nationwide collective action of employees under the FLSA and a California class of employees under California law.  (ECF #1.)  He asserts claims for unpaid overtime, waiting time penalties, failure to maintain adequate and accurate wage statements, failure to provide meal and rest breaks, and violations of California's Unfair Competition Law ("UCL").

On May 31, 2013, Plaintiffs filed their First Amended Complaint, adding Mr. Vieira as a named plaintiff and claims on his behalf and on behalf of a proposed Massachusetts class under that state's wage and hour laws.[5]  (ECF #64.)  Mr. Vieira asserts claims for unpaid overtime and HP's failure to maintain adequate and accurate wage statements.

On July 11, 2014, Plaintiffs filed their Second Amended Complaint, adding Mr. Mustain as a named plaintiff and claims on his behalf and on behalf of a proposed Colorado class under that state's wage and hour laws.  (ECF #258.)  Mr. Mustain asserts claims for unpaid overtime and HP's failure to maintain adequate and accurate wage statements.

---

[5] Although the First Amended Complaint also included Richard Bowders as a named plaintiff and claims on his behalf and on behalf of a proposed Maryland class under that state's wage and hour laws, Plaintiffs do not seek certification of such a class at this time.

**B.**  **HP's Job Architecture Policy Delineates the Primary Job Duties of Technical Solutions Consultants.**

As noted above, the Court conditionally certified this case as a collective action under the FLSA, holding that TSCs are similarly situated.  The Court made two findings relevant to Plaintiffs' current motion.  First, the Court found that TSCs are "uniformly subjected to the same policy that classifies them as exempt under FLSA."  FLSA Order at 14:18-19.  Second, the Court found that TSCs "share similar job duties."  *Id.* at 16:17-19.

The Court's conclusions were based in part on HP's Job Architecture ("JA") Policy, which HP defines as a common system to "classify employees using a global hierarchy of jobs." Pilotin Decl., Ex. 1[6] at HP00001263; *id.*, Ex. 3 (Albert Depo.) at 86:25 (describing Job Architecture as a "common system").  HP adopted the JA Policy so that it could apply "a more standardized approach" to organizing its employees.  Albert Depo. at 85:12-13; *see also id.* at 86:13-14 (noting JA Policy was adopted to "better manage our employees and treat them on a consistent basis"); *id.* at 143:8-11 (noting JA Policy's focus "was to add consistency, was to add structure to what we had, was to add simplicity and just make it a little bit more streamlined and easier to manage the workforce").  As Plaintiffs describe below, this policy provides common evidence supporting certification under Rule 23.

**1.**  **HP's Job Architecture Policy applies companywide and categorizes employees based on their job duties.**

As the Court found previously, the JA Policy mandates that "employees performing the same work are assigned the same job title, as the system requires managers to assign job titles based on the nature of the job."  FLSA Order at 6:22-24; Albert Depo at 99:1-4 ("[T]he architecture was designed so that you map the employees based upon the content of the work that they're performing."); *id.* at 138:25-139:3 (explaining job title assignment focuses "on what is the content of that job, and therefore . . . the responsibilities that that person is going to be assigned to"); *id.* at 140:8-10 (explaining that managers categorize "employees into the architecture based upon the work that they are performing").  The Policy ensures that, "no matter where the work is

---

[6] Unless otherwise stated, citations to exhibits refer to exhibits of the Pilotin Declaration.

1    happening . . . if the work is similar," employees have the same job title.  Albert Depo. at 96:7-10.

2    This is because the Policy makes clear that "JA decisions are based on the job not the person."

3    Ex. 2 at HP00002350.

4           The JA Policy begins at a high level of classification, categorizing employees into various

5    groups and subgroups that ultimately culminate in a specific Job Title.  Ex. 1 at HP00001263 (JA

6    Policy is intended "to manage and sustain the structure of the company workforce by organizing

7    and classifying work into globally consistent job levels.").  At the highest level, jobs are

8    methodically categorized based on "Job Functions," which are then "subdivided into Job Families

9    based on type of work."  Ex. 2 at HP00002344; *see also* FLSA Order at 5:19-20.  In turn, Job

10   Families are subdivided into "Global Job Levels."  Ex. 2 at HP00002347; Ex. 1 at HP00001264.

11   The Job Level defines "job responsibilities & requirements" and determines whether an employee

12   is classified as exempt from overtime pay.  Ex. 2 at HP00002339-40; Albert Depo. at 123:4-11

13   (explaining how Job Levels determine exemption status); *see also* FLSA Order at 6:12-13.

14          HP classifies its employees into one of three categories, each of which has its separate set

15   of Job Levels: "Individual Contributor," "Supervisor/Manager," or "Executive."  Ex. 1 at

16   HP00001264-65.  In contrast to Managers, Individual Contributors do not manage other

17   employees and do not have "hire/fire authority [or] responsibility for performance management or

18   salary decisions."  Albert Depo. at 95:25-96:2; *see also* Ex. 1 at HP00001264 (defining an

19   "Individual contributor" as "roles where no direct people management responsibilities exist"); Ex.

20   4 (Ortolani Depo.) at 42:25-43:7 (distinguishing an "individual contributor" as a "nonleader"

21   from a leader, who is "[s]omeone who is responsible for managing or leading employees").

22   Within the Individual Contributor category, there are five standard Job Levels: Entry,

23   Intermediate, Specialist, Expert, and Master.  Ex. 2 at HP00002340.  Individual Contributors in

24   these Job Levels are uniformly classified as exempt from overtime pay in the United States.  Ex. 2

25   at HP00002340; Ex. 1 at HP00001264.

26          An HP employee's Job Title reflects the Job Function, Job Family, and Job Level into

27   which she is classified.  Ex. 2 at HP00002346; *see also* Albert Depo. at 97:10-14 (explaining that

28   employees are "mapped" by "identifying the appropriate job function, the appropriate family, and

1    then the appropriate level, based upon the content of work that that employee is performing and

2    the level of work that that employee is performing"). Each Job Title has a standardized job

3    description, which identifies "the responsibilities and requirements associated with a particular

4    job title." Ex. 2 at HP00002348.  As HP's Rule 30(b)(6) designee explained, a Job Title's job

5    description explains the "[p]rimary" or "key" duties "that you would expect a particular job to

6    have."  Albert Depo. at 134:4-5, 19-21 (stating that "primary" and "key" are used

7    "interchangeably"); *id.* at 88:25-89:3 ("If I'm a TC1, the job description clearly outlines for me

8    what a TC1 is, in terms of the roles and responsibilities, the knowledge, scope and impact.").

