1   Wendy M. Lazerson, SBN 97285
    wlazerson@sidley.com
2   Caryn F. Horner, SBN 273500
    chorner@sidley.com
3   SIDLEY AUSTIN LLP
    1001 Page Mill Road
4   Building 1
    Palo Alto, California  94304
5   Telephone:  (650) 565-7000
    Facsimile:  (650) 565-7100
6
7   Max C. Fischer, SBN 226003
    mfischer@sidley.com
8   David R. Carpenter, SBN 230299
    drcarpenter@sidley.com
9   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
10  Los Angeles, California  90013-1010
    Telephone:  (213) 896-6000
    Facsimile:  (213) 896-6600
11
    Attorneys for Defendant and Counterclaimant Hewlett-Packard Company
12

**REDACTED VERSION**
OF DOCUMENT SOUGHT
TO BE SEALED

13          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
14             SAN JOSE DIVISION

15  ERIC BENEDICT, RICHARD BOWDERS,       ) Case No. C13-0119-BLF
    KILRICANOS VIEIRA, and DAVID          )
16  MUSTAIN on behalf of themselves and classes )
    of those similarly situated,          )
17              Plaintiffs,               ) **DEFENDANT HEWLETT-PACKARD**
                                          ) **COMPANY'S OPPOSITION TO**
18       v.                               ) **PLAINTIFFS' MOTION FOR CLASS**
                                          ) **CERTIFICATION**
19  HEWLETT-PACKARD COMPANY,              )
              Defendant.                  ) Date:  July 30, 2015
20                                        ) Time:  9:00 a.m.
                                          ) Courtroom:  3
21  _____ ) Judge:  Hon. Beth Labson Freeman
                                          )
22  ERIC BENEDICT,                        )
              Counterdefendant,           )
23                                        )
         v.                               )
24                                        )
    HEWLETT-PACKARD COMPANY,              )
25            Counterclaimant.            )
26  _____ )

27

28

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND .................................................................................................... 2

     A.      The Parties and this Litigation ................................................................. 2

     B.      HP's Job Architecture Provides High-Level, General Guidance But Does
            Not Dictate Actual Job Duties ................................................................... 4

     C.      Roles and Duties Vary Among and Within Groups................................... 6

            1.      Putative Class Members ("TSCs") in HPSW ............................... 6

            2.      TSCs in Enterprise Group Technology Services ("EG TS")...................... 8

            3.      There Are No Uniform Procedures Dictating the Substance of
                  Employees' Work .......................................................................... 10

III.    LEGAL STANDARDS .......................................................................................... 12

     A.      Class Certification Standards.................................................................... 12

     B.      The Underlying State Law Exemptions..................................................... 13

IV.     ARGUMENT ......................................................................................................... 16

     A.      Courts Have Frequently Denied Class Treatment of Technology Worker
            Misclassification Claims, Despite a Common Job Title...................................... 16

     B.      The Record Here Shows That the Job Code Does Not Dictate Employees'
            Actual Duties, Making Individualized Inquiries Necessary and Defeating
            Predominance ............................................................................................ 18

            1.      The Job Architecture Is Not Any Significant Form of Common
                  Proof............................................................................................... 18

            2.      Individual Inquiries Are Necessary into Each TSC's Mixture of
                  Tasks and to Determine What Constitutes the TSC's Primary Duty........ 19

     C.      Plaintiffs' "Processes" and "Procedures" Evidence Is Not Sufficient to
            Show Misclassification on a Classwide Basis, Without Needing Individual
            Inquiries .................................................................................................... 21

     D.      Certification Should Be Denied As to Each State Class For Additional
            Reasons ..................................................................................................... 23

            1.      Massachusetts ................................................................................ 23

            2.      California ........................................................................................ 24

1

3.      Colorado...................................................................................... 25

E.      Plaintiffs Also Fail to Establish Superiority ........................................................ 25

V.      CONCLUSION................................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aburto v. Verizon Cal.*,
No. CV-11-03683, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012) ..................................................... 18

*Alakozai v. Chase Inv. Servs. Corp.*,
No. CV 11-09178, 2014 WL 5660697 (C.D. Cal. Oct. 6, 2014) ................................................. 24

*Badella v. Deniro Mktg LLC*,
No. C 10-03908, 2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ................................................... 25

*Bernard v. Group Pub., Inc.*,
970 F. Supp. 2d 1206 (D. Colo. Sept. 13, 2013) ....................................................................... 16

*Blake v. Hewlett-Packard Co.*,
No. 11-CV-592, 2013 WL 3753965 (S.D. Tex. July 11, 2013) .................................................. 18

*Boyd v. Bank of Am. Corp.*,
300 F.R.D. 431 (C.D. Cal. 2014) .......................................................................................... 22, 23

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ............................................................................................... 24

*Clarke v. JPMorgan Chase Bank, N.A.*,
No. 08 Civ. 2400, 2010 WL 1379778 (S.D.N.Y. Mar. 26, 2010) .............................................. 16

*Combs v. Skyriver Commc'ns*,
159 Cal. App. 4th 1242 (2008) ............................................................................................. 14, 15

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) .......................................................................................................... 13, 21

*Cruz v. Lawson Software, Inc.*,
764 F. Supp. 2d 1050 (D. Min n. 2011) ......................................................................... 15, 18, 22, 23

*Curry v. Matividad Medical Center*,
No. 11-cv-4662, 2013 WL 2338110 (N.D. Cal. May 28, 2013) ................................................. 15

*Dailey v. Sears, Roebuck & Co.*,
214 Cal. App. 4th 974 (2013) ..................................................................................................... 24

*Damassia v. Duane Reade, Inc.*,
250 F.R.D. 152 (S.D.N.Y. 2008) ............................................................................................... 21

*Dunbar v. Albertson's, Inc.*,
141 Cal. App. 4th 1422 (2006) ................................................................................................... 21

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .................................................................................. 12, 13

*Espinoza v. Domino's Pizza, LLC*,
  No. EDCV 07-1601, 2009 WL 882845 (C.D. Cal. Feb. 18, 2009) ............................ 21

*In re Farmers Ins. Exch.*,
  481 F.3d 1119 (9th Cir. 2006) ................................................................................... 22

*Gales v. Winco Food*,
  No. C-09-05813, 2011 WL 3794887 (N.D. Cal. Aug. 26, 2011) .............................. 18

*Hamilton v. Genesis Logistics, Inc.*,
  No. CV13-01848, 2014 WL 4187941 (C.D. Cal. Aug. 22, 2014) ............................. 18

*Hanon v. Dataprods.*,
  976 F.2d 497 (9th Cir. 1992) ............................................................................... 13, 24

*Harris v. Superior Court*,
  53 Cal. 4th 170 ........................................................................................................... 14

*Heffelfinger v. Elec. Data Sys. Corp.*,
  No. CV 07-101, Dkt. #166 (C.D. Cal. Feb. 26, 2013) .............................................. 18

*Hill v. R&L Carriers, Inc.*,
  690 F. Supp. 2d 1001 (N.D. Cal. 2010) .................................................................... 15

*In re Farmers Ins. Exch. Claims Reps.' Overtime Pay Litig.*, No. MDL 1439, 2003
  WL 23669376 (D. Or. May 19, 2003) ....................................................................... 13

*Jovel v. Boiron, Inc.*,
  No. 11-cv-10803, 2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) .............................. 24

*Kennedy v. Commonwealth Edison Col.*,
  410 F. 3d 365 (7th Cir. 2005) ................................................................................... 22

*Koppinger v. Am. Interiors, Inc.*,
  295 F. Supp. 2d 797 (N.D. Ohio Dec. 5, 2003) ........................................................ 16

*Marlo v. United Parcel Serv., Inc.*,
  639 F.3d 942 (9th Cir. 2011) .............................................................................. *passim*

*Nelson v. Avon Products*,
  No. 13-cv-02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015) .............................. 21

*Novak v. Boeing*,
  No. SACV09-01011, 2011 WL 7627789 (C.D. Cal. Dec. 19, 2011) .................... 18, 20

*Orphanos v. Charles Indus., Ltd.*,
  No. 95 C 4039, 1996 WL 437380 (N.D. Ill. 1996) .................................................... 16

*Pellerin v. Xspedius Mgmt.Co.*,
   432 F. Supp. 2d 657 (E.D. La. 2006) ................................................................ 16

*Reyes v. Snowcap Creamery, Inc.*,
   No. 11-CV-02755, 2013 WL 4229835 (D. Colo. Aug. 14, 2013) ............................. 13

*Rosenberg v. Renal Advantage, Inc.*,
   No 11-CV-2152 2013 WL 3205426 (S.D. Cal. June 24, 2013) ................................ 18

*Santiago v. Amdocs, Inc.*,
   No. C 10-4317, 2013 WL 5444324 (N.D. Cal. Sept. 30, 2013) ................. 2, 17, 18, 20

*Silverman v. SmithKline Beecham Corp.*,
   No. cv06-7272, 2007 WL 6344674 (C.D. Cal. Oct. 15, 2007) ............................... 21

*Sirko v. Int'l Bus. Mach. Corp.*,
   No. CV 13-03192, 2014 WL 4452699 (C.D. Cal. Sept. 3, 2014) ............... 2, 17, 18, 20

*Sutton-Price v. Daugherty Sys., Inc.*,
   No. 11-cv-1943, 2013 WL 3324364 (E.D. Mo. July 1, 2013) ................................. 18

*Valles v. Int'l Bus. Mach. Corp.*,
   No. SACV 09-202, 2010 WL 9434915 (C.D. Cal. May 6, 2010) ............................. 15

*Vasquez v. First Student, Inc.*,
   No. 14-CV-06760, 2015 WL 1125643 (C.D. Cal. Mar. 12, 2015) .................. 19, 22, 24