9    Employees in a particular Job Title perform the work set forth in the job description applicable to

10   all employees in that Job Title. *Id.* at 162:13-14; FLSA Order at 7:9-12.

11          If an employee's job duties change, she is "re-mapped" (*i.e.*, reassigned) to a new Job

12   Title that better reflects her responsibilities.  Albert Depo. at 161:13-17 ("So if a . . . particular

13   individual employee's responsibilities have changed, then the expectation of the company is that

14   the manager would map the employee to a job that represents what he or she is doing."); *id.* at

15   98:11 (explaining that if employees' responsibilities changed, one "would . . . remap them to

16   reflect that change in responsibilities"); FLSA Order at 7:12-13.

17          **2.    Technical Solutions Consultants are non-managers whom HP**
               **uniformly classifies as exempt.**
18

19          Under the JA Policy, all TSCs fall under the "Services" Job Function and the "Customer

20   Solutions Center – Technical" Job Family.  Ex. 5 at HP00000001; Ex. 6 at HP00008435; FLSA

21   Order at 5:22-6:2.  The State Classes include only TSC Is, TSC IIs, and TSC IIIs.  The JA Policy

22   provides that employees with these titles are Individual Contributors who fall within the Entry,

23   Intermediate, and Specialist Job Levels, respectively.  Ex. 6 at HP00008435 (showing Job Levels

24   for TSC I-III).  These Job Levels are the three lowest in the Individual Contributor category;

25   those TSCs in the Expert and Master Job Levels are not included in the State Classes.  Ex. 2 at

26   HP00002340; Ex. 6 at HP00008435.  The JA Policy uniformly classifies TSC Is, IIs, and IIIs as

27   exempt.  Ex. 2 at HP00002340.

28

As noted above, the JA job description for TSCs defines their primary job duties.  Albert Depo. at 134:4-5, 19-21; *see generally* Ex. 5 at HP00000001-2.  The job description explains that employees in the TSC I, II, and III positions share the following responsibilities, among others:

- "Successfully resolve technical issues (hardware and software) from incoming internal or external businesses and end user's contacts and proactive notification systems."

- "Respond to service, product, technical, and customer-relations questions on subjects such as features, specifications, and repairs on current and discontinued products, parts, and options, based on customer entitlement[.]"

- Work with customers "to avoid or reduce problem occurrence."

*Id*.  As explained further below, HP's Rule 30(b)(6) witnesses' testimony and the declarations of Class Members submitted herewith confirm that these are TSCs' primary job duties.

By HP's own job descriptions, a TSC I, II, or III is not defined to be a "trusted advisor for peers and customers alike" or a "subject matter expert."  *See* Ex. 5 at HP0000004.  They are not required to have a four-year college education.  *See id.* at HP0000003.  Moreover, to perform their roles, they need no more than three years of "experience in relevant technologies and customer environments."  *See id.* at HP0000003.

## C.      Class Members Work In Organizations That Provide Technical Support for HP Hardware and Software Products.

The State Classes include only TSCs who were or are employed by one of three HP organizations providing technical support for HP products: (1) HP Enterprise Group, Customer Solutions Center ("Enterprise Group"); (2) HP Software: Support Delivery / IMBU Support ("HPSW Support"); or (3) HP Software: Enterprise Security Products ("ESP").  TSC Is, IIs, and IIIs in these organizations are the quintessential help desk employees, whose classification as properly exempt or non-exempt may be determined with common proof.

According to HP's Rule 30(b)(6) designees, each of these organizations provide support for HP products, with the Enterprise Group principally supporting HP hardware and, as their names suggest, the HP Software organizations supporting HP software.  Ex. 7 (HPSW 30(b)(6) Depo.) at 11:18-12:4 (explaining that HPSW Support supports software products); Ex. 8 (Enter.

30(b)(6) Depo.) at 99:3-23 (explaining that Enterprise Group supports hardware); Ex. 9 (ESP

30(b)(6) Depo.) at 23:10-14 (discussing ESP's position under umbrella of HP Software).  Each of

these organizations follows the JA Policy.  HPSW 30(b)(6) Depo. at 58:20-23; Enter. 30(b)(6)

Depo. at 54:17-55:4; ESP 30(b)(6) Depo. at 32:17-19.  Consistent with that Policy, these

organizations designate individuals who perform technical troubleshooting as TSCs.  HPSW

30(b)(6) Depo. at 46:24-25; Enter. 30(b)(6) Depo. at 55:5-56:12, 57:11-59:5, 65:2-24; ESP

30(b)(6) Depo. at 29:8-12; 40:2-14; 41:25-42:6.  Importantly, these organizations—and, by

extension, the TSCs who work in them—do not design, develop, or engineer the HP products

they support.[7]  Nor do these organizations consult with customers to develop or customize their

computer systems.[8]  Rather, TSCs in each of these organizations all do the same thing: they

perform "break fix" work to resolve HP's customers' problems through a regimented

troubleshooting process.[9]

---

[7] HPSW 30(b)(6) Depo. at 147:22-148:19, 153:14-16, 154:21-25 (explaining that R&D is outside of the HPSW Support organization and "they are the developers, the writers of the products"); Enter. 30(b)(6) Depo. at 44:6-47:5, 65:21-24; 105:21-106:3 (explaining that TSCs fall in three tiers of customer support, and escalate to a separate R&D group and that TSC's primary job duty is customer support break/fix work); ESP 30(b)(6) Depo. at 45:20-25 (explaining that R&D, which is separate from the support team, includes the "people who develop the code [and] who write the software product itself"), 50:6-20, 53:22-23 (explaining that TSCs "would file the bugs . . . with the FastTrack team," which "is an R&D team that do not have the technical consulting job families or titles"); Benedict Decl. ¶¶ 14-15; Mustain Decl. ¶¶ 14-15; Vieira Decl. ¶¶ 14-15; Decl. 1 ¶¶ 13-15; Decl. 2 ¶¶ 14-15; Decl. 3 ¶¶ 14-15; Decl. 4 ¶¶ 14-16; Decl. 5 ¶¶ 14-15;; Decl. 6 ¶¶ 13-15; Decl. 7 ¶¶ 14-15; Decl. 8 ¶¶ 15-16; Decl. 9 ¶¶ 14-15 Decl. 10 ¶¶ 14-15; Decl. 11 ¶¶ 14-15; Decl. 12 ¶¶ 16-18; Decl. 13 ¶¶ 13-15; Decl. 14 ¶¶ 15-16; Decl. 15 ¶¶ 14-15.