*Vinole v. Countrywide Home Loans*,
   571 F.3d 935 (2009) ................................................................................... 13, 15

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ................................................................................ 12, 13

*Weigele v. FedEx Ground Package Sys., Inc.*,
   267 F.R.D. 614 (S.D. Cal. 2010) ......................................................................... 13

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ......................................................................... 16, 19

*Williams v. Lockheed Martin*,
   No. 09-CV-1669, 2011 WL 2200631 (S.D. Cal. June 2, 2011) ............................... 18

*Young v. Cerner Corp.*,
   No. 06-321, 2007 WL 2463205 (W.D. Mo. Aug. 28, 2007) ................................... 16

*Zinser v. Accufix Research Inst.*,
   253 F.3d 1180 (9th Cir. 2001) ...................................................................... 13, 25

**State Statutes and Regulations**

Cal. Lab. Code § 515.5 ................................................................................. 14, 15

8 Cal. Code Reg. § 11040(1)(A)(2)(f) ............................................................ 15

8 Cal. Code Regs. § 11040(2) .................................................................... 13, 14

7 Col. Code Regs. 1103-1:5 ........................................................................... 13

Mass Gen. Laws ch. 151, § 1A(3) .................................................................. 13

454 Mass. Code Regs. § 2.02(3) ..................................................................... 13

**Federal Regulations**

29 C.F.R. § 541.200 ...................................................................................... 14

29 C.F.R. § 541.201 ...................................................................................... 14

29 C.F.R. § 541.202 ................................................................................. 14, 15

29 C.F.R. § 541.400 ...................................................................................... 14

29 C.F.R. § 541.700 ...................................................................................... 15

29 C.F.R. § 541.704 ............................................................................. 15, 22, 23

29 C.F.R. § 541.708 ...................................................................................... 15

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.:  C13-0119-BLF

## I.     INTRODUCTION

Hewlett-Packard Company ("HP") is a leading provider of advanced servers, storage, networking, converged infrastructure, and enterprise software products that companies and governments rely on to operate their core business functions.  The technologies that HP sells, and that the putative class supports, include for example, █████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████.  The complexity and diversity of HP's technologies and customer needs translate into a broad array of specialized work groups and specific and distinct roles, responsibilities, and duties for members of the putative class.

Plaintiffs' theory is that putative class members are all "quintessential 'help desk' employees, serving as the first contact HP customers have with HP's technical support," who "all do the same thing" performing a "limited troubleshooting role" pursuant to "regimented procedural guidelines." Mot. 3, 8-10.  These are hollow assertions.  Plaintiffs have not met their burden under Rule 23 to show a *form of common proof* that, at trial and consistent with HP's due process rights, could adjudicate their theory on a classwide basis without the need for individual inquiries.

Plaintiffs' principal source of purported "classwide evidence" is the class's shared job code – Technology Solutions Consultant I-III – and a generic job description under HP's "Job Architecture."  Plaintiffs do *not* argue that the job description proves misclassification, and indeed, it evidences exempt work.  Plaintiffs, instead, contend that all putative class members ("TSCs") are in a "limited troubleshooting role."  But the record shows otherwise.  Some TSCs play a *proactive* role planning and advising customers on upgrades and ongoing operations.  Others do handle support cases, but there are differences among all of them.  Some may be "the first contact HP customers have," and others are in an "elevated" or "backline" role handling unique and complex cases that others cannot solve, or are dedicated representatives for premier customers, like ██████████ ████████.  Ultimately, the specific work each TSC performs, and the levels of independent judgment and discretion each exercises, is affected by many factors: the team and manager, the products and customer environments on which the TSC works, and the TSC's own training,

experience, and skill, among other factors.  The declarations and testimony HP presents here detail

that variation and contrast sharply with the self-serving, cookie-cutter declarations from Plaintiffs.

On this record, a shared job code does not eliminate the need for individual inquiries into

each TSC's actual duties, and how the TSC's specific combination of work lines up against the

elements of the administrative and computer professional exemptions.  This precludes Plaintiffs

from meeting Rule 23's requirements of predominance and superiority, *see*, *e.g.*, *Marlo v. United*

*Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir. 2011), just as in other cases alleging misclassification

of technology workers, where courts rejected class certification, notwithstanding a shared job code.

*See, e.g.*, *Sirko v. Int'l Bus. Mach. Corp.*, No. CV 13-03192, 2014 WL 4452699 (C.D. Cal. Sept. 3,

2014); *Santiago v. Amdocs, Inc.*, No. C 10-4317, 2013 WL 5444324 (N.D. Cal. Sept. 30, 2013).

Plaintiffs also argue that TSCs' work is uniformly circumscribed by alleged "common

processes" and technical documents.  Plaintiffs have failed to identify any such "common processes"

or other common method of proof, let alone a trial plan, that would permit classwide adjudication

consistent with Rule 23 and due process.  The "process" documents Plaintiffs cite neither apply

classwide nor purport to dictate the substance of employees' work, and could not adjudicate TSCs'

exempt status in one fell swoop.  *See Marlo*, 639 F.3d at 948.  Instead, each employee's specific

facts must be reviewed to adjudicate their self-serving characterizations as non-exempt "help desk"

employees performing routinized tasks.  This lack of predominance and superiority – as well as

unique facts making each class representative atypical – requires denying the Motion.

## II.    BACKGROUND

### A.    The Parties and this Litigation

HP sells a wide range of services and "enterprise" technology products that entities use to

organize and run their business operations.  *See generally* Ex. 1 (Albert) at 35:17-60:8.[1]  HP's

Software Group ("HPSW") markets 141 different product suites with functions including operations

management software (monitors and reports on the performance of networks, servers, and storage);

information management software ("big data" analytics), application lifecycle software (software

---

[1] Exhibit ("Ex.") cites are to HP's Appendix of Exhibits and reference the name of the deponent. Last names otherwise refer to declarations in HP's Compendium of Declarations.

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.:  C13-0119-BLF

that manages software), and enterprise security software.  Davis ¶¶ 4-5; Clemons ¶ 3.  HP's Enterprise Group ("EG") sells servers, storage, network, and converged infrastructure systems, along with associated operating systems and software.  Kumar ¶ 4.  HP's customers range from small-and-midsize businesses to financial institutions, telecommunications providers, hospitals, airlines, manufacturers, government agencies, and other technology companies.  *See id.* ¶5;  Davis ¶ 6; Clemons ¶ 3.  Customers invest millions of dollars on HP products to achieve a return on investment by optimizing their IT systems and running their business operations more efficiently.  *Id.*

HP's customers generally have their own sophisticated IT departments, which are responsible for the day-to-day administration and troubleshooting of HP products within their environments, and which have access to the product manuals and other technical documents.  Kumar ¶ 6; Clemons ¶ 4; Davis ¶ 6.  The "help desk" is on the customer side.  HP support teams are engaged when customers' engineers, network managers, and system administrators cannot resolve an issue; even HP's "frontline" support engineers are providing "backline" service, advising customers' IT teams on handling issues from an administrator standpoint.  *Id.*; *see also* Ex. 2 (Kumar) at 104:3-105:15 (customer IT group is like the "general practitioner" seen first; HP support is the "cardiologist").

Plaintiffs Eric Benedict, Kilricanos Vieira, and David Mustain are former HP employees who worked as TSCs supporting different HP products, each alleging that HP misclassified them as exempt from overtime under federal and state law (California, Massachusetts, and Colorado, respectively).  Plaintiffs originally sought to represent a nationwide FLSA collective and Rule 23 state classes of employees across **all** of HP's business organizations and **multiple** job families, not just TSCs.  On February 13, 2014, Judge Koh granted *conditional* certification of Plaintiffs' proposed FLSA class based on the "lenient" "notice-stage standard."  Dkt. No. 175. Yet, Plaintiffs backtracked from their position, already conceding that the FLSA collective action was **grossly** overbroad and that the evidence presented to Judge Koh would be insufficient under Rule 23.  They now limit their proposed Rule 23 classes to the TSC job family, and only TSCs who fall into certain of HP's  organizations:  (1) EG Technology Services/Global Customer Experience; (2) HPSW Global Support Delivery and IM Support ("HPSW Support"); and (3) HPSW Enterprise Security Products.  Even this last ditch effort to salvage a class, however, encompasses employees on a wide

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.:  C13-0119-BLF

variety of teams.  There are 404 putative class members, who collectively have had 149 different managers, and annual salaries ranging  from just under ███████ to nearly $ █████  Rowe ¶¶ 3-4.

Plaintiffs submitted certain Rule 30(b)(6) testimony, a handful of documents drawn from large document repositories, and declarations from themselves and 15 FLSA opt-in plaintiffs – four of whom have withdrawn their declarations.  Dkt. Nos. 305, 309.  HP submits declarations from 19 putative class members and 7 leaders/managers, and the deposition testimony of Plaintiffs and the opt-in declarants, all of which shows significant variation in job roles across and within businesses.

**B.**     **HP's Job Architecture Provides High-Level, General Guidance But Does Not Dictate Actual Job Duties**

Like many companies of its size, HP has adopted a "Job Architecture" "framework" to help organize its workforce.  *See* Pl. Exs. 1-2.  When a new employee joins HP, through direct hire or acquisition of a company, the employee is "mapped" to a Job Architecture job code based on what the manager thinks is the "best fit" for the expected quality and nature of work.  Ex. 1 (Albert) at 97:8-98:15; *see also id.* at 86:22-87:01, 89:20-90:10, 100:12-101:14 (discussing other purposes).