[8] *E.g.*, HPSW 30(b)(6) Depo. at 54:12-25 (explaining that those in Professional Services, outside HPSW Support, "do client consultancy work"); Enter. 30(b)(6) Depo. at 36:7-16 (distinguishing between support and consulting); ESP 30(b)(6) Depo. at 29:3-19 (distinguishing between "Professional Services" and ESP, noting that "Professional Services" does not have TSCs). Benedict Decl. ¶ 9; Mustain Decl. ¶ 9; Vieira Decl. ¶ 9; Decl. 1 ¶ 9; Decl. 2 ¶ 9;  Decl. 3 ¶ 9; Decl. 4 ¶ 10; Decl. 5 ¶ 9; Decl. 6 ¶ 9; Decl. 7 ¶ 9; Decl. 8 ¶ 10; Decl. 9 ¶ 9; Decl. 10 ¶ 9; Decl. 11 ¶ 9; Decl. 12 ¶ 9; Decl. 13 ¶ 9; Decl. 14 ¶ 9; Decl. 15 ¶ 9;

[9] *See, e.g.,* HPSW 30(b)(6) Depo. at 76:5-77:7, 114:9-15 (a TSC serves as "a technical engineer that provides support for . . . customers" in HPSW Support, which "primarily deal[s] with a break fix situation"); Enter. 30(b)(6) Depo. at 105:21-106:3 (confirming that the Customer Solutions Center performs "Break Fix support"); ESP 30(b)(6) Depo. at 42:1-6 (noting that TSCs "primary responsibility is to provide the support function to our customers, " which includes "fielding customers' . . . problems, issues, bugs, bug reports, et cetera"); Benedict Decl. ¶¶ 6, 10-13; Mustain Decl. ¶¶ 6, 10-13; Vieira Decl. ¶¶ 6, 10-13; Decl. 1 ¶¶ 6, 10-13; Decl. 2 ¶¶ 6, 10-13; Decl. 3 ¶¶ 6, 10-13; Decl. 4 ¶¶ 7, 11-14; Decl. 5 ¶¶ 6, 10-13; Decl. 6 ¶¶ 6,10-13; Decl. 7 ¶¶ 6, 10-13; Decl. 8 ¶¶ 7, 11-14; Decl. 9 ¶¶ 6, 10-13; Decl. 10 ¶¶ 6, 10-13; Decl. 11 ¶¶  6, 10-13; Decl. 12 ¶¶ 6, 10-16; Decl. 13 ¶¶ 6, 10-15; Decl. 14 ¶¶ 6, 10, 12-15; Decl. 15 ¶¶ 6, 10-13.

1          TSCs in these organizations follow detailed procedures in responding to customer

2    requests.  After a customer contacts HP about a problem with their hardware or software, a ticket

3    or case is opened in HP's "SPARKS" or "OPT" system.[10]  The TSC then attempts to resolve the

4    problem, following strict HP procedural guidelines. ████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████   ████████████████████████████

7    ████████████████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████.  TSCs in ESP follow similarly regimented procedural guidelines

10   governing every aspect of their day to day work. ████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████.  Even the amount of time TSCs have

19   to respond to customers and elevate cases is predetermined, depending on the severity of the

20   incident.[11]

21   _____

22   [10] HPSW 30(b)(6) Depo. at 91:16-92:4 (explaining how incoming incidents are created, noting
     that "a case gets logged in SPARKS"); Enter. 30(b)(6) Depo. at 74:1-21 (explaining that "One

23   Page Tool [OPT] is the tool that my employees in Global Support Delivery use to record case
     information"); ESP 30(b)(6) Depo. at 95:15-18 (explaining that a "technical support consultant

24   opens a SPARKS ticket" after "a customer calls in with a new problem"); ██████████████████
     ████████████████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████ Benedict Decl.
     ¶ 11; Mustain Decl. ¶ 11; Vieira Decl. ¶ 11; Decl. 1 ¶ 11; Decl. 2 ¶ 11; Decl. 3 ¶ 11; Decl. 4 ¶ 12;

27   Decl. 6 ¶ 11; Decl. 7 ¶ 11; Decl. 8 ¶ 12; Decl. 9 ¶ 11; Decl. 10 ¶ 12; Decl. 11 ¶ 11; Decl. 12 ¶ 11;
     Decl. 13 ¶ 11; Decl. 14 ¶ 12; Decl. 15 ¶ 11;

28   [11] HPSW 30(b)(6) Depo. at 103:8-19 (explaining that customer's contract defines time to respond
     to customer); Enter. 30(b)(6) Depo at 76:22-80:8, ████████████████████████████████

Further, in attempting to resolve a customer's problem, the TSC relies on internal HP knowledge bases (*e.g.*, "iROCK," or "SAW,"), case notes in prior tickets, and/or external search engines (*e.g.*, Google).[12] Once the TSC searches for and identifies a technical solution for the customer's problem, she either sends the document providing the fix instructions to the customer, or logs onto the customer's machine remotely and implements the fix herself.[13] The ticket is then resolved, and TSCs are required to note the resolution in HP's ticketing system so that the ticket will be a resource if another customer experiences the same problem in the future.[14] If the TSC cannot promptly locate a fix for the problem, she must elevate the case to the next support level.[15]

TSCs are uniformly circumscribed to this limited troubleshooting role. They do not develop software or hardware, write code, or create fixes for bugs in the hardware or software being supported. *See*, *supra*, nn.7-8. Nor do they consult with customers regarding how their

██████████████████████; ESP 30(b)(6) Depo. at 96:24-97:8 (explaining time-to-respond requirements under SLAs); Benedict Decl. ¶ 11; Mustain Decl. ¶ 11; Vieira Decl. ¶ 11; Decl. 1 ¶ 11; Decl. 2 ¶ 11; Decl. 3 ¶ 11; Decl. 4 ¶ 12; Decl. 6 ¶ 11; Decl. 7 ¶ 11; Decl. 8 ¶ 12; Decl. 9 ¶ 11; Decl. 10 ¶ 11; Decl. 11 ¶ 11; Decl. 12 ¶ 12; Decl. 13 ¶ 10; Decl. 14 ¶ 12; Decl. 15 ¶ 11.