Job Codes are associated with a "job description template" that describes "the general nature of the responsibilities" for the position.  Pilotin Decl. Ex. 1 ¶ 2.0 ("Pl. Ex.").  Within the U.S., the TSC position is an FLSA exempt job code because ***the general expectations align to exempt work***.[2] For example, a TSC III "[a]pplies developed subject matter knowledge to solve common and complex business issues" and ***"[e]xercises independent judgment*** within generally defined policies and practices to identify and select a solution."   Pl. Ex. 5 (emphasis added).  Responsibilities are broadly described to include, among other things:  "[s]uccesfully resolve technical issues (hardware and software);" "[r]espond to service, product, technical, and customer-relations questions on subjects such as features, specifications, and repairs;" "[p]roactively assist internal or external businesses;" "[a]bility to act as a team or project leader providing direction to team activities and facilitates … team decision-making process;" "[r]epresent and participate on an HP team" to customers, vendors, and at industry conferences; "[p]artners frequently with the Sales Pursuit team."

---

[2] Within the same set of job families there are exempt and non-exempt job codes, and HP relies on its managers to determine whether employees should be "mapped" to an exempt or non-exempt Job Code.  *See* Pl. Ex. 2, at HP0002340; Pl. Ex. 6, at HP00008436; Albert Dep. 161:11-164:20.

*Id.* The job description expressly states that it "**describe[s] the general nature and level of work only**," and the duties listed are not exhaustive. Pl. Ex. 5, at 5; *see also* Ex. 1 (Albert) 134:3-8, 137:17-138:5 (HR job descriptions written "at a general level;" managers assign "individual roles").

Ultimately, the idea of the Job Architecture is that *if* employees are performing similar work at a similar level of responsibility, then, conceptually, they could map to the same job code. The reverse, however, is not true: just because employees share a job code, they do not necessarily have the same duties or roles. HP's Rule 30(b)(6) witnesses confirm that, for their organizations, the Job Architecture does *not* dictate *actual* job duties: "These are HR general definitions of a job level and family that are not directly applicable to the actual role and role responsibility itself. Very high-level language here that helps to describe it from an HR perspective, but not really how we define the job … in the business itself." Ex. 3 (Triolo) at 42:12-22; *see also id.* at 41:8-16 ("These are really wide categories that are executed by a lot of different people."); Ex. 4 (Davis) at 42:18-45:17, 58:20-23 (Job Architecture "guidelines" do not define duties "at the engineer level"); Kumar ¶¶ 7-10.[3]

HP's businesses and teams in fact articulate more specific job roles and hiring criteria. *See, e.g.*, Pl. Ex. 2, at HP00002352; Gorden ¶¶ 4-7; Clemons ¶¶ 15-18; Kumar ¶ 8. Plaintiff Benedict conceded in deposition that a job posting for a Senior Technical Support Engineer (TSC III) position in EG included responsibilities different from his. Ex. 5 (Benedict) at 127:3-129:5, 135:21-136:13 & Dep. Ex. 12; Dkt. No. 154 ¶ 5. Plaintiffs claim that, under the Job Architecture, TSCs I-III have minimal education and experience, but the education and training of putative class members varies: some have only an associate's degree, while others have bachelors of science or master's degrees, technical certifications, and decades of experience.[4] Similarly, while Plaintiffs contend that TSCs I-III cannot be considered "subject matter experts" (Mot. 8), Plaintiff Mustain and others in fact were. *See, e.g.*, Ex. 11(Mustain) at 39:5-41:10; Ex. 9 (O'Toole) at 147:17-22; Saechao ¶ 4; Jagannath ¶ 9.

---

[3] Ex. 6 (Bargainer) at 63:2-18, 71:16-24 (Job Architecture has "a high level generic description" for each job code," but "[w]e don't manage at the job code level"); Ex. 7 (Paier) at 58:21-60:11 (Job codes defined only at a "high level" and are used based on manager's discretion and interpretation).

[4] *See, e.g.*, Burkholder ¶ 2; Gyambavantha ¶ 2; Grinnell ¶ 2; Jaroszynski ¶ 2; Frenna ¶ 2; Stokes ¶ 2; McKenna ¶ 2; Multhauf ¶2; Ex. 8 (Kennedy) at 165:10-18, 33:4-7, 140: 4-9; Ex. 9 (O'Toole) at 40:11-16. *But see* Ex. 10 (Shropshire) at 16:13-17:2, 109:18-111:7.

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.: C13-0119-BLF

C.     **Roles and Duties Vary Among and Within Groups**

1.     **Putative Class Members ("TSCs") in HPSW**

In HPSW, under the general umbrella of the TSC job code, TSCs can have multiple distinct job roles, several of which are not even within the reactive "troubleshooting" paradigm described in Plaintiffs' Motion.  *See* Clemons ¶¶ 14-18 & Exs. A-C; Gorden ¶¶ 4-6 & Exs. A, B.

Technical Account Managers ("TAMs") play a primarily proactive role and are a focal point representative for premier customers.  *See* Clemons ¶ 17 & Ex. A; Gorden ¶ 6.  TAMs meet with their clients regularly and develop an operational profile and support plan based on in-depth knowledge of the customer's IT environment and business objectives, and how the HP software is customized for them.  *Id.*  TAMs develop plans for upgrades and proactive maintenance, and provide recommendations on system improvements.  *See id.*; *see also* Gill ¶¶ 4-7, 15; Gyambavantha ¶¶ 4-12.  TAMs generally do not handle support cases themselves; they monitor support cases handled by others, track trends, manage customer "escalations" (when a customer expresses dissatisfaction with progress on a case or wants additional resources), and respond to customer satisfaction surveys.  *Id.*  They also seek out sales opportunities and partner with Sales.  *Id.*

For ArcSight specifically, TSCs may also be "Customer Advocates" ("CAs"), which is a non-technical, administrative role.  Gorden ¶ 7 & Ex. B.  CAs' duties include assigning inbound support calls to the engineers, managing the queue, and developing team trainings and process materials.  *Id.*  Opt-in Whitney Ihling, for example, was a Senior CA who authored her team's Return Merchandise Authorization ("RMA") process for handling defective equipment.  Ex. 12 (Ihling) at 31:7-13, 34:20-25, 40:16-21, 58:16-25, 64:18-22 & Ex. 13 (Ihling Dep. Ex. 7); *see also* Ex. 14 (Levin) at 18:8-17, 21:20-22:1, 39:9-40:17, 68:16-70:24.

Opt-in Clinton Mills, as a TSC II, was in yet a different role as a "Duty Manager" ("DM") on the HPSW Worldwide Escalations Team, handling customer "escalations" and disputes on cases without a dedicated resource.  *See* Clemons ¶¶ 29-32.  Mills also did reporting and analyses on escalation trends to make recommendations to HPSW Support management.  *See id.* ¶ 32.

Even among "support engineers" (those who handle support cases), HPSW has different roles, such as "Account Support Engineers" ("ASE") and "Named Account Support Engineer"

("NASE").  Clemons ¶¶ 15-16 & Exs. B-C.  ASEs are veteran engineers with extended training in certain products suites, who are reserved for customers paying for enhanced service.  Clemons ¶ 16; Gyambavantha ¶ 14.  For further enhanced service, NASEs are a dedicated resource, responsible for a deeper understanding of the customer's environment, building the customer relationship, and planning and resolving the most unique and complex cases.  *See* Clemons ¶ 16; Jagannath ¶11.

The record confirms that work experiences diverge.  Plaintiff Benedict, as a TSC III, worked on the ArcSight █████ product and, in his eleven months at HP, was a Tier 1 engineer – *i.e.*, the first TSE to respond to a case.  With  over 25 years of experience in the computer field and programming languages, he was hired at a salary of over █████ per year, yet Benedict denies any analytical duties, alleging his job was to "cut and paste" Google post solutions to customers.  *See* Ex. 5 (Benedict) at 155:24-157:3, 200:14-201:2, 209:4-15, 264:7-15, 317:19-318:12, 443:6-20.

Whether or not one finds Benedict's testimony credible, it is different from that of Peter Halton who, like Benedict, is an ArcSight TSC III, but works as a "Tier 2" engineer and generally receives a case after a Tier 1 engineer has been unable to solve it.  Halton ¶¶ 4-5.  Halton works on the more complex █████ product and has handled cases for, e.g., the ████████████████ ████ and, recently, has been a NASE for the █████ account.  *Id.* ¶¶ 3-4, 7, 9.  In contrast to what Benedict claims, Halton's cases are rarely solved through "cut and paste" solutions; rather, he has to use investigative techniques, including reviewing system "log" files and the customer's environment, such as firewall settings, Linux configurations, disc space and memory, among others. *Id.* ¶¶ 14, 17.  His work includes, e.g., writing code within the customer's system to provide workarounds pending a new product release; conducting root cause analyses for recommendations on long-term solutions to prevent problems' reoccurrence; and working in the lab to test different solutions before making a recommendation to the customer.  *Id.* ¶ 10-11, 13, 20-21.  For █████, he also makes proactive recommendations on upgrades and system changes.  *Id.*¶¶ 7, 22.

In a Business Group with over a hundred product families and numerous separately managed teams, TSCs' specific duties will depend on the complexity of the products on which they work, their particular role, and their own experience and skill.  Contrary to Plaintiffs' suggestion that all putative class members serve "as the first contact HP customers have with HP's technical support,"

7

Level 1 engineers are typically off-shore, and certain product teams use outside contractors for Level 1 and 2 support.  *See* Davis ¶¶ 8-9.  Thus, on many teams, putative class members would only be in an elevated or backline role.  Similar to Halton and unlike Benedict, many such TSCs primarily work on more complex issues without pre-existing answers, and exercise significant judgment in analyzing and investigating the issue, and creating solutions or making recommendations to the customer.[5]  The same employee also may play different roles on different teams or over time.[6]

### 2. TSCs in Enterprise Group Technology Services ("EG TS")

TSCs in EG TS also play a wide variety of roles, such as those who have primarily proactive roles (called "Remote Support Account Advocate" or "RSAA") or who provide specialize service to premier customers.  *See* Richardson ¶¶ 10-13; Miranda ¶¶ 4-7; Stokes ¶¶ 4-6.  While Plaintiffs cite the phrase "break/fix" to describe TSCs' work, that covers a very broad range of work and does not imply that the work is routine, mechanical, or limited.  Ex. 2 (Kumar) at 106:3; Kumar ¶¶ 11-18.