[12] HPSW 30(b)(6) Depo. at 123:19-124:3 (explaining that TSCs check knowledge base first when attempting to resolve a problem); Enter. 30(b)(6) Depo. at 81:5-7 ("[Y]ou go to the knowledge database to look up whether it has a correlation to the problem you're trying to solve"); ESP 30(b)(6) Depo. at 67:20-25 (explaining iRock is a "document repository for a lot of the knowledge within the ESP org");██████████████████████████████████████████ ██████████████████████████; Benedict Decl. ¶¶ 10-13; Mustain Decl. ¶¶ 10-13; Vieira Decl. ¶¶ 10-13; Decl. 1 ¶¶ 10-13; Decl. 2 ¶¶ 10-13; Decl. 3 ¶¶ 10-12; Decl. 4 ¶¶ 11-13; Decl. 5 ¶¶ 10-12; Decl. 6 ¶¶ 10-12; Decl. 7 ¶¶ 10-13; Decl. 8 ¶¶ 11-13; Decl. 9 ¶¶ 10-12; Decl. 10 ¶¶ 10-13; Decl. 11 ¶¶ 10-13; Decl. 12 ¶¶ 10-14; Decl. 13 ¶¶ 10-13; Decl. 14 ¶¶ 10-13; Decl. 15 ¶¶ 10-12.

[13] Benedict Decl. ¶ 12; Mustain Decl. ¶ 12; Vieira Decl. ¶ 12; Decl. 1 ¶ 12; Decl. 2 ¶ 12; Decl. 3 ¶ 12; Decl. 4 ¶ 13; Decl. 6 ¶ 12; Decl. 7 ¶ 12; Decl. 8 ¶ 13; Decl. 9 ¶ 12; Decl. 10 ¶ 12; Decl. 11 ¶ 12.

[14] ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████; Mustain Decl. ¶ 11; Vieira Decl. ¶ 11; Decl. 1 ¶ 11; Decl. 2 ¶ 11; Decl. 3 ¶ 11; Decl. 4 ¶ 12; Decl. 5 ¶ 12; Decl. 6 ¶ 11; Decl. 7 ¶ 11; Decl. 8 ¶ 12; Decl. 9 ¶ 11; Decl. 10 ¶ 11; Decl. 11 ¶ 11; Decl. 12 ¶ 12; Decl. 13 ¶ 12; Decl. 14 ¶¶ 10, 12; Decl. 15 ¶ 11.

[15] HPSW 30(b)(6) Depo. at 95:3-96:8 (explaining use of different support levels); Enter. 30(b)(6) Depo. at 44:6-45:4 (explaining progression of cases through levels of support); ESP 30(b)(6) Depo. at 46:2-7; 47:18-50:5 (same);████████████████████████; Benedict Decl. ¶ 13; Mustain Decl. ¶ 13; Vieira Decl. ¶ 13; Decl. 1 ¶ 13; Decl. 2 ¶ 13; Decl. 3 ¶ 13; Decl. 4 ¶ 14; Decl. 5 ¶ 13; Decl. 6 ¶ 13; Decl. 7 ¶ 13; Decl. 8 ¶ 14; Decl. 9 ¶ 13; Decl. 10 ¶ 13; Decl. 11 ¶ 13; Decl. 12 ¶ 14; Decl. 13 ¶ 13; Decl. 14 ¶ 14; Decl. 15 ¶ 13.

computer systems should be designed.  *Id.*  Such work is done by other groups, all of which are outside of the support organizations at issue.  *Id.*

## II.     ARGUMENT

### A.     Legal Standard for Class Certification

Class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see also Nelson*, 2015 WL 1778326, at *4 (explaining requirements of Rule 23(a)).  For a class seeking damages, there must also be questions of law or fact common to class members that predominate over any questions affecting only individual members, and the class action must be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

In determining whether a class should be certified "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) (citations omitted); *Nelson*, 2015 WL 1778326, at *5 (same).

### B.     Rule 23(a)(1): Numerosity is Satisfied Because There Are Sufficiently Numerous Class Members Such that Joinder is Impracticable.

Rule 23(a)(1) requires class members to be "so numerous that joinder of all members is impracticable."  There is not "a specific number of class members required for numerosity."  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (Jenkins, J.).  While the requirement is presumptively met when there are 40 or more class members, courts have certified classes with as few as 14 class members.  *See, e.g.*, *In re Cirrus Logic Secs.*, 155 F.R.D. 654, 656 (N.D. Cal. 1994); *see also Nelson*, 2015 WL 1778326, at *5 ("Courts have repeatedly held that

1    classes comprised of 'more than forty' members presumptively satisfy the numerosity

2    requirement.") (citing *DuFour v. BE LLC*, 291 F.R.D. 413, 417 (N.D. Cal. 2013)).

3        "A court may make common sense assumptions to support a finding that joinder would be

4    impracticable." *In re Rubber Chems.*, 232 F.R.D. at 350. Factors a court may consider with

5    respect to numerosity include "the geographical diversity of class members, the ability of

6    individual members to institute separate suits, and the nature of the underlying action and the

7    relief sought." *Nat'l Ass'n of Radiation Survivors v. Walters*, 111 F.R.D. 595, 599 (N.D. Cal.

8    1986) (citations omitted) (Patel, J.); *see also Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp.

9    2d 1114, 1121 (E.D. Cal. 2009) (same). Whether joinder is impracticable depends on the "facts

10   and circumstances of each case." *Marilley v. Bonham*, No. C-11-02418-DMR, 2012 WL 851182,

11   at *3 (N.D. Cal. Mar. 13, 2012) (Ryu, M.J.); *Torres v. Mercer Canyons, Inc.*, No. 1:14–cv–

12   03032–SAB, 2015 WL 1641519, at *3 (E.D. Wash. Apr. 8, 2015) (same).

13       According to HP's data, the California, Colorado, and Massachusetts classes have 213,

14   147, and 43 members respectively. Pilotin Decl. ¶¶ 4(a)-4(c). Because membership in each State

15   Class exceeds 40, each of them presumptively satisfy numerosity. *See, e.g.*, *Nelson*, 2015 WL

16   1778326, at *5 (observing presumption of numerosity when class membership exceeds forty)

17   (citation omitted).

18       Further, common sense shows that joinder is impracticable as to each of the State Classes.

19   First, it is unlikely that individual employees will institute separate suits. As federal and state

20   courts alike recognize, fear of retaliation severely curtails the likelihood individual employees

21   will institute separate law suits, making employment class actions valuable. *See, e.g.*, *Gentry v.