Many TSCs are on a "Mission Critical" team or regularly handle "mission critical" cases for premier clients with cutting-edge systems that have heightened performance and availability requirements.  *See* Richardson ¶¶ 4-8.  These are "Mission Critical" systems because any disruption could cost millions of dollars, impact large sectors of the U.S. population, or even risk lives.  *See id.*; Inghram ¶¶ 3-7 (███████████ supercomputer used for ████████████); Stokes ¶ 7 (storage infrastructure for ████████████████); Ady ¶ 4 (storage for ███████████); Miranda ¶ 4 (storage infrastructure for ████████); Saechao ¶ 7 (████ and ████████); Burkholder ¶ 6 ████████████).

TSCs' specific duties will depend on the product line, customer environment, mix of issues they see, and the individual's experience and ability, and different TSCs describe very different work experiences.  For example, Roberts claims that TSCs on his team took assignments based merely on

---

[5] *See* Jagannath ¶¶ 3-11; Jaroszynski ¶¶ 4-13; McKenna ¶¶ 4-12; Ex. 15 (Chang) at 29:23-30:2; Ex. 16 (Jessen) at 154:1-2; Ex. 17 (Greenspan) at 88:1-11, 107:11-111:23; Exs. 18-20 [Greenspan Dep. Exs. 6-8]; *see also* Multhauf ¶¶3-14.

[6] *See, e.g.*, Jaroszynski ¶¶ 4-13 (backline but also worked as a "part time" TAM); Jagannath ¶ 11 (NASE for one customer); Ex. 16 (Jessen) at 16:6-17:25, 129:3-8 (higher level role on ████████," than when moved to ████, which was more "complex"); Ex. 21 (Austin) at 34:5-36:2; 36:5-11; 52:6-24 (was backline on one product, but "frontline" as a "novice" on another).

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.: C13-0119-BLF

priority in the queue, did not have specialties, and that "by no means were the customers unique" because "[t]here were a handful of regular scenarios that we would see."  Ex. 22 (Roberts) at 53:16-54:1, 63:16-25, 65:8-66:5, 153:24-154:4.  Opt-in Ken Shropshire, on that same team, denies making any decisions about how to investigate or solve a case, and instead claims that he simply followed and then forwarded instructions from higher-tier engineers.[7]

Many TSCs, however, specialize in more complex products, and choose or are referred the most complex cases, and they report having to exercise significant judgment in determining how to identify the problem and develop a solution to address unique features of each client's environment. The work these TSCs describe include, for example:  investigating the source of issues (whether with the HP product or arising from changes in the customer's environment); figuring out how to quickly resolve high-severity incidents (e.g., outages); developing technical action plans for others to implement; performing root cause analyses to assess vulnerabilities and avoid problem reoccurrence; modifying system configurations, and recommending other modifications, purchases, or proactive improvements; disbursing thousands or millions of dollars in equipment replacement, without needing manager approval; writing computer program scripts to create workarounds or monitoring applications, or gather and analyze data; and collaborating with R&D in analyzing issues and proposing and testing developments.[8]  For these TSCs, cases may have several possible solutions –

---

[7] *See* Ex. 10 (Shropshire) at 158:8- 159:3 (claiming he did not investigate problems independently and merely passed along solutions given to him by Level III engineers); *id.* at 161:24-165:2 (calling himself a mere "conduit"); *see also id.* at 55:21-56:2, 87:1-6, 112:15-17, 155:12-15 (denying exercising any independent judgment in investigating issues or identifying a solution).

[8] *See* Ady ¶¶ 4-11 (describing most of the above), Burkholder ¶¶7-17 (specializes in complex performance issues; creates data collecting tools and monitoring programs; root cause analyses; consults on configurations and proactive improvements; collaborates with R&D); Clark ¶¶ 4-18 (handles performance issues, "purple" and "red screens of death," recommends action plans and manages collaboration teams, writes scripts and code to automate processes for testing; recommends system changes; orders replacement parts of substantial value); DiPinto ¶¶8-16 (tests solutions in lab; performs root cause analysis; makes recommendations on best solution for customer's goals); Frenna ¶¶ 4-18 (has, at times, specialized in "mission critical" cases, does root cause analysis, develops technical action plans, makes recommendations from alternatives, writes computer scripts for testing); Grinnell ¶¶ 7-15, 26 (analyzes network failures, develops workarounds, recommends hardware replacements and other proactive improvements); Inghram ¶¶ 6-10, 15, 17 (end-to-end solutions on 1000+ node cluster platform, developed action plans and coordinated work of outside vendors, collaborated with R&D in analysis and testing); Lewis ¶¶ 5-16 (specializes in complex performance issues, develops workarounds and reconfigurations, may write computer scripts for data collection); Saechao ¶¶ 5-14 (investigates issues in lab, develops workarounds, writes computer

1   *e.g.*, different ways to reconfigure the network, or the ability to create a "workaround" versus taking

2   the system off-line for maintenance – and the TSC must determine the best solution and advise the

3   customer on the pros and cons of different approaches.  *See supra* n.8; Lowenberg ¶¶ 16-17.

4   TSCs also have varying responsibilities beyond handling cases.  Trevor Clark, as a TSC II,

5   became a "Team Lead" responsible for performing "deep dive" case reviews on other engineers'

6   cases, managing customer "escalations," and assigning cases.  *Id.* ¶¶ 5-6.  Plaintiff Mustain, as a

7   TSC II, also was a "Team Lead" and describes himself as solving cases others could not solve,

8   having a unique role working with hardware in the lab, and accepting special projects such as

9   "developing and delivering training to the global support community."  Ex. 11 (Mustain) at 39:8-11;

10   46:3-11; 186:7-8, 204:18-21, 205:19-20 & Dep. Ex. 42.  Other TSCs also report creating or leading

11   trainings for customers and other engineers and creating or managing internal team processes.[9]

12   ### 3.   There Are No Uniform Procedures Dictating the Substance of Employees' Work

13   While EG TS and HPSW maintain certain high-level processes and best practices, witnesses

14   agree that there are no uniform, centrally mandated procedures, manuals, or handbooks – across or

15   within businesses – that dictate the *substance* of TSCs' work or provide step-by-step instructions on

16   how to *solve* a case.[10]  Many of the processes or guidelines attached to Plaintiffs' Motion only

17

18   program scripts for testing, makes proactive suggestions); Stokes ¶¶ 7-20 (workarounds and recovery plans; coordinates work of field engineers; discretion to order replacement equipment, including ordering $2.8 million in equipment on just one case); Workman ¶¶ 5-22 (develops

19   workarounds by writing computer scripts or system reconfiguration; advises customers through research on non-HP products; root cause analysis; collaborates with R&D); *see also, e.g.*, Ex. 23

20   (Vieira) at 107:3-108:7, 174:21-24, 191:5-194:5, 212:12-14, 231:11-22, 244:7-19; Ex. 24 (Ford) at 59: 4-13, 62:21-64:10, 65:7-12, 79:10-80:6, 86:15-88:20; Ex. 8 (Kennedy) at 96:5-15.

21   [9] *See* Grinnell ¶ 22; Frenna ¶¶ 15, 19, 22-23; Inghram ¶ 14; McKenna ¶¶ 13-16; Workman ¶ 19.  For

22   HPSW TSCs, see Jagannath ¶ 10; Jaroszynski ¶ 15; Ex. 17 (Greenspan) at 32:1-33:5, 165:16-167:19 (created secure upload process; mentoring, training); Ex. 16 (Jessen) at 131:2-16, 132:11-15, 134:8-

23   13; Ex. 15 (Chang) at 71:7-19; Ex. 11 (Mustain) at 89:19-92:9, 170:8-15, 202:22-25.

24   [10] *See, e.g.*, Clemons ¶¶ 7-8; Davis ¶7; Gorden ¶¶ 8-12; Kumar ¶¶ 17-20; Frenna ¶ 11; Gill ¶ 13; Halton ¶¶ 18-19; Jagannath ¶ 7; McKenna ¶ 8; Multhauf ¶¶ 9-10; Gyambavantha ¶15; Jaroszynski ¶¶10, 17; Ady ¶¶ 8, 19-20; Burkholder ¶ 14; Clark ¶10; Grinnell ¶ 14; Lewis ¶¶ 11, 23; Lowenberg ¶

25   7; Saechao ¶¶8, 19; Stokes ¶¶ 10, 22-24; Ex. 5 (Benedict) at 246:6-247:1 (conceding that there were no "formally documented checklists;" just general steps for handling a case, like being sure to

26   research available resources); Ex. 11 (Mustain) at 84:3-86:7; 137:14-140:9; 146:2-147:3; 151:2-19; 154:2-155:7; 166:13-167:1, 168:11-172:1; Ex.25, 26 [Mustain Dep. Exs. 36, 37-A]; Ex.24 (Ford)

27   43:4-25, 55:10-25, 132:9-15; Ex. 23 (Vieira) 197:9-14, 200:1-201:19, 204:20-24; Ex. 21 (Austin) at 66:1-18; 121:5-123:19; Ex. 17 (Greenspan) at 75:19-76:11; 155:15-159:22.