22   Superior Court*, 42 Cal. 4th 443, 460 (2007) (noting that "federal courts have widely recognized

23   that fear of retaliation for individual suits against an employer is a justification for class

24   certification in the arena of employment litigation") (citing cases); *see also O'Brien v. Encotech

25   Const. Servs., Inc.*, 203 F.R.D. 346, 351 (N.D. Ill. 2001) (finding numerosity met by 30-person

26   class seeking overtime because "a very important concern is the fear of retaliation for individual

27   employees required to file individual claims"). Here, this fear is amplified when many Class

28   Members are current HP employees. *See also Romero v. Producers Dairy Foods, Inc.*, 235

1   F.R.D. 474, 485 (E.D. Cal. 2006) (noting that "numerosity requirement is more readily met where

2   a class contains employees suing their present employer").  Second, individual employees are not

3   likely to sue to recover overtime in light of the time and financial burdens litigation places on

4   litigants.  Finally, Class Members may be geographically dispersed: it is not apparent that all

5   Class Members still reside in the states in which they were once employed.  And, even if they did

6   and even if they elected to sue, it would be inefficient for a multitude of lawsuits to be prosecuted

7   throughout these states.  *See, e.g.*, *O'Brien*, 203 F.R.D. at 350 ("Were plaintiffs to file multiple

8   claims under multiple laws in multiple fora, precious judicial resources would be wasted on

9   duplicative lawsuits.").

10      **C.      Rule 23(a)(2): Commonality is Satisfied Because There Are Questions of Law
11              and Fact Common to Members of the Proposed Classes.**

12          Federal Rule of Civil Procedure 23(a)(2) requires that "questions of law or fact common

13   to the class" exist.  "[C]ommonality requires that the class members' claims depend upon a

14   common contention such that determination of its truth or falsity will resolve an issue that is

15   central to the validity of each claim in one stroke."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161,

16   1165 (9th Cir. 2014) (citations and internal quotation marks omitted).

17          Commonality imposes only a "limited burden."  *Mazza v. Am. Honda Motor Company,*

18   *Inc.*, 666 F.3d 581, 589 (9th Cir. 2012).  So "long as there is even a single common question, a

19   would-be class can satisfy" commonality.  *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)

20   (citation and internal quotation marks omitted).  To determine whether commonality is met, a

21   court must consider "the nature of the underlying claims."  *Parsons*, 754 F.3d at 676 (citations

22   omitted).

23          As explained further below, Plaintiffs present multiple common questions that can be

24   resolved by common proof, thereby "generat[ing] common answers" that will "drive the

25   resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)

26   (internal quotation and citation omitted).

27

28

1

### 1. Class claims for overtime pay, waiting-time penalties, and inadequate wage statements entail common questions of fact and law.

2

3        Under the laws of their respective states, the State Classes assert claims for HP's failure to

4    provide overtime pay, for waiting-time penalties, and for HP's failure to maintain adequate wage

5    statements.  These claims pose common legal questions, including (1) whether any applicable

6    state overtime exemption applies to TSCs, and (2) whether HP failed to maintain adequate time

7    records for Class Members.  Likewise, the claims pose common factual questions central to these

8    claims, including

9                (1) whether HP uniformly classifies TSCs as exempt from overtime
                 pay requirements, so as to deprive them of overtime pay;
10

                 (2) whether TSCs' duties and responsibilities involve work related
11               to HP's management policies or HP's general business operations;

12               (3) whether TSCs customarily and regularly exercise discretion and
                 independent judgment;
13

                 (4) with respect to the California Class, whether TSCs determine
14               hardware, software, or system functional specifications;

15               (5) with respect to the California Class whether TSCs design,
                 develop, document, analyze, create, test, or modify computer
16               systems or programs based on and related to user or system design
                 specifications; and
17

                 (6) with respect to the California Class, whether TSCs document,
18               test, create, or modify computer programs related to the design of
                 software or hardware for computer operating systems.
19

20    Because common evidence shows that TSCs have the same primary job duties and are subject to

21    HP's uniform JA Policy, these questions can be resolved through a classwide proceeding.

22        These various, significant common legal and factual questions more than sufficiently

23    satisfy commonality.  Courts routinely hold that commonality exists in overtime misclassification

24    cases where the plaintiff simply alleges that that all subject employees faced a common wrong by

25    being "misclassified as exempt." *Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419, 426 (N.D. Cal.

26    2011) (Seeborg, J.); *Bowerman v. Field Asset Servs., Inc.*, No. 13-CV-00057-WHO, 2015 WL

27    1321883, at *14 (N.D. Cal. Mar. 24, 2015) (finding commonality met because the "key legal

28    issue underlying this case is whether putative class members were misclassified under California

1  law as independent contractors instead of employees") (Orrick, J.); *see also Grenawalt v. AT&T*

2  *Mobility*, No. 11 Civ. 2664 (ALC), 2014 WL 4832318, at *4 (S.D.N.Y. Sept. 29, 2014) (holding

3  commonality met because of allegation that employer "perpetrated a common wrong against them

4  in misclassifying them as independent contractors and failing to pay them overtime and regular

5  wages in connection with their work") (citing cases); *Perez v. Allstate Ins. Co.*, No 11-CV-1812

6  (JFB)(AKT), 2014 WL 4635745, at *15 (E.D.N.Y. Sept. 16, 2014) (holding commonality met

7  based on question of whether class members "are properly exempt from the overtime

8  requirements of" state law); *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1143

9  (2012) ("'[c]laims alleging that a uniform policy consistently applied to a group of employees is

10  in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for

11  class treatment'") (quoting *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1033 (2012)).

12  **2.  The proposed California Class's additional claims for missed meal and rest breaks and unfair competition raise common questions of fact and law.**

13

14  In addition, the proposed California Class also asserts claims for missed meal and rest

15  breaks and unfair competition.  These claims pose common legal questions, including (1) whether

16  HP violated California's UCL by violating California's labor laws and (2) whether HP complied

17  with California's requirement to provide meal and rest breaks.  There are additional common

18  factual questions that pertain specifically to the proposed California Class, including (1) whether

19  HP lacks a policy relieving TSCs of all duties so they may take the requisite meal and rest breaks

20  and (2) whether HP failed to pay for missed meal and rest breaks.  *See Bradley*, 211 Cal. App. 4th

21  at 1150 (holding common question predominated where plaintiffs "challeng[ed] the fact that the

22  employer's *lack* of a policy violated the law") (emphasis in original); *see also Wang v. Chinese*

23  *Daily News, Inc.*, No. 2:04-cv-01498-CBM(AJWx), 2014 WL 1712180, at *7 (C.D. Cal. Apr. 15,

24  2014) ("[C]urrent California and federal law affirm that [the defendant's] uncontested lack of any

25  meal or break policy is strong evidence favoring class certification in this matter.")