28

10                    HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
                      Case No.:  C13-0119-BLF

pertain to certain teams or job roles – such as Level 1 Engineers, who are frequently not U.S.-based employees, Davis ¶¶ 8-9; Kumar ¶ 8 – and thus are inapplicable or not regularly used by TSCs in other roles or on other teams.[11]  The elevation process varies from team to team, there are no uniform predetermined rules for how long an engineer should work a case before elevating it, and many TSCs report using their own judgment in deciding when to elevate a case, consult with colleagues, or engage additional resources.[12]

HP maintains for its customers and engineers "knowledge bases" ("KB") containing technical documentation on previously encountered issues.  While Plaintiffs allege that their jobs primarily involve searching the KB for pre-existing instructions (Mot. 11), many TSCs report that they do not use the KB much at all, because of the uniqueness of their customers' environments and cases they handle, and the rapidly changing nature of the technologies.  *See, e.g.*, Inghram ¶ 13; Clark ¶ 14; Halton ¶ 19; Lewis ¶ 13; Multhauf ¶ 10; Saechao; ¶ 11; *see also* Kumar ¶18 (different products will have different levels of KB documentation depending on maturity or evolution).  Yet others explain that they use the KB (and other resources) as a research tool, but that (like a lawyer or doctor) they have to exercise their own judgment in formulating searches and evaluating the results, and that the KB articles themselves are not sufficient to solve most of their cases.[13]  The record also reflects that many TSCs *create* KB articles, for use by lower-level engineers and customers, or act as

_____

[11] *See* Ex. 24 (Ford) at 153: 18-154:5, 155:22-156:2 (did not use Pl. Exs. 17 or 24 in his work for HP); DiPinto ¶ 21 (Ex. 24 "not relevant to me because I do not create cases or tickets"); McKenna ¶ 17 (has never seen Pl. Ex. 13 and is not relevant to him or team because team does not use the SPARKS ticketing system); Grinnell ¶ 28; Lewis ¶ 23; Saechao ¶ 19; Workman ¶ 24; Jagannath ¶ 12 (never seen Pl. Ex. 10; processes appear to be directed at Service Desk Assistants).

[12] *See, e.g.*, Davis ¶ 19; Clemons ¶¶ 27-28; Gorden ¶¶ 8-9, 12; Ex. 2 (Kumar) at 44:6-25; Ex. 15 (Chang) at 62:13-22 (uses judgment on when to elevate); Ex. 23 (Vieira) at 214:13-219:25 (discussing informal, collaborative process to determine elevation); Ex. 11 (Mustain) at 118:25-119:24; 123:15-125:10; Ex. 8 (Kennedy) at 116: 5-118:24; Ex. 24 (Ford) at 38:15-19; Inghram ¶ 10; Grinnell ¶ 6; Frenna ¶ 9; DiPinto ¶¶ 14-15; Clark ¶¶ 20-21; Multhauf ¶ 13.

[13] Ex. 11 (Mustain) at 70:22-71:10, 74:24-75:3, 84:8-86:7 (agreeing that "in deciding which knowledge base article solution to apply to a customer's situation," he used his "own judgment deciding whether or not a particular solution was appropriate"); Ex. 21 (Austin) at 75:13-17, 80:25-82:5; Ex. 10 (Shropshire) 189:12-14 (admitting Knowledge Base articles "rarely" provided solution); Ex. 15 (Chang) at 88:3-20 ("I use knowledge base and sometimes I just use my critical thinking"); Gill ¶14; Stokes ¶ 23; Ady ¶¶ 13-16; DiPinto ¶ 18; Burkholder ¶ 14; Gyambavantha ¶ 15; Workman ¶ 24; Ex. 24 (Ford) at 154:6-155:2 (would likely have referred to Pl. Ex. 19 on "linking" SAW articles, but it did not instruct him on how to solve technical problem); Grinnell ¶ 28.

KB "Coach" or reviewer for their team.  Pl. Exs. 18, 19; Clark ¶ 14; Inghram ¶13; Lewis ¶ 13; *see also, e.g.,* Ex. 23 (Vieira) at 94:15-95:18, 201:20-203:1.[14]

Customer contracts also have Service Level Agreements that vary by contract, but can include a time for making a "first technical contact" (letting the customer know the case has been received), depending on the severity and priority level.  Davis ¶18; Lowenberg ¶¶8-9.  This SLA is of little relevance to certain TSCs in elevated or backline roles, who generally do not do first technical contacts.  *See, e.g.*, Grinnell ¶28; Lewis ¶23.  Moreover, TSCs are the ones responsible for *setting the severity and priority level*, based on their assessment of the customer's system and the issue, and many TSCs may also *negotiate* with customers over the expected response time.  *See* Ex. 2 (Kumar) at 78:13-79:1; Richardson ¶¶20-22; Ex. 11 (Mustain) at 92:14-93:9; Stokes ¶ 18; Halton ¶ 5; Ex. 16 (Jessen) at 58:25-60:14.  Some TSCs also report being able to deviate from processes to meet customer needs, and they may be involved in developing team processes.  *See* Ady ¶ 19; Burkholder ¶ 9; Clemons ¶¶ 24-25; Gill ¶ 8; Kumar ¶ 20; Ex. 16 (Jessen) at 34:14-16; *see also supra* n.9.

## III.   LEGAL STANDARDS

### A.     Class Certification Standards

Plaintiffs bear the burden of establishing that they meet the requirements of Rule 23 of the Federal Rules of Civil of Procedure.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).  "Rule 23 does not set forth a mere pleading standard" and instead requires a "rigorous analysis."  *Wal-Mart*, 131 S. Ct. at 2551.  Plaintiffs here must show they meet the Rule 23(a) elements – numerosity, commonality, typicality, and adequacy – and Rule 23(b)(3)'s requirements that (1) common questions of law and fact predominate, and that (2) a class action is superior to other means for fairly an efficiently adjudicating the controversy.

[14] Ex. 17 (Greenspan) at 32:1-33:5, 165:16-167:19; Jaroszynski ¶ 15; Ex. 16 (Jessen) at 131:2-16, 132:11-14, 134:8-13; Ex. 15 (Chang) at 71:7-19; Ex. 11 (Mustain) at 186:9-11.

1  "Commonality" requires an issue in which the "determination of its truth or falsity will

2  resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart*, 131 S.

3  Ct. at 2551.  Rule 23(b)(3)'s predominance inquiry is "even more demanding," and will not be

4  satisfied if individual issues "will inevitably overwhelm questions common to class." *Comcast*

5  *Corp. v. Behrend*, 133 S. Ct. 1426, 1432-33 (2013).  "[I]t is not correct to say a district court *may*

6  consider the merits to the extent that they overlap with class certification issues; rather, a district

7  court *must* consider the merits if they overlap" with these requirements.  *Ellis*, 657 F.3d at 981.

8  In misclassification cases, Plaintiffs must show how, under the applicable exemptions,

9  "common proof" could obviate the need for individualized inquiries into employees' actual work

10  duties and how they spend their time.  *See Marlo,* 639 F.3d at 948.  Predominance will fail when

11  trial will require "an individualized inquiry into the manner in which each [plaintiff] actually carried

12  out his or her work," notwithstanding "the presence of other issues susceptible to common proof."

13  *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944, 46-48 (2009).  Likewise, superiority

14  requires that a class trial be efficient and manageable and consistent with due process.  *Zinser v.*

15  *Accufix Research Inst.*, 253 F.3d 1180, 1190-93 (9th Cir. 2001); *see also Wal-Mart*, 131 S. Ct. at

16  2561 ("[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate

17  its statutory defenses to individual claims."); *Weigele v. FedEx Ground Package Sys., Inc.*, 267

18  F.R.D. 614, 623-24 (S.D. Cal. 2010) (decertifying class for failure of predominance and superiority).

19  **B.     The Underlying State Law Exemptions**

20  For predominance, courts first examine the substantive issues – here, the underlying state law

21  exemptions – and then inquire into the proof relevant to each issue.  *See Hanon v. Dataprods.*, 976

22  F.2d 497, 508-09 (9th Cir. 1992).  Massachusetts and Colorado each recognize "administrative" and

23  "professional" exemptions, which are treated as equivalent to federal law.[15]  California's

24  administrative exemption incorporates a prior version of the federal regulations, 8 Cal. Code Regs.

25

26  ---
[15] *See* Mass Gen. Laws ch. 151, § 1A(3); 454 Mass. Code Regs. § 2.02(3); 7 Col. Code Regs. 1103-
1:5; *Reyes v. Snowcap Creamery, Inc.*, No. 11-CV-02755, 2013 WL 4229835, at *6 (D. Colo. Aug.

27  14, 2013); *In re Farmers Ins. Exch. Claims Reps.' Overtime Pay Litig.*, No. MDL 1439, 2003 WL
23669376, at *6 (D. Or. May 19, 2003) (applying Colorado administrative exemption).

28

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
                                                          Case No.:  C13-0119-BLF

1   § 11040(2), and it provides a computer employee exemption, Cal. Lab. Code § 515.5.  In their

2   alleged common issues, Plaintiffs focus only on certain exemption elements and treat the state laws

3   as similar for this Motion.  Mot. 2 n.3, 15.  Plaintiffs do not raise any argument as to the "salary

4   basis" requirements, or certain other elements specific to the California administrative exemption.

5        Administrative Exemption.  The administrative exemption covers work involving "the

6   performance of office or non-manual work directly related to the management or general business

7   operations of the employer *or the employer's customers*," and the "exercise of discretion and

8   independent judgment."  29 C.F.R. § 541.200(a) (emphasis added); 8 Cal. Code Regs.