26

27

28

**D.   Rule 23(a)(3): Typicality is Satisfied Because Plaintiffs' Claims are Reasonably Co-Extensive with Those of the Absent Class Members.**

To satisfy typicality, Plaintiffs' claims must be "reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation and internal quotation marks omitted).  This is a permissive standard.  *Nelson*, 2015 WL 1778326, at *7 (citing *Ries v. Ariz. Beverages USA*, 287 F.R.D. 523, 539 (N.D. Cal. 2012)).

Each Plaintiff was a TSC who received no overtime pay while he was employed as a TSC by HP, and each Plaintiff has wage and hour claims that are typical of the absent Class Members. Those claims stem from the same conduct: HP's policies requiring TSC I, II, or IIIs to perform non-exempt work, while uniformly misclassifying them as exempt from overtime pay requirements.  Typicality is therefore met.

**E.   Rule 23(a)(4), (g): Plaintiffs and Their Counsel will Fairly and Vigorously Represent the Interests of the State Classes.**

The adequacy determination requires answering "two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* (citation omitted).  "Adequate representation is usually presumed in the absence of contrary evidence."  *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) (Armstrong, J.) (citations omitted); *Brown v. Hain Celestial Grp., Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *14 (N.D. Cal. Nov. 18, 2014) (same) (Beeler, J.).

Plaintiffs readily satisfy the adequacy requirement.  They share the same grievances against HP as the absent Class Members and have the same interests as the absent Class Members in obtaining redress from HP.  They will vigorously prosecute this action to recover overtime pay and related relief from HP.

Class Counsel likewise will vigorously prosecute this action on Plaintiffs' and Class Members' behalf, thereby satisfying the requirements of Rule 23(a)(4) and 23(g).  Class Counsel investigated this case and filed the original complaint Mr. Benedict's behalf.  Dermody Decl. ¶ 6. Both firms have substantial experience in class actions, including wage and hour class actions. Dermody Decl. ¶¶ 4-5, Ex. A; Safafi Decl. ¶¶ 4-5.  Moreover, both firms have been appointed lead counsel in numerous such cases.  Dermody Decl. ¶ 5; Safafi Decl. ¶ 5.  Both firms will commit the necessary resources to vindicate Plaintiffs' and Class Members' rights.  Dermody Decl. ¶ 8; Safafi Decl. ¶ 6.

**F.      Rule 23(b)(3): Plaintiffs Satisfy the Predominance and Superiority Requirements.**

**1.      Common questions of law and fact predominate.**

Federal Rule of Civil Procedure 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]"  This analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (citations and internal quotation marks omitted).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is 'clear justification' for certifying a class action."  *Nelson*, 2015 WL 1778326, at *9 (quoting *Hanlon*, 150 F.3d at 1022).  Importantly, predominance does not require "that each element of [a plaintiff's] claim is susceptible to classwide proof."  *Amgen*, 133 S. Ct. at 1196 (citation and internal brackets and quotation marks omitted).  Courts have "held that common questions predominated even though certain class members' circumstances varied and some of the defendant's practices would have to be proven by anecdotal testimony."  *Delagarza v. Tesoro*

1    *Refining & Mktg. Co.*, No. C–09–5803 EMC, 2011 WL 4017967, at *12 (N.D. Cal. Sept. 8, 2011)

2    (Chen, J.) (citation omitted).

3         In a misclassification action like this one, the "balance between individual and common

4    issues" hinges on the existence of "comprehensive uniform policies detailing the job duties and

5    responsibilities of employees [which] carry great weight for certification purposes." *In re Wells*

6    *Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958-59 (9th Cir. 2009) (citing *Damassia*

7    *v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008); *see also Perez*, 2014 WL 4635745,

8    at *7 ("[U]niform corporate procedures and policies are unquestionably probative of . . . actual

9    duties.") (citations and internal quotation marks omitted). "Such centralized rules, to the extent

10   they reflect the realities of the workplace, suggest a uniformity among employees that is

11   susceptible to common proof." *Wells Fargo*, 571 F.3d at 958-59. Predominance can be met

12   where, as here, "the employer exercised some level of centralized control in the form of

13   standardized hierarchy, standardized corporate policies and procedures governing employees,

14   uniform training programs, and other factors susceptible to common proof." *Vinole v.*

15   *Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (citing cases). "[U]niformity

16   in work duties and experience . . . diminish the need for individualized inquiry." *Id.* at 947

17   (quoting affirmed lower court opinion).

18        Here, there are various types of undisputed common evidence showing that common

19   questions predominate over individual inquiries. First, HP uniformly classifies TSCs as exempt.

20   *See* Ex. 2 at HP00002340. As the Ninth Circuit instructed in *Wells Fargo*, "an exemption policy

21   is a permissible factor for consideration under Rule 23(b)(3)." 571 F.3d at 957. This is because

22   "[a]n internal policy that treats all employees alike for exemption purposes suggests that the

23   employer believes some degree of homogeneity exists among the employees." *Id.*; *see also*

24   *Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 359 (D. Conn. 2013) (noting that

25   defendant's blanket exemption "decision to classify all [employees] as exempt is relevant to

26   deciding whether the Massachusetts plaintiff's jobs were similar in ways material to the

27   establishment of the exemption criteria") (citation and internal quotation marks omitted).

28

1    However, HP's exemption policy is not the only common evidence binding Class Members

2    together.