9   § 11040(2)(a)(i) (same).[16]  (Plaintiffs' alleged common issue #2 misstates the exemption.)  "Work

10  directly related to management or general business operations" includes "*computer network, internet*

11  *and database administration*," among other functions that involve planning, advising management,

12  and representing the company.  *See* 29 C.F.R. §§ 541.201(b); *Combs v. Skyriver Commc'ns,* 159 Cal.

13  App. 4th 1242, 1256, 1264 (2008).  "[T]he exercise of discretion and independent judgment involves

14  the comparison and the evaluation of possible courses of conduct and acting or making a decision

15  after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  Work must relate to

16  "matters of significance," in contrast to being "clerical" or "routine," or simply involving following

17  well-established procedures found in manuals or similar sources.  29 C.F.R. § 541.202(b), (e).[17]

18       Professional/Computer Exemption.  Under the law of all three states, computer work can be

19  exempt when it involves, among other things, "the design, development, documentation, analysis,

20  creation, testing *or* modification of computer systems or programs … based on and related to user or

21  system design specifications."  29 C.F.R. § 541.400(b)(2).[18]

---

22  [16] For ease of reference, citations above are to the current version of the FLSA regulations.  As the
23  Ninth Circuit and California Supreme Court recognize, the current FLSA regulations "were intended
    to be consistent with the old regulations," and thus federal case law on the current regulations is
24  instructive for California law.  *Harris v. Superior Court,* 53 Cal. 4th 170, 189 n.8.

25  [17] Work on "matters of significance" includes, among other things, where the employee has the
    authority to "formulate, affect, interpret, or implement management policies or operating practices,"
26  or where the work "affects business operations to a substantial degree," and "whether the employee
    provides consultation or expert advice to management," and includes making recommendations for
27  actions, even if the recommendations are reviewed at a higher level.  *Id.* § 541.202(b)-(c).

    [18] For Massachusetts and Colorado, this work would fall under the professional exemption.  *See*
28  *supra* n.15; 29 C.F.R. § 541.400(a) ("Computer systems analysts, computer programmers, software

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.:  C13-0119-BLF

Evaluation of Primary Duties.  Insofar as Massachusetts and Colorado follow federal law, the "primary duty" test takes into account, among other things, the "relative importance of the exempt duties as compared with other types of duties," as well as "the amount of time spent performing exempt work."  29 C.F.R. § 541.700(a).  Under California law, the "primary duty" test turns principally on the amount of time the employee spends on exempt versus non-exempt work, and this inquiry must be made *on a workweek-by-workweek basis*.  8 Cal. Code Reg. § 11040(1)(A)(2)(f); *Marlo*, 639 F.3d at 948.  An employee whose primary duty is a combination of exempt duties is also exempt.  *See* 29 C.F.R. § 541.708; *Hill v. R&L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1008 (N.D. Cal. 2010) (considering California law).  Applying the exemptions is a "fact-intensive inquiry" that turns on the employees' actual work duties.  *Vinole*, 571 F.3d at 945.

Application to Technology Support.  Consistent with these regulations, "technical support" work may or may not qualify as exempt, depending on the employee's specific duties.  Routine end-user support and maintenance pursuant to detailed, pre-existing instructions – so-called "help desk" tasks – are non-exempt.  *See* 29 C.F.R. §§ 541.202(e), 541.704.  In other contexts, troubleshooting or technical support has been found to be exempt work.  *See, e.g., Valles v. Int'l Bus. Mach. Corp.*, No. SACV 09-202, 2010 WL 9434915 (C.D. Cal. May 6, 2010) (California administrative exemption applied to employee who handled infrastructure outages); *Combs*, 159 Cal. App. 4th at 1247, 1269 (applying exemption when employee spent 60-70% of time "maintaining the well-being of Skyriver's network," including "high-level problem solving and 'troubleshooting'").  In *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050 (D. Min n. 2011), the court found plaintiffs exempt under the FLSA where their duties included "fix[ing] problems that other consultants could not solve," "training and knowledge transfers," and providing "subject matter expertise on Lawson's product for its client system administrators—how to use and troubleshoot the software from an administrative standpoint, not from a user standpoint."  *Id.* at 1069-70; *see also Curry v. Matividad Medical Center*, No. 11-cv-4662, 2013 WL 2338110, at *5 (N.D. Cal. May 28, 2013) (describing "provid[ing] escalation support to helpdesk personnel," as well as "network analysis, testing,

engineers or other similarly skilled workers ... are eligible for exemption as professionals ...."). California's free-standing computer exemption also focuses on these duties.  Cal. Lab. Code § 515.5.

15

configuration, and modification," as among exempt tasks); *Orphanos v. Charles Indus., Ltd.*, No. 95 C 4039, 1996 WL 437380 (N.D. Ill. 1996) (troubleshooting by "technical support engineer II" exempt when work went beyond merely applying pre-existing instructions).[19]

## IV.    ARGUMENT

This Motion does not require the court to decide what exactly constitutes exempt versus non-exempt work, but rather what form of proof would be necessary to try this case. If no common proof is available, and individualized inquires are necessary, the Motion fails under well-settled law. Notably, Plaintiffs do ***not*** argue that all "technical support" work is categorically non-exempt. Instead, they claim that the Job Architecture and alleged "regimented" procedures show that TSCs all "do the same thing." This is undermined by the testimony of Plaintiffs and opt-in declarants, who articulate widely varying work experiences. After over two years of discovery, Plaintiffs have not offered a form of proof that binds the class together in support of their misclassification theory or that would eliminate the need for individual inquiries into TSCs' actual duties at trial. In the face of such variation and absence of common proof, Plaintiffs cannot satisfy the predominance and superiority requirements of Rule 23, and as to each state class typicality also fails.

### A.    Courts Have Frequently Denied Class Treatment of Technology Worker Misclassification Claims, Despite a Common Job Title

Plaintiffs principally point to TSCs' classification with HP's "Job Architecture," but while a common job classification or "blanket exemption policy" *may* be probative, it is not dispositive because it "does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) ("courts must still ask where the individual employees actually spent their time"). "[T]he existence of a policy classifying [a position] as exempt from overtime-pay

---

[19] Other cases are in accord. *See, e.g., Bernard v. Group Pub., Inc.*, 970 F. Supp. 2d 1206 (D. Colo. Sept. 13, 2013) (describing "Tier III" support as among exempt duties); *Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400, 2010 WL 1379778, *6-7, 17-20 (S.D.N.Y. Mar. 26, 2010) (same); *Young v. Cerner Corp.*, No. 06-321, 2007 WL 2463205, at *4-5 (W.D. Mo. Aug. 28, 2007) (testing and collaboration with R&D); *Koppinger v. Am. Interiors, Inc.,* 295 F. Supp. 2d 797 (N.D. Ohio Dec. 5, 2003) (exercise of judgment and discretion in deciding how to approach and fix problems); *Pellerin v. Xspedius Mgmt.Co.*, 432 F. Supp. 2d 657 (E.D. La. 2006) (exemption applied to employee who "maintained and supported pre-existing software applications").

requirements does not necessarily establish that [employees] were misclassified, because the policy may have accurately classified some employees and misclassified others." *Marlo*, 639 F.3d at 948. Indeed, courts have widely rejected class treatment in misclassification cases like this one, even when employees shared a job title and were all involved in "technical support."

In *Sirko v. International Business Machines Corp.*, No. CV 13-03192, 2014 WL 4452699 (C.D. Cal. Sept. 3, 2014), the claims involved employees in the "Technology Services 24A job family," who all supported Kaiser Permanente's technology systems. The court found that, notwithstanding the existence of a common, "generic" and "high-level" job description, the employees performed a range of work "with varying levels of importance to the management or operation of Kaiser's business," as relevant to California's administrative exemption. *Id.* at *11.

The court highlighted one employee, whose duties were "gathering information about Kaiser's information storage needs, determining the best solution to a problem, and planning and implementing those solutions." *Id.* The court observed that such duties "appear less routine and clerical, and of more importance to the manager or operation of Kaiser's business," than another employee who simply opened tickets and then called others to fix the issue. *Id.* The court also found variation on the discretion element, contrasting a programmer who simply followed upgrade instructions with others who, in responding to outages, "had to use their specialized technical knowledge of impacted system to identify the problem and figure out the quickest path to recovery." *Id.* at *12. The court observed that "it is far from clear that installation, maintenance, and support are uniformly non-exempt activities," when "sometimes those tasks involve a great deal of discretion and independent judgment and very little supervision," and the record showed that "even those with similar job duties could spend different amounts of time on each discrete task." *Id.* at *13. The court thus held that individualized issues would predominate in adjudicating the exemption. *Id.*

Other cases are in accord. In *Santiago v. Amdocs, Inc.*, No. C 10-4317, 2013 WL 5444324 (N.D. Cal. Sept. 30, 2013), Judge Illston decertified an FLSA collective action and denied Rule 23 certification as to a California class, even though the technical-support employees were "mapped" to the same job families within a "global job classification system." *Id.* at *2-3. The court found such "generalized commonalities" insufficient given that employees' "actual job duties" varied and would

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
Case No.: C13-0119-BLF

require individual analysis under the exemptions.  *Id.* at *5-6 (quotation omitted).  In *Novak v. Boeing*, No. SACV09-01011, 2011 WL 7627789 (C.D. Cal. Dec. 19, 2011), the court rejected class treatment on California claims for "Level 4 Programmer/Analyst" employees, because workers "perform different amounts of exempt and non-exempt duties, have different levels of supervision, employ different amounts of independent judgment and discretion, work in different teams and environments, and have vastly different educational backgrounds." *Id.* at *5-6; *see also Cruz*, 764 F. Supp. 2d at 1058-64 (decertifying FLSA collective of tech workers with shared job description).[20]

**B.    The Record Here Shows That the Job Code Does Not Dictate Employees' Actual Duties, Making Individualized Inquiries Necessary and Defeating Predominance**

For similar reasons, class certification should be denied here for failure of predominance.