3         Second, HP's JA Policy defines and constrains what TSCs do.  As explained above, the

4    JA Policy provides a hierarchical classification system that gives employees a job title based on

5    "what he or she is doing."  *E.g.*, Albert Depo. at 161:16-17; *see generally*, *supra*, § I.B.1.  In other

6    words, employees are classified as TSCs because they all do the same thing.  What TSCs do is

7    encapsulated by the uniform job description the JA Policy provides, which summarizes the

8    "[p]rimary" or "key duties that you would expect a [TSC] to have."  Albert Depo. at 134:4-5, 19-

9    21; *id.* at 132:20-22 (noting that job description "identif[ies] the most critical responsibilities, the

10   top five critical responsibilities").  For TSCs, these primary duties revolve around "resolv[ing]

11   technical issues" and answering customer questions. Ex. 5 at HP00000001.  The JA Policy

12   likewise defines the level of expertise and "impact" TSCs in the State Classes have: they are not

13   high-level advisors or "subject matter expert[s]."  *Id.* at HP00000004.  This is important because

14   it further limits what TSCs in the State Classes do: by operation of the JA Policy, if the TSCs in

15   the State Classes were high-level advisors or subject-matter experts, or if they acquired such

16   responsibilities over time, they would be re-classified as a TSC IV or V, and therefore excluded

17   from the case.  Albert Depo. at 161:13-17 (explaining that, if a "particular individual employee's

18   responsibilities have changed,"  he or she will be placed into a new job title); *id.* at 163:1-4

19   (explaining that "a manager is going to appropriately classify an employee based upon the type of

20   work they were doing and the level of work that they're doing").  Thus, the JA Policy is common

21   evidence of who TSCs are and what they do.

22        Third, the functions of the organizations in which Class Members work constitutes

23   common evidence of what TSCs do.  HP structured its business units based on their functions.

24   Ex. 1 at HP00001263-64.  As Rule 30(b)(6) witnesses testified, Class Members in the

25   organizations at issue here perform solely "help desk" responsibilities, supporting—but not

26   developing, engineering, or consulting with HP customers about—HP products.  But if a

27   customer's case raises a technical flaw in one of HP's products, requiring re-programming the

28   product or addressing other issues under the hood, that is not a problem that a TSC in the

1    Enterprise Group, HPSW Support, or ESP handles.  *See*, *supra*, nn.7, 9.  Likewise, if a customer's

2    case raises an issue regarding what system may be appropriate for that customer's needs, that is

3    not addressed by a TSC in the State Classes.  *See*, *supra*, n.8.  In such cases, the TSC must refer

4    the case to other HP employees outside of these organizations.  *See*, *supra*, nn.7, 8.

5            Fourth, to perform their support work for these organizations, TSCs uniformly follow the

6    same processes.  *See*, *supra*, nn.10-11.  HP's process and technical documents thus present

7    common proof of TSCs' jobs.  These documents detail the processes, procedures, and steps TSCs

8    follow in supporting HP's customers.  *E.g.*, HPSW 30(b)(6) Depo. at 162:22-25 (explaining

9    "process overview"); Enter. Group 30(b)(6) Depo. at 76:22-80:8; ESP 30(b)(6) Depo. at 58:11-12

10   (explaining "procedure document").  These standardized documents, as an HP Rule 30(b)(6)

11   witness explained, are used "for our business consistency" and they show "how our business

12   works at the end of the day."  HPSW 30(b)(6) Depo. at 86:21-22, 86:10-11; *see also id.* at 80:5

13   ("It's a way of documenting the process.").  Indeed, this consistency is important to HP and its

14   marketing.  HP uses its documented standardized processes to obtain certification from industry

15   groups such as the Technical Services Institute Association ("TSIA").  *Id.* at 85:24-86:15; *see*

16   *also* ███████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   (emphases added).  Such a certification constitutes "recognition of [HP's] operational or business

20   excellence" and "creates sales opportunities" for HP.  HPSW 30(b)(6) Depo at 167:17-168:5.

21           Fifth, the declarations of the named Plaintiffs and 15 Class Members corroborate the

22   documentary evidence and HP's Rule 30(b)(6) witnesses' testimony.  The declarations, taken

23   together, reveal that Class Members perform the same job, demonstrating that HP's JA Policy—

24   by design—has successfully categorized employees doing the same work into the same job title.

25           Finally, with respect to the proposed California Class, HP's lack of policy providing

26   TSC's with meal and rest breaks is common evidence for the class's meal-and-rest break claim

27   under the California Labor Code.  As California courts have held, class certification is appropriate

28   where an employer fails "to adopt a policy authorizing and permitting meal and rest breaks to its

technicians." *Benton v. Telecom Network Specialists, Inc.*, 220 Cal. App. 4th 701, 726 (2013); *see also Bradley*, 211 Cal. App. 4th at 1149; *Wang*, 2014 WL 1712180, at *7.

Such common evidence answers the question of what TSCs do, a central issue in this case for the State Classes as a whole.  Courts routinely hold that Rule 23(b)(3) is met when presented with this kind of common evidence.  *See, e.g.*, *Vinole*, 571 F.3d at 947; *Nelson*, 2015 WL 1778326, at *9; *Perez*, 2014 WL 4635745, at *20 (predominance met where the primary job duties of [class members] are largely similar for purposes of the . . . exemption determination"); *Damassia*, 250 F.R.D. at 159-61; *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 443 (C.D. Cal. 2014).

The Court's recent decision in *Nelson* is instructive.  There, the Court found predominance met based on "common proof that relies in no small part on the nature of [the employees'] duties." *Nelson*, 2015 WL 1778326, at *9.  While the defendant insisted that "a determination of liability by the Court requires individualized inquiries regarding how DSMs actually perform their job duties," the Court nevertheless certified the class, reasoning that "plaintiffs can still certify a class when they show uniformity in work duties and experiences that would diminish the need for individualized inquiry." *Id.* at *9-10 (citation and internal quotation marks omitted).  Similarly here, Plaintiffs present common proof—via standardized corporate policies and procedures governing employees' work, as well as the consistent testimony of Class Members—of what TSCs do.

*Boyd* is another recent overtime misclassification case that also supports class certification here.  There, as in *Nelson*, predominance was satisfied because, among other things, the "job descriptions of [the employees] are standardized nationwide," the "[employees] receive their assignments through the same computer program . . . and they may not pick and choose those assignments," the defendant "has standardized compensation policies that apply to all [employees]," and the defendant "promulgated several detailed guidelines to direct the conduct of [the employees]."  300 F.R.D. at 442-43 (citations and internal quotation marks omitted).  As this Court did in *Nelson*, the *Boyd* court recognized that, while "[s]everal individual inquiries still remain," a "close look" revealed "that common questions predominate over individual ones." *Id.*

1  at 443 (citations and internal quotation marks omitted).  The same facts supporting predominance

2  *Boyd* exist here.  TSCs work pursuant to a standardized job description that identifies their

3  primary duties, their assignments are assigned through and recorded in centralized ticketing

4  systems, they are uniformly classified as exempt, and they follow standardized, documented

5  processes from centralized repositories that HP uses to obtain highly-marketable certifications.