**1.    The Job Architecture Is Not Any Significant Form of Common Proof**

On its face, HP's Job Architecture only provides the kind of general, high-level job descriptions that courts have found insufficient to advance the Rule 23 inquiry.  *See Sirko*, 2014 WL 4452699, at *11; *Santiago*, 2013 WL 5444324, at *2-6.[21]  Even Plaintiffs do not contend that the TSC job description, in itself, describes non-exempt work or that one could try this case simply by putting the job description on trial.[22]  The record also clearly refutes Plaintiffs' allegation that the Job Architecture "defines and constrains what TSCs do," Mot. 19-20, or that simply by virtue of the TSCs' job code, one can infer, e.g., that all TSCs have the exact same job duties, or have limited education or expertise.  *See supra* Part II.B.  The broad range of salaries, even among people with

---

[20] *See also Sutton-Price v. Daugherty Sys., Inc.*, No. 11-cv-1943, 2013 WL 3324364, at *4 (E.D. Mo. July 1, 2013) (rejecting FLSA class because "[i]t is not enough" to show that class members "share computer-related duties in a broad sense"); *Blake v. Hewlett-Packard Co.*, No. 11-CV-592 , 2013 WL 3753965, at *11 (S.D. Tex. July 11, 2013) (rejecting FLSA class of HP "IT Support Specialists" because "the work of 'resolving tickets' is simply too general to bind the class"); *Heffelfinger v. Elec. Data Sys. Corp.*, No. CV 07-101, Dkt. #166 (C.D. Cal. Feb. 26, 2013) (decertifying California law class of systems engineers/analysts based on variation in job duties).

[21] *See also, e.g., Rosenberg v. Renal Advantage, Inc.*, No 11-CV-2152 2013 WL 3205426, at *7-8 (S.D. Cal. June 24, 2013); *Aburto v. Verizon Cal.*, No. CV-11-03683, 2012 WL 10381, at *4 (C.D. Cal. Jan. 3, 2012); *Williams v. Lockheed Martin*, No. 09-CV-1669, 2011 WL 2200631 (S.D. Cal. June 2, 2011); *Gales v. Winco Food*, No. C-09-05813, 2011 WL 3794887 (N.D. Cal. Aug. 26, 2011).

[22] *See Hamilton v. Genesis Logistics, Inc.*, No. CV13-01848, 2014 WL 4187941, at *7 (C.D. Cal. Aug. 22, 2014) (common job classification "is not common evidence of misclassification in the absence of evidence showing that the policy was wrongful").

HP'S OPP'N TO MTN. FOR CLASS CERTIFICATION
                                        Case No.:  C13-0119-BLF

the same job code, is further evidence that they do not all "have the same job."  *See* Rowe ¶ 4.  The Job Architecture does not represent a form of proof that, at trial, would lessen the need for individual inquiries into employees' actual work.  *See Marlo*, 639 F.3d at 948; *Wells Fargo*, 571 F.3d at 959.

## 2. Individual Inquiries Are Necessary into Each TSC's Mixture of Tasks and to Determine What Constitutes the TSC's Primary Duty

The record also establishes substantial variation with respect to Plaintiffs' misclassification theory – that all TSCs perform a "*uniformly circumscribed*," and "*limited troubleshooting role*" (Mot. 11) – and as necessary to adjudicate the elements of the respective exemptions.[23]

<u>First</u>, many TSCs have roles that fall completely outside Plaintiffs' paradigm of "troubleshooters" who primarily perform alleged "break/fix" work.  Instead, as "RSAAs" or "TAMs," they do proactive planning and advising on system modifications and special projects, act as HP's lead technical representative to the customer, and frequently partner with sales.  *See supra* at 6, 8.  TSCs like opt-ins Clinton Mills (Duty Manager) and Whitney Ihling (Customer Advocate) also each had distinct roles that did not primarily involve technical "troubleshooting."  *See supra* at 6.

<u>Second</u>, even among those who handle support cases, there is wide variation in their specific roles (e.g., Level 1 vs. Level 2 or 3 vs. ASEs vs. NASEs), and in how they carry out their duties, so as to require individualized inquiries to adjudicate the exemptions and the alleged "common questions" identified in Plaintiffs motion.  *See* Mot. 15.  In particular, the record shows disparate work experiences going to the elements of administrative exemption:  whether work is "directly related" to management policies or general operations, and whether the employee exercises independent judgment and discretion.  Plaintiffs, like Eric Benedict and opt-in Ken Shropshire, allege that their work was routine and clerical.  But other TSCs report, to varying degrees, performing potentially administratively exempt tasks, such as:  complex problem-solving on critical or elevated cases; exercising independent judgment and discretion in deciding how to approach an issue and choosing the best solution from alternatives; doing technical action plans to direct the work of others; acting as a dedicated representative or trusted advisor to premier customers; authorizing,

---

[23] This variation should preclude a finding even of Rule 23(a) commonality, but this brief focuses on Rule 23(b) predominance and superiority because it is a stricter, superseding standard.

without manager approval, thousands or even millions of dollars in replacement equipment; and making recommendations for proactive improvements and purchases. *See supra* at 9 & n.8.

TSCs also report, to varying degrees, doing work relevant to the computer professional exemption, such as writing computer scripts (code) to create workarounds or enhancements in the customer's environment, or doing analysis and testing for system reconfiguration and modification. *See id.*[24] Plaintiffs try to distinguish TSCs in the "Support" organizations from employees in R&D or the sales/"consultancy" teams. Mot. 9, 11-12, 20-21. But (a) Plaintiffs fail to explain why that is dispositive (*i.e.*, that they can just put the org chart on trial); and (b) the lines are not so absolute, given that certain TSCs frequently collaborate with R&D on issue analysis and testing, and/or partner with sales or do special "consultancy" projects. *See id.*

Third, TSCs may spend significant amount of time on other activities relevant to the administrative exemption, such as training lower-level or off-shore engineers, developing or managing internal team processes, and acting as a Team Lead or "Knowledge Base" coach. Even among TSCs in support engineer roles, some report spending <u>less than 50%</u> of their time handling support cases, as opposed to other team-related and proactive consulting activities, while others (as especially relevant to California law) report that their mixture of duties vary week-to-week. *See* McKenna ¶¶ 8, 13, 15; Gill ¶ 15; Grinnell ¶ 26; Gyambavantha ¶ 12.

As in *Sirko*, *Santiago*, and *Novak*, the Court today does not decide who or what roles or tasks are or are not exempt. Rather, the variation in actual job roles duties and time spent on different activities goes squarely to the elements of the relevant exemptions, and would require individualized inquiries into what specific tasks a given employee performs, and then a determination of what tasks or combination of tasks make up the employee's "primary duty." Even if certain TSCs, like Eric Benedict and Ken Shropshire, characterize *their work* on *their teams* as rote, there is no way of adjudicating that without inquiring *into their work*, and there is no basis to extrapolate their experience to all TSCs working in different roles on different teams with different technologies.

---

[24] The training and education of the TSCs also varies significantly. *See supra* at 5 & n.4. This goes to the elements of the exemptions, in that differences in TSCs' backgrounds can manifest in, *e.g.*, the relative complexity of their cases, the kinds of computer work they perform, and whether they consult on cases as specialists and expert advisors or simply receive cases from a general queue.

1    Indeed, the primary-duty evaluation, by itself, "will inevitably overwhelm questions common

2    to class." *Comcast*, 133 S. Ct. at 1432-33.  Under Massachusetts and Colorado law, the court must

3    apply the multi-factored federal test, including the relative importance of different duties within the

4    context of the specific employee's mix of tasks.  California law requires a *workweek-by-workweek*

5    analysis of time spent on different tasks, which necessarily defies class treatment when, as here, the

6    mix of work varies day-to-day and over time.  *See Marlo*, 639 F.3d at 948 (affirming denial of

7    certification); *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422 (2006) (decertifying class).

8    The record here stands in stark contrast to the cases on which Plaintiffs rely.  In *Nelson v.*

9    *Avon Products*, No. 13-cv-02276, 2015 WL 1778326 (N.D. Cal. Apr. 17, 2015), the putative class

10   members all had the same specific job role, and the parties *agreed* on the discrete set of tasks that

11   they performed, with the parties each presenting "a single class-wide argument on the merits" as to

12   whether the employees were exempt.  *Id.* at *3, 7, 9-10; *see also, e.g.*, *Damassia v. Duane Reade,*

13   *Inc.*, 250 F.R.D. 152, 159 (S.D.N.Y. 2008) (evidence showed that specific duties and responsibilities

14   of store managers were centrally derived and uniformly controlled).  Here, there is no such

15   homogeneity.  Even if it were true that HP painted with too broad a brush in classifying all putative

16   class members as exempt, HP "may have accurately classified some employees and misclassified

17   others," and Plaintiffs have not shown how they could show misclassification on a classwide basis

18   through common proof, and without the need for individual inquiries.  *Marlo*, 639 F.3d at 948.