6        Finally, *Damassia*, which the Ninth Circuit cited with approval in *Wells Fargo* and

7  *Vinole*, likewise supports a finding of predominance.  There, the district court held predominance

8  was satisfied in part because "the duties and responsibilities of assistant managers are 'centrally

9  derived.'"  250 F.R.D. at 159 (citation omitted).  The court noted that where "there is evidence

10  that the duties of the job are largely defined by comprehensive corporate procedures and policies,

11  district courts have routinely certified classes of employees challenging their classification as

12  exempt, despite arguments about 'individualized' differences in job responsibilities."  *Id.* at 160

13  (citing cases).  That is precisely what HP's JA Policy does here.  As in *Damassia*, HP's JA Policy

14  centrally defines TSCs' job duties and responsibilities.  HP's Rule 30(b)(6) witnesses' testimony

15  and Class Members' declarations confirm the effectiveness of the JA Policy, showing that TSCs

16  perform the same work.

17        To the extent that HP can point to any individualized issues between Class Members, they

18  are not of "such a magnitude as to cause individual issues to predominate."  *Damassia*, 250

19  F.R.D. at 160.  Any differences it may cite now did not influence its decision to classify all TSCs

20  as exempt, regardless of the business unit in which they work.  *See Youngblood v. Family Dollar*

21  *Stores, Inc.*, No. 09 Civ. 3176, 2011 WL 4597555, at *5 (S.D.N.Y. Oct. 4, 2011) (giving little

22  weight to differences among class members cited by the defendant where such differences were

23  not considered in classifying the class members as exempt); *Myers v. Hertz Corp.*, 624 F.3d 537,

24  549 (2d Cir. 2010) ("[A] blanket [classification] policy . . . suggests the employer believes some

25  degree of homogeneity exists among the employees, and is thus in a general way relevant to the

26  [predominance] inquiry . . . .") (citation and internal quotation marks omitted).

27

28

**2.**     **A class action is the superior method to adjudicate proposed class members' claims.**

Rule 23(b)(3) also requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  This requires the Court to determine "'whether the objectives of the particular class action procedure will be achieved in the particular case.'"  *Nelson*, 2015 WL 1778326, at *10 (quoting *Hanlon*, 150 F.3d at 1023).  In making this determination, a court may consider

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, these factors favor a superiority finding.  First, Class Members likely have little interest in individually controlling the prosecution of separate actions.  As already explained, because of the burdens of litigation and fears of retaliation, individual employees are unlikely to sue on their own.  The Court previously held such retaliation concerns to support a finding of superiority.  *Nelson*, 2015 WL 1778326, at *10 (explaining that class action was superior because "[a]llowing Plaintiffs to proceed in a representative capacity ensures that all class members will receive their day in court without requiring current employees . . . to risk their employment to receive that right").

Second, Plaintiffs are unaware of any litigation with respect to recovering overtime pay for TSCs in California, Colorado, or Massachusetts.

Third, it is highly desirable to have the Class Members' claims adjudicated in this court. HP is headquartered within the District and maintains substantial operations here. In addition, many Class Members work in or near the District. In fact, the largest concentration of Class Members is in California.

1    Finally, classwide resolution of Class Members' claims will be manageable. The central

2    issue of liability will hinge on the factfinder's evaluation of the several categories of common

3    proof outlined above, along with representative testimony regarding Class Members' daily duties.

4    In *Tierno v. Rite Aid Corp.*, which the Ninth Circuit cited approvingly in *Vinole*, the court

5    rejected the notion that "an overtime [misclassification] class action would necessarily

6    'degenerate into a multitude of mini-trials.'"  No. C 05-02520 TEH, 2006 WL 2535056, at *11

7    (N.D. Cal. Aug. 31, 2006) (citing *Sav-On Drug Stores v. Superior Court*, 34 Cal. 4th 319, 332

8    (2004)) (Henderson, J.).  The court observed:

9
> [C]ourts in overtime cases such as this may properly couple
10  uniform findings on common issues regarding the proper
> classification of the position at issue with innovative procedural
11  tools that can efficiently resolve individual questions regarding
> eligibility and damages.  Such tools include administrative
12  miniproceedings, special master hearings, and specially fashioned
> formulas or surveys.

13   *Id.*; *see also Boyd.*, 300 F.R.D. at 444 (same).  The same holds true here.

14   **III.    CONCLUSION**

15    For the foregoing reasons, Plaintiffs respectfully request that the Motion for Class

16   Certification be granted, with Mr. Benedict, Mr. Mustain, and Mr. Vieira serving as California,

17   Colorado, and Massachusetts class representatives, respectively, and LCHB and O&G appointed

18   as Class Counsel.

19

20   Dated:  May 7, 2015                    Respectfully submitted,

21                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

22                                          By: _____/s/ *Kelly M. Dermody*_____
                                                  Kelly M. Dermody
23

24                                          Kelly M. Dermody (Cal. Bar No. 171716)
                                            Daniel M. Hutchinson (Cal. Bar No. 239458)
25                                          Anne B. Shaver (Cal. Bar No. 255928)
                                            Marc A. Pilotin (Cal. Bar No. 266369)
26                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
27                                          San Francisco, CA 94111-3339
                                            Telephone:  (415) 956-1000
28                                          Facsimile:   (415) 956-1008
                                            E-Mail: kdermody@lchb.com

1    E-Mail: dhutchinson@lchb.com
     E-Mail: ashaver@lchb.com
2    E-Mail: mpilotin@lchb.com

3    Jahan C. Sagafi (Cal. Bar No. 224887)
     OUTTEN & GOLDEN LLP
4    One Embarcadero Center, 38th Floor
     San Francisco, CA 94111
5    Telephone:  (415) 638-8800
     Facsimile:  (415) 638-8810
6    E-Mail: jsagafi@ outtengolden.com

7    Adam T. Klein (admitted pro hac vice)
     Juno Turner (admitted pro hac vice)
8    OUTTEN & GOLDEN LLP
     3 Park Avenue, 29th Floor
9    New York, New York 10016
     Telephone:  (212) 245-1000
10   Facsimile:   (212) 977-4005
     E-Mail: atk@outtengolden.com
11   E-Mail: jturner@outtengolden.com

12   *Attorneys for Plaintiffs and proposed Class Members*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -                    PLTFS' MTN FOR CLASS CERT PURSUANT TO R. 23
                                                          CASE NO. 13-0119 BLF