19   **C.    Plaintiffs' "Processes" and "Procedures" Evidence Is Not Sufficient to Show**
     **Misclassification on a Classwide Basis, Without Needing Individual Inquiries**

20   Plaintiffs also argue that there are uniform, "regimented" and "strict guidelines" governing

21   "every aspect of [TSC's] day-to-day work."  Mot. 9-11, 20.  In support of this allegation, they offer a

22   handful of documents drawn from large document repositories.  They also offer vague assertions in

23   the boilerplate opt-in declarations.[25]  Here, Plaintiffs must show both that *common* procedures exist,

24   *and* that the procedures replace the need for individual inquiries at trial by showing, in themselves,

25

26   _____

27   [25] Courts reject "cookie-cutter" declarations that lack meaningful detail.  *See Espinoza v. Domino's*
     *Pizza, LLC*, No. EDCV 07-1601, 2009 WL 882845, at *13 (C.D. Cal. Feb. 18, 2009); *Silverman v.*
28   *SmithKline Beecham Corp.*, No. cv06-7272, 2007 WL 6344674, *2 & n.5 (C.D. Cal. Oct. 15, 2007).

that the employees were misclassified. *Marlo*, 639 F.3d at 948 ("the fact that [a company] expects [employees] to follow certain procedures or perform certain tasks" is not itself dispositive of the exemption inquiry or sufficient to avoid individual inquiries). Plaintiffs have not met the burden.

First, many of Plaintiffs' exhibits simply identify the existence a case-tracking system, basic instructions on how to use the tool when opening or closing a case, or high-level work flows or guidelines in interacting with customers. *See* Pl. Exs. 10, 12-14, 16-17, 22, 24. Many declarants, including *Plaintiffs' own opt-ins*, report that they either are unaware of these processes, or that the processes are not applicable to them because, for example, they are not the ones creating cases. *See supra* at 11 & n.11. Indeed, none of the declarations identify the documents attached to Plaintiffs' Motion as ones constraining their duties. Regardless, the documents only refer to use of the tool or generalized guidelines, ***not how the employee substantively goes about solving a case***. Nor do Plaintiffs proffer the case-management system to show, for example, that assignments are made in a uniform fashion (they are not), or that TSCs have identical case loads or all do high-volume/short-duration case work (they do not). In short, the allege proof is neither common nor material, in sharp contrast to cases on which Plaintiffs rely. *See, e.g.*, *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 443 (C.D. Cal. 2014) (employees could not choose assignments and had to use same 50-page handbook detailing how to conduct appraisals, including angles for photos).

Second, Plaintiffs cite exhibits identifying the existence of, and guidelines for using, certain "Knowledge Base" ("KB") system. *See* Mot. 11, 21; Pl. Exs. 18-20. As a matter of law, the "use of manuals, guidelines or other established procedures" on "highly technical" matters does not preclude exemption where they "can be understood or interpreted only by those with advanced or specialized knowledge or skills," and when the employee still exercises judgment and discretion in how the tool or resource is used. 29 C.F.R. § 541.704.[26] Thus, the mere existence of a KB is not sufficient, and

---

[26] *See also In re Farmers Ins. Exch.*, 481 F.3d 1119, 1124, 1130-31 (9th Cir. 2006) (software loss estimation tool did not preclude administrative exemption, where employee still had to use discretion and judgment in applying software); *Kennedy v. Commonwealth Edison Col.*, 410 F. 3d 365, 374 (7th Cir. 2005) (holding that "work planners" at nuclear power plant – whose job was to come up with solutions to remedy problems at the plant – were exempt, notwithstanding fact that "they look to past work packages for guidance and use a computer to aid their recommendations"); *Cruz*, 764 F. Supp. 2d at 1068-70 (technology employees exercised independent judgment and discretion, despite existence of manuals, because they needed to deviate from manuals to customize solutions).

the record reflects material variation in how TSCs use it.  Some TSCs claim to rely primarily on pre-existing solutions.  But others use the KB articles rarely or only as a potential research tool to consider when generating their own solutions; and others frequently write KB articles *to transfer knowledge to customer IT administrators and lower-level engineers.  See supra* at 11-12 & nn.13-14; *Cruz*, 764 F. Supp. 2d at 1069-70.  Thus, the independent judgment and discretion inquiry would require looking separately into how each TSC used the KB articles and the TSC's role in creating and transferring knowledge.  Moreover, the technical documentation is not *common* evidence, because it varies from product to product and issue to issue.  The trier of fact would not be able to adjudicate whether the documentation eliminates discretion under 29 C.F.R. § 541.704 without actually reviewing, on an individual basis, the documents relevant to each TSC's cases.

Third, Plaintiffs cite to the "First Technical Contact" SLA, s*ee* Mot. 10 & n.11; Pl. Ex. 24, but they fail to explain why the mere existence of that SLA negates any exemption or further inquiry into individuals' work.  Indeed, the evidence shows that this SLA (a) does not constrain the solutions TSCs create; (b) is not uniformly relevant to TSCs (because they do not do the FTC); and (c) TSCs play varying roles in setting, changing, and negotiating priority levels – just as they may play various roles in developing or deviating from other internal team procedures.  *See supra* at 12.

All of the above establishes that this case is far more similar to *Marlo* than *Boyd.*  There is no common or uniform document that evidences how each class member did or was supposed to do the substance of his or her work.  Plaintiffs want to try this case on the theory that class members' work was "routine" and "closely proscribed," but they have offered no common evidence that would permit a trier of fact to reach that question.  Instead, the trier of fact would have to examine each class member's case reports, email correspondence with customers, colleagues, vendors, and managers, and hear conflicting testimony on the way in which a class member characterizes his or her own work.  For these additional reasons, Plaintiffs have not met their burden under Rule 23.

**D.      Certification Should Be Denied As to Each State Class For Additional Reasons**

**1.      Massachusetts**

In addition to the failure of predominance, Plaintiffs cannot satisfy even the Rule 23(a) requirements for the Massachusetts class.  First, Vieira is subject to a unique defense, which defeats

1    typicality and adequacy.  *See, e.g., Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992);

2    *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 557 (C.D. Cal. 2012) ("[e]ven an arguable

3    defense peculiar to the named plaintiff … may destroy the required typicality … as well as bring into

4    question the adequacy of the named plaintiff's representation").  Prior to this lawsuit being filed,

5    Vieira received substantial severance pay in exchange for waiving both his substantive state law

6    claims and his ability to bring a class action.  Ex. 23 (Vieira) at 126:10-127:7-15; Ex. 27 (waiver

7    agreement).  There is a substantial risk that Vieira's claims will be deemed released or barred from

8    being raised as a class action, leaving the Massachusetts class without a representative.  Second,

9    there are also numerosity and commonality problems.  Plaintiffs have not proffered any evidence

10   specific to Massachusetts TSCs beyond the testimony of Vieira and two others (Kennedy and

11   O'Toole) who were from the same team.  There is no indication of commonality or ability to

12   represent TSCs in HPSW or other EG TS teams.  If Vieira cannot represent, for example, HPSW

13   TSCs, then the class would fail the numerosity requirement.

14                    **2.**     **California**

15          Benedict also is not a typical or adequate representative for California, based on unique

16   issues going to his integrity and credibility.  *See, e.g., Jovel v. Boiron, Inc.*, No. 11-cv-10803, 2014

17   WL 1027874, at *3 (C.D. Cal. Feb. 27, 2014); *Alakozai v. Chase Inv. Servs. Corp.*, No. CV 11-

18   09178, 2014 WL 5660697, at *14 (C.D. Cal. Oct. 6, 2014).  As the Court is aware, in the days before

19   his resignation, Benedict surreptitiously imaged his work computer in obvious breach of his HP

20   confidentiality agreement.  *See* Dkt. #100, 161.  Even apart from HP's counterclaims, serious

21   questions exist as to why he would image his entire work computer and whether his explanation –

22   that he simply wanted to keep some personal files – is credible.

23          Benedict also seeks to certify California meal-and-rest-break claims, which are derivative of

24   the misclassification claim and properly denied for the reasons above.  Moreover, Plaintiffs offer no

25   evidence that HP systematically denied class members meal and rest periods, and the mere absence

26   of a written policy, by itself, does not compel certification.  *See Vasquez v. First Student, Inc.*, No.

27   14-CV-06760, 2015 WL 1125643, at *9 (C.D. Cal. Mar. 12, 2015); *Dailey v. Sears, Roebuck & Co.*,

28

214 Cal. App. 4th 974, 1002 (2013).  Indeed, California class members testified that they had no issues taking such breaks.  *See, e.g.*, Halton ¶ 27; Gyambavantha ¶ 18; Miranda ¶ 12.

### 3.   Colorado

Mustain too has injected into this case extraneous claims that would distract from any trial, and thus render him atypical.  Prior to leaving HP, Mustain was promoted into a different Job Code as a Technology Consultant ("TC") III.  Despite abandoning the claims on behalf of other employees in that job code, Mustain is still purporting to pursue his individual claims for time as a TC III, contending that his job duties did not change. Ex. 11 (Mustain) at 23:8-11; 60:12-22; 174:22-25. That theory – that an employee's actual duties do not necessarily align with the Job Architecture – runs counter to the premise of Plaintiffs' class theory, *i.e.*, that the Job Architecture is dispositive.

### E.   Plaintiffs Also Fail to Establish Superiority

In order to show "superiority" under Rule 23(b)(3), plaintiff must show that a class action would be superior to individual lawsuits by the putative class   Plaintiffs fail to establish the requisite superiority because each putative class member will need to "litigate numerous and substantial separate issues to establish his or her right to recover individually."  *Zinser*, 253 F. 3d at 1192. Indeed, Plaintiffs have failed (and do not even attempt) to describe their trial plan.  *See id.* at 1189 (noting plaintiffs' "burden of demonstrating 'a suitable and realistic plan for trial of the class claims'" and a court "cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome"); *Badella v. Deniro Mktg LLC*, No. C 10-03908, 2011 WL 5358400, at *12-13 (N.D. Cal. Nov. 4, 2011) (not superior due to, among other things, "Plaintiff's lack of any suggestions, much less a plan," to manage the case for trial).

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Dated: June 23, 2015                SIDLEY AUSTIN LLP

By: _____/s/ Wendy Lazerson_____
Wendy M. Lazerson

Attorneys for Defendant and Counterclaim
Plaintiff Hewlett-Packard Company

25