# EXHIBIT XX

## REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE

4                     ---o0o---

5

6    ERIC BENEDICT, RICHARD         )

7    BOWDERS and KILRICANOS VIEIRA,)

8    on behalf of themselves and   )

9    classes of those similarly    )

10   situated,                     )

11         Plaintiffs,             )

12     vs.                         )   No. C13-0119-LHK

13                                 )

14   HEWLETT-PACKARD COMPANY,      )

15         Defendant.              )

16   _____)

17   AND RELATED COUNTERCLAIMS.    )

18   _____)

19

20

21        VIDEOTAPED DEPOSITION OF KILRICANOS VIEIRA

22              FRIDAY, OCTOBER 4, 2013

23

24

25   PAGES 1 - 291

                                          Page 1

```
 1        Q    Other than UMAS Dartmouth, have you        10:05:35AM

 2   attended any other colleges or universities?

 3        A    No.

 4        Q    How about community colleges?

 5        A    No.                                        10:05:51AM

 6        Q    Do you have any professional

 7   certifications?

 8        A    I am VCX certified.

 9        Q    Are there different levels of VCX

10   certification?                                       10:06:20AM

11        A    Not that I recall.  I think it's just

12   Master of VCX.

13        Q    And when did you obtain your Master of

14   VCX?

15        A    I don't have an exact date.               10:06:34AM

16        Q    Do you recall who you were employed with

17   when you received that certification?

18        A    Hewlett-Packard or 3Com.  I don't recall.

19   You know, like I said, I was with 3Com for three

20   years and two of which I was with Hewlett-Packard,   10:06:50AM

21   so....

22        Q    Are you saying essentially a total of five

23   years, three of which were with 3Com and two of

24   which were with Hewlett-Packard?

25        A    (Nods head.)                              10:07:04AM
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1              What would you do?                    11:36:42AM

 2      A    I would find out in a group, see if

 3  anybody else had a similar issue.

 4      Q    Okay.

 5              What if people said "no"?              11:36:53AM

 6      A    And then I would look for Knowledge Base

 7  articles.

 8      Q    How would you know what to look for?

 9      A    If it's Knowledge Base, it was based on

10  the Web, so there would be a search engine, not    11:37:04AM

11  Google, but it would be like a search engine

12  between, you know, internal.

13      Q    This was an internal Knowledge Base?

14      A    Uh-huh.

15      Q    Did you ever contribute Knowledge Base    11:37:20AM

16  articles?

17      A    Yes.

18      Q    Was that part of your job?

19      A    Yes.

20      Q    And when would you contribute a Knowledge 11:37:25AM

21  Base article?

22      A    There was no, like, metric system.  It's

23  just like if you get a -- if you get, like,

24  something that we haven't all saw before, you know,

25  write a document on it, so it doesn't happen to the  11:37:42AM
```

Page 94

```
 1   next guy.  Say, if it stumped you for more than, you      11:37:46AM

 2   know, you know, a time frame, just write an article

 3   on it so we don't make the same mistakes twice.  A

 4   wise man learns from other people's mistakes.

 5        Q    Were the Knowledge Base articles also        11:38:07AM

 6   written to provide solutions --

 7        A    Yes.

 8        Q    -- that you had determined?

 9        A    Yes.

10        Q    Did you ever write any Knowledge Base         11:38:14AM

11   articles in which you provided a solution that you

12   had determined?

13        A    Yes.

14        Q    Okay.

15        A    For -- you're saying for Vertical             11:38:29AM

16   Communications?

17        Q    Right.

18        A    Yes.

19        Q    How did you determine --

20             Can you think of how you determined the      11:38:38AM

21   solutions on the occasions you wrote Knowledge Base

22   articles?

23        A    This was a Windows product, so you could

24   Google -- the platform was Windows, so you could

25   Google sometimes, you know, and find the answer that   11:38:54AM
```

Page 95

```
 1                THE WITNESS:  Yes.                    11:53:18AM

 2     BY MR. FISCHER:

 3          Q     And how do you --

 4                So how do you prove it's true?

 5          A     So what I would do is I would -- I would   11:53:26AM

 6     look at the logs, look at the call flow and

 7     determine where that -- the hiccup was, you know,

 8     "hiccup" being where the call is stuck.  And if it's

 9     on my side, I can go further with the solution.

10                But if it's -- if it's on the carrier's   11:53:58AM

11     side, I just identified -- I help -- I help the

12     carrier do their job.

13          Q     And how do you --

14                If you could, how do you use the logs to

15     reach that conclusion?                           11:54:16AM

16          A     The job -- the logs -- it's basically

17     it's -- it's words on a piece of paper, and it shows

18     call data and your eye gets trained to look at

19     certain material, you know.  It's like looking at

20     the notes that -- I don't want to say the wrong name   11:54:43AM

21     of -- it's like looking at the technical jargon that

22     she's going to provide in the transcript.  And so --

23     but your eyes get focused on, you know, seeing --

24     seeing the call flow.  So you can actually take out

25     or parse out some of the information that's being,   11:55:13AM
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1   you know -- being in that call flow.                11:55:16AM

 2        Q    Did you say "parse out"?

 3        A    Parse, take out.

 4        Q    And how did you learn to interpret logs

 5   like that?                                          11:55:35AM

 6        A    I've been doing it for a while, and every

 7   log is different.

 8             MR. FISCHER:  Okay.  It's 11:57.  I could

 9   go a while longer or we can pause, whatever you, in

10   particular, Mr. Vieira, would prefer to do.         11:56:07AM

11             THE WITNESS:  Let's go.

12             MR. SAGAFI:  "Go" meaning eat?

13             THE WITNESS:  No, let's continue.

14             MR. PILOTIN:  Let's go for another 20

15   minutes.                                            11:56:16AM

16             THE WITNESS:  Yeah.

17             MR. FISCHER:  Whatever your preference is.

18   Okay.

19             THE WITNESS:  Yeah.

20   BY MR. FISCHER:                                      11:56:21AM

21        Q    So turning back to Exhibit Number 1, if

22   you could go up to the -- the "Objective" section of

23   this resume --

24        A    Uh-huh.

25        Q    -- which again, if I heard you correctly,  11:56:41AM
```

Page 108

1            The question, when you're ready to answer        1:21:19PM

2    it, is whether you recognize this document.

3         A    I recognize this document.

4         Q    What is this document?

5         A    I believe I signed this document when I --    1:21:26PM

6    when I left HP.

7         Q    Did you read it before you signed it?

8         A    Yes.

9         Q    Did you understand -- strike that.

10            Did you have an understanding whether if        1:21:40PM

11    you signed this document, you would receive a

12    payment from HP?

13         A    It's stated here in paragraph 5, "in

14    return of this cash severance payment."

15         Q    Yes.                                           1:22:03PM

16         A    So, yeah, you wouldn't -- you wouldn't get

17    a severance package based on this document.

18         Q    Unless what?

19         A    Unless you signed it.

20         Q    Okay.                                          1:22:13PM

21            Do you recall actually signing Exhibit 6?

22         A    No.

23         Q    If you look at the handwriting on the

24    front, is that your handwriting?

25         A    This is my handwriting.                        1:22:30PM

                                                               Page 126

1          Q    Can you think of a reason why you          1:22:32PM

2     didn't -- why you did not sign it?

3          A    No.

4          Q    Did you intend to sign it?

5          A    Yes.                                        1:22:43PM

6          Q    Okay.

7               And do you recall that you received money

8     from HP after you provided Exhibit 6 to them?

9               MR. PILOTIN:  Objection; vague.

10              THE WITNESS:  Yes.                           1:22:54PM

11    BY MR. FISCHER:

12         Q    Okay.

13              In other words, you did get a -- what you

14    understood to be a cash severance payment, correct?

15         A    Right.  Yes.                                 1:23:01PM

16         Q    Okay.  Done with that one.

17              I want to turn to some questions about

18    your job at 3Com.

19              When you started working at 3Com, was your

20    office located in Marlborough?                         1:23:35PM

21         A    Yes.

22         Q    At some point during your employment with

23    HP, did your office location move?

24         A    Yes.

25         Q    Where did it move to?                        1:23:44PM

                                              Page 127

```
 1              Can you give me an example of a low-level      1:49:23PM

 2   call?

 3       A    That's where the Level 0, and Level --

 4   Level 0 engineers were, so they're more of a

 5   help-desk person, and they would triage calls, and      1:49:38PM

 6   we had a Level I in-house, like, so they will triage

 7   to the Level I folks, the Call Team, which Ed

 8   Stratton managed, okay?  And -- and that's how our

 9   tickets would come in and the severity level of that

10   ticket.                                                 1:50:12PM

11       Q    So it starts at Level -- with a Level 0

12   engineer who triages it, it then goes to a Level I

13   engineer and then, if necessary, it goes to Level

14   II, correct?

15       A    If necessary, it goes to Level II.              1:50:30PM

16       Q    And you were at Level II, right?

17       A    I believe that was my title.

18       Q    Is that your understanding -- strike that.

19            Is it your understanding that you were a

20   Level II engineer?                                      1:50:42PM

21       A    Yes.

22       Q    We've been talking about the tickets.

23   Let's take a look at some.

24            MR. PILOTIN:  Max, if it's okay, can we

25   take a break in about 10 minutes?                       1:51:39PM
```

Page 146

```
 1              THE WITNESS:  That is correct.          2:11:46PM

 2   BY MR. FISCHER:

 3       Q    Okay.

 4            Is -- again, take as much time as you need

 5   to review Exhibit 8, but the question is, when       2:11:57PM

 6   you're ready to answer it, is this an example of a

 7   ticket?

 8       A    This is an example of a call tracking

 9   system that we used.  And before I said it was SAR.

10   I believe this was -- SAR was -- this was in          2:12:09PM

11   conjunction with SAR, S-A-R.

12       Q    "This" being -- when you say "this" --

13       A    This document, it's a call tracking

14   system, GCSS.  I don't know what that GSS stands

15   for, but this is a call tracking system.             2:12:30PM

16       Q    Okay.

17            So let's -- let's focus -- just before we

18   get into the details of this particular exhibit,

19   the -- how -- when you're working -- strike that.

20            When you were working for 3Com and HP, how   2:12:54PM

21   would you get an assignment?

22            MR. PILOTIN:  Objection; vague.

23            THE WITNESS:  A ticket would come in many

24   forms, meaning it would come in from Level 0 and

25   then Level I, and then from there, they would        2:13:15PM
```

Page 148

```
 1    determine where it would go, if it was a Data case        2:13:21PM

 2    or a Voice case.

 3    BY MR. FISCHER:

 4         Q    And if it was --

 5              If they determined it was a Voice case, it      2:13:30PM

 6    would head to your department?

 7         A    To the Enterprise Solutions Team, yes, my

 8    department.

 9         Q    The Voice Team?

10         A    The Voice Team.                                  2:13:40PM

11         Q    Okay.

12              And if you look on the front page of

13    Exhibit 8, you see that there's a -- something

14    called a Case ID --

15         A    Uh-huh.                                          2:13:51PM

16         Q    -- at the top?

17         A    Yes.

18         Q    Is that -- is that the same thing as a

19    ticket number?

20         A    That is a ticket number.                        2:13:58PM

21         Q    Okay.

22              And so how is it that a particular ticket

23    would be one that you would be assigned to work on?

24              MR. PILOTIN:  Objection; lack of

25    foundation.                                                2:14:08PM
```

Page 149

1    And if you could just help us understand what --          2:44:23PM

2    just interpret that for us.

3         A    Okay.  Here, it's just saying that there's

4    a warning at such and such a time, and -- and later

5    on, it's giving some errors followed by another          2:44:38PM

6    warning.

7         Q    What are the errors?  What errors is it

8    reporting?

9         A    That there's some hung jobs, hung

10   sessions.                                                 2:44:53PM

11        Q    What's -- what's a hung session?

12        A    A hung session would be -- Oracle does

13   things in the background that we don't see, the

14   customer doesn't see, and so if it doesn't hit all

15   them points that it's supposed to do, it's going        2:45:17PM

16   to -- it's going to parse out some sort of error.

17        Q    Is -- is it a way to understand that

18   Oracle is performing some internal query that wasn't

19   completed?

20        A    That is correct.                              2:45:31PM

21        Q    Okay.

22             And this error message does not indicate

23   to you why that query was not completed, correct?

24        A    That is correct.

25        Q    Okay.                                          2:45:40PM

Page 174

1          A     Based on -- based on the second page,          2:53:30PM

2     HP30597, I did indicate that -- here, it says, "I

3     will elevate the core file as well," so that's going

4     to another team for review.

5          Q     My question is:  Did you make the decision     2:53:56PM

6     to send it to them?

7               MR. PILOTIN:  Objection; asked and

8     answered.

9               THE WITNESS:  Based on -- based on this

10    document, did I make the -- that could be standard      2:54:04PM

11    operating procedures.

12    BY MR. FISCHER:

13         Q     Sorry, what do you mean?

14         A     That could be part of my standard

15    operating procedures to, you know -- if it's -- if      2:54:18PM

16    it's a core file, to elevate the core file, because

17    it's not my job description to determine what this

18    technical jargon means in the core file.

19         Q     I -- I -- I understand what you're saying.

20    My question is a little bit different.                  2:54:35PM

21              When you -- when you were deciding what to

22    do, if I've understood you correctly, you said it

23    could have been one of two things:  You could have

24    decided to look further and delve into other logs or

25    perhaps that was a suggestion that came from Product    2:54:51PM

Page 180

```
1    Support; is that right?                        2:54:54PM

2        A    Uh-huh, yes.

3        Q    Okay.

4             So it could have been one or the other,

5    right?                                          2:54:57PM

6        A    Could have been one or the other.

7        Q    And my question is:  Are you -- was it up

8    to you to decide at what point you were going to

9    elevate this to Product Support as opposed to try to

10   delve further or -- or employ other -- other        2:55:09PM

11   techniques to get at the problem?

12            MR. PILOTIN:  Objection; asked and

13   answered.

14            THE WITNESS:  Based on this core file, I

15   thought it was prudent to elevate.                   2:55:22PM

16   BY MR. FISCHER:

17       Q    Okay.

18            If we could -- if you could turn to page

19   HP30604.

20       A    Yes.                                        2:56:03PM

21       Q    There's a note that's about a fourth of

22   the way down the page.  It looks like one that you

23   entered that begins, "Hi Jim."

24            Do you see that note?

25       A    Yes.                                        2:56:18PM
```

                                                  Page 181

```
 1        Q    Is that a note that you entered?          2:56:18PM

 2        A    Yes.

 3        Q    Okay.

 4             And you say:

 5                 "Hi Jim, I escalated this case         2:56:22PM

 6             to Product Support to verify if

 7             this core file is harmless or not

 8             ...  As soon as they ping me I will

 9             let you know...."

10        A    Yes.                                       2:56:38PM

11        Q    What did you mean, "if this core file is

12   harmless or not"?

13        A    Based on -- in Exhibit HP3597, I wanted to

14   make sure through Product Support or Development

15   that what these errors are before we would move       2:56:55PM

16   forward, because they were out of line with a system

17   that was functioning properly.

18        Q    Okay.

19             And then if you look down the page,

20   there's another note that says -- it begins, "Gave    2:57:24PM

21   Jim the solution...."

22             Do you see that?

23        A    Yes.

24        Q    Okay.

25             And it reads:                               2:57:33PM
```

                                              Page 182

```
 1    recommendation that it's best to add that additional     3:10:21PM

 2    bandwidth now rather than later, right?

 3         A    If it says that.  Let me see.  I don't

 4    know.  Where does it say that?

 5         Q    Well, where I'm looking, Mr. Vieira, is a     3:10:36PM

 6    note that actually begins with the word "e-mail

 7    out" --

 8         A    Okay.

 9         Q    -- at the bottom quarter of the page.

10         A    Yep.                                          3:10:45PM

11         Q    And there you've written:

12              "Mike, Gateway utilization for

13              Outbound and Inbound calls will you

14              the some idea."

15              Do you mean the "same" idea?                  3:10:53PM

16         A    Yeah.

17         Q    (Reading):

18              "Like I mentioned on the

19              phone, it would probably be 'BEST'

20              to add a new T1 now as it's a lot             3:11:01PM

21              harder to add it later.  That's

22              my" --

23               I think you said "remomondation."

24         A    Yeah.  Yeah.  Thank you.  But there was no

25    spell checker in this thing.  So forgive my            3:11:13PM
```

Page 191

```
1    technical jargon.                              3:11:17PM

2        Q    Did you mean "recommendation"?

3        A    Recommendation.

4             MR. PILOTIN:  Don't worry, lawyers are --

5    we spell things wrong all the time.            3:11:24PM

6             THE WITNESS:  So to get back to the

7    question.

8    BY MR. FISCHER:

9        Q    Yes.

10       A    I had him look at the Gateway Utilization    3:11:28PM

11   outbound call, and I based my information -- my

12   recommendation based on that call -- I mean, based

13   on that CDR.

14       Q    Which is the report of the volume?

15       A    The report of the volume.            3:11:41PM

16       Q    Okay.

17            So you looked at the volume, and you

18   essentially gave him the recommendation, "I'd add

19   the capacity now."

20       A    Now, because it sounded like that in    3:11:49PM

21   some -- some future date that they were going to,

22   you know, migrate the office to a bigger office.

23       Q    Got it.

24            And so was it within your job duties,

25   Mr. Vieira, to provide those sort of recommendations    3:12:04PM
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    to customers?                                    3:12:06PM

 2            MR. PILOTIN:  Objection; vague.

 3            THE WITNESS:  Well, it depends.  If

 4    there's a report in this case, there's a report, it

 5    says that, you know, what that utilization was and,  3:12:16PM

 6    you know, whatever that output is, you know,

 7    that's -- that's what I'm making recommendations on.

 8    BY MR. FISCHER:

 9        Q    Oh, no, I understand that.

10        A    Okay.                                    3:12:29PM

11        Q    You're making a recommendation based upon

12    the data itself, correct?

13        A    Right.

14        Q    My question is broader, which is whether

15    customers asked you for those types of             3:12:36PM

16    recommendations?

17        A    Well, if they asked me for a

18    recommendation, only certain recommendations I could

19    provide if I had some sort of backup.

20        Q    Data?                                    3:12:50PM

21        A    Data.

22        Q    Okay.

23            So if they asked you for a recommendation,

24    you would ask them for data upon which you could

25    make that recommendation, correct?                3:12:57PM
```

Page 193

```
 1      A     That's correct.                    3:13:00PM

 2      Q     Okay.

 3            And that was something you were called

 4    upon to do while you worked at HP and 3Com, right?

 5      A     Yes.                                3:13:07PM

 6            MR. PILOTIN:   Objection; vague and

 7    argumentative.

 8    BY MR. FISCHER:

 9      Q     I think Exhibit 10 -- I'm only smiling

10    because I think it looks like your e-mail system did    3:13:31PM

11    have spell check.

12            If you want --

13            If you could take a look in Exhibit 10 and

14    just the question really is:  Is this e-mail stream

15    related to the ticket we were just looking at?    3:13:44PM

16      A     It -- it does seem like it is, because I

17    use the same technical words as Gateway Utilization.

18    So to take it a little step further is, this call

19    tracking system I don't believe had e-mail

20    capabilities to clients, and that's why    3:14:03PM

21    Hewlett-Packard is -- moved to a different SAR

22    program.

23      Q     Got it.  Okay.

24            MR. FISCHER:  I think we've been having

25    enough fun for one hour.  Why don't we take a quick    3:14:24PM
```

Page 194

```
 1    are more of a summary of essentially the things      3:40:17PM

 2    you've tried to employ to resolve the issue; is that

 3    accurate?

 4              MR. PILOTIN:  Objection; argumentative.

 5              THE WITNESS:  It's -- you could say that      3:40:29PM

 6    it's a summary.

 7    BY MR. FISCHER:

 8         Q    Okay.

 9              Are there any documents that you're aware

10    of that would give a specific step-by-step account    3:40:38PM

11    of everything that you did to try to resolve a

12    problem?

13         A    No.  Based on just several documents there

14    that I would review to help resolve the case.

15         Q    I'll come back to that in a second.  I was    3:41:16PM

16    asking, I think, a slightly different question,

17    which is, I'm trying to figure out if there's a

18    record -- if we wanted to see what you did on a

19    particular case, I understand that one thing we can

20    look at are the case logs or the tickets, like the    3:41:29PM

21    two that we've looked at so far, correct?

22         A    Uh-huh.  Yes.

23         Q    And then we could also, in theory, look at

24    e-mails that you may or may not have cut and pasted

25    into the tickets; is that right?                      3:41:43PM
```

1        Q      You mentioned, I think, in response to a        3:44:05PM

2    question that I don't think I asked you, but I'll

3    ask you now:  You said there's several documents

4    that you would review to help resolve a case; is

5    that right?                                                3:44:16PM

6        A      That is correct.

7        Q      What documents are you referring to?

8        A      Manuals.

9        Q      Which manuals?

10       A      That's hard to say.  Manuals on the ███         3:44:32PM

11   ███

12       Q      Why is it hard to say?

13       A      Because there's several manuals.

14       Q      Would you always look at a manual to

15   help -- would you -- strike that.                          3:44:49PM

16              With respect to every ticket, would you

17   always look at these manuals?

18       A      I will either look at a manual or look at

19   a Knowledge Base article.

20       Q      Would you also do searches on the              3:45:07PM

21   Internet?

22       A      Searches on the Internet?  Can you be more

23   specific?

24       Q      Sure.

25              Would you -- you testified earlier in          3:45:18PM

                                                        Page 200

```
 1    another job -- I think it was for Vertical        3:45:20PM

 2    Communications -- you would sometimes use Google,

 3    for example, to try to figure out if the external

 4    world had ever dealt with this issue.

 5            Did you do that in your job at 3Com or HP    3:45:33PM

 6    ever?

 7        A    Not at 3Com or HP.  We had -- we had a

 8    Knowledge Base article.  It was via the Internet, so

 9    the server was in some other location that I would,

10    you know, type in some data and it would, you know,   3:45:53PM

11    give me some information based on my criteria.

12        Q    So you would type in criteria for what you

13    were researching; is that right?

14        A    That is correct.

15        Q    Okay.                                       3:46:09PM

16            And was this Knowledge Base specific to

17    the Voice Team?

18        A    It was company, so the Voice Team had

19    rights to it.

20        Q    Is one of your responsibilities to          3:46:29PM

21    actually create entries for the Knowledge Base?

22        A    That is correct.

23        Q    Okay.

24            How many times did you do that?

25        A    I don't recall the actual number.           3:46:41PM
```

Page 201

```
 1        Q    Did you do it frequently?                3:46:44PM

 2        A    I think there was --

 3             MR. PILOTIN:  Objection; vague.

 4             THE WITNESS:  I think there was some --

 5    there could have been some number that, you know, HP    3:46:53PM

 6    wanted you to write.

 7    BY MR. FISCHER:

 8        Q    Do you recall meeting that expectation?

 9        A    I can't recall.

10        Q    Did you ever do it?                       3:47:10PM

11        A    Yes.

12        Q    Okay.

13             Do you recall what the topic was you wrote

14    on?

15        A    No.                                       3:47:17PM

16        Q    And Knowledge Base entries were intended

17    to be solutions that engineers, like yourself, had

18    come up with to problems, correct?

19             MR. PILOTIN:  Objection; vague and

20    argumentative.                                     3:47:34PM

21             THE WITNESS:  They were -- they were

22    solutions to what we encountered.

23    BY MR. FISCHER:

24        Q    That -- that the engineer had come up

25    with, right?                                       3:47:45PM
```

Page 202

1          A     Right.                                      3:47:46PM

2          Q     Other than manuals and the Knowledge Base,

3     are there any other documents that you would refer

4     to in doing your job, the technical aspects of your

5     job?                                                   3:48:07PM

6          A     Maybe some advice from another team.

7          Q     This would be --

8                Are you referring to instances where you

9     would decide to reach out to your colleagues on one

10    of the other teams you mentioned earlier to see what   3:48:27PM

11    their views on a particular problem was?

12         A     Right.  Product Support mainly.

13         Q     Would that happen via --

14               Would you just walk down the hallway?

15    Phone them?  How would you do that?                    3:48:45PM

16         A     It would depend.  It depends.  It's safe

17    to say that we would have weekly meetings, so if

18    it's an issue that they haven't seen, they would ask

19    us, you know, let's talk about their issues.  There

20    was an arena for that.                                 3:49:07PM

21         Q     To have a dialogue with your team and

22    their team?

23         A     That is correct.

24         Q     Okay.  Okay.

25               Any other documents that you would refer    3:49:34PM

Veritext National Deposition & Litigation Services
866 299-5127

1    to in performing the technical aspects of your job?        3:49:37PM

2        A    I can't recall the documents that I would

3    have used in the past.  It's been over 18 months.

4    Sorry, sorry, sorry.

5        Q    Are you counting the months since July of        3:49:58PM

6    2012, right?

7        A    Since July.  Or June 15th.

8        Q    Okay.  Since June of 2012.

9             But as you sit here today, other than the

10   manuals and the Knowledge Base, you can't identify        3:50:09PM

11   any other documents that you would have used to

12   perform the technical aspects of your job, correct?

13       A    That is correct.

14       Q    And the manual -- the manual you

15   identified was the ███ manual, correct?                    3:50:22PM

16       A    That is correct.

17       Q    Okay.

18            Let's come back to the manual for a

19   second.

20            Is the ███ manual something that was            3:50:46PM

21   provided to customers?

22            MR. PILOTIN:  Objection; vague.

23            THE WITNESS:  Yes, it was provided to

24   customers.

25

                                                    Page 204

```
 1    severity level is until they actually speak to me      3:56:02PM

 2    live.  They may tell the person on the phone that

 3    their system is down because they want to talk to,

 4    quote/unquote, the engineers and, you know, somebody

 5    could sort of help them out, not like a how-to,         3:56:19PM

 6    meaning -- meaning Level 0 or Level I person.

 7         Q    Well, let's -- let's go --

 8              So if I hear what you're saying correctly,

 9    the severity level is not necessarily an indicator

10    as to whether the system's down or not; is that fair   3:56:43PM

11    to say?

12              MR. PILOTIN:  Objection to the extent it

13    mischaracterizes the witness' testimony.

14              THE WITNESS:  There's some gray area,

15    okay?  Based on what I said before, if a system --     3:56:51PM

16    if they say it's a down system -- when someone calls

17    in, they say it's a down system, I treat it as a

18    down system.

19    BY MR. FISCHER:

20         Q    Right.                                        3:57:05PM

21         A    So does that answer your question?  And

22    then later on, I can determine if it was actual

23    down.

24         Q    Okay.

25              Well, let's -- let's turn to -- let's turn   3:57:14PM
```

Page 208

```
 1    your belief that you would have looked at any        4:01:19PM

 2    documents in order to perform the tasks that you

 3    describe there?

 4         A    At this stage, what I'm looking for was --

 5    if we go back to Exhibit 9 --                         4:01:30PM

 6         Q    Yes.

 7         A    -- I'm looking for -- I'm sorry --

 8    Exhibit 8 --

 9         Q    Yes.

10         A    -- for the record.  I was looking for,      4:01:38PM

11    like, any core files that would cause an error.

12         Q    So you're investigating whether there are

13    core files that would cause an error; is that right?

14         A    Uh-huh.  Yes.

15              MR. PILOTIN:  Objection; vague.  Hold on.   4:01:51PM

16    Allow everyone to talk.

17    BY MR. FISCHER:

18         Q    Okay.

19              So when you --

20              When you are telling Chris Perry that       4:02:06PM

21    you're going to get into the system to see if

22    anything is causing the system to go down, what is

23    it that you're going to be looking for?

24         A    As I just indicated, I'm looking for

25    any -- any -- any coring of the logs.                 4:02:22PM
```

Page 212

1          A     If the issue happened previously.          4:03:53PM

2          Q     Okay.

3                And if the Knowledge Base articles and

4     manuals do not indicate a recurring problem, what's

5     the next thing you do?                                4:04:08PM

6          A     Like I indicated before, is I will seek

7     assistance from the Product Support.

8          Q     Is there anything else that you might try

9     to do to resolve the problem first?

10         A     Yeah.  I would look -- I would look into    4:04:31PM

11    more logs.  There's-- there's-- there's many logs,

12    so....

13         Q     So is it up to you, Mr. Vieira, to

14    determine when you've kind of done enough looking in

15    logs, when you've done enough searching in Knowledge   4:04:43PM

16    Bases and manuals to see if you can figure out what

17    the problem is --

18                MR. PILOTIN:  Objection; vague.  Sorry.

19    BY MR. FISCHER:

20         Q     -- and then make the decision to seek       4:04:52PM

21    assistance?

22                MR. PILOTIN:  Objection; vague, compound

23    and argumentative.

24                THE WITNESS:  As a Technical Support

25    Engineer, we try to take the call as far as we can     4:05:04PM

                                                     Page 214

```
 1    possibly take it through completion.                  4:05:08PM

 2    BY MR. FISCHER:

 3         Q    And the company is relying on you to make

 4    a determination as to when you can't take it any

 5    further, correct?                                     4:05:22PM

 6              MR. PILOTIN:  Objection; calls for

 7    speculation and vague.

 8              THE WITNESS:  My boss is -- you know, if I

 9    can't take, you know -- I'll take -- like you said,

10    I would take a call to a certain point, and I would  4:05:37PM

11    raise an issue to my boss, and then from there,

12    he -- he would give us some sort of permission to go

13    talk to Product Support, or if that permission is

14    not granted, like I said before, there is an arena

15    for that, you know, like on conference calls.  We     4:06:02PM

16    have in-house meetings, weekly meetings to

17    collaborate, you know, with our team.

18    BY MR. FISCHER:

19         Q    Is it your testimony, Mr. Vieira, that you

20    needed permission from Ed Stratton in order to talk  4:06:19PM

21    to Product Support?

22              MR. PILOTIN:  Objection to the extent it

23    mischaracterizes the witness' testimony and

24    argumentative.

25              THE WITNESS:  To -- I don't know if it's    4:06:32PM
```

Page 215

```
 1    moving to HP, Product Support -- things got a little      4:06:34PM

 2    strict, and they -- Product Support wanted you to

 3    fill out a questionnaire of work that has been

 4    completed.

 5            To answer your question, your previous           4:06:55PM

 6    question, is that would determine how far you went

 7    with the case.  So we would go as far as -- as -- if

 8    it's a down system, we could get the information

 9    in-house, meaning a copy of that database, and we

10    will rack the system, we will put the system -- we       4:07:22PM

11    would put their -- their product on our environment

12    and then -- and then try to see what's going on.

13    From there, you know, I would bring it up to Ed or

14    my team lead, and then from there, we will elevate

15    the issue.                                               4:07:49PM

16    BY MR. FISCHER:

17        Q    Just going back to what you just said, "if

18    it's a down system, we could get the information

19    in-house, meaning that a copy of the database and we

20    would rack the system.  We'd put the system on our       4:08:04PM

21    environment and try to see what's going on from

22    there."

23            That's what you just testified to.

24            You're referring now to what you, yourself

25    would be doing, correct?                                 4:08:14PM
```

```
 1        A    Me, myself.                              4:08:16PM

 2        Q    Okay.

 3             In terms of --

 4             You're describing, correct, replicating

 5   the system in a lab environment, right?            4:08:23PM

 6             MR. PILOTIN:  Objection; vague.

 7             THE WITNESS:  That is correct.

 8   BY MR. FISCHER:

 9        Q    And when you say, "Try to see what's going

10   on from there, try to determine what the cause of   4:08:33PM

11   the problem is," right?

12        A    That is correct.

13        Q    Okay.

14             If you go back to Exhibit 8, you'll recall

15   that we saw some advice that you received from Steve 4:09:05PM

16   Doane, right?

17        A    That is correct.

18        Q    Is it your testimony that you needed

19   permission in order to reach out to Steve Doane and

20   get his advice?                                     4:09:20PM

21             MR. PILOTIN:  Objection; argumentative.

22             THE WITNESS:  There was a time that --

23   that you needed permission, meaning things change.

24   Like, meaning our titles changed, and so yes.  There

25   was a time that it wasn't that easy to -- to have    4:09:38PM
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | that contact with the next level.  They wanted some | 4:09:44PM |
| 2 | sort of metric system, so they asked us to put -- | |
| 3 | put it in the call tracking system. | |
| 4 | BY MR. FISCHER: | |
| 5 | Q    Okay. | 4:09:56PM |
| 6 | A    So meaning when I said Ed Stratton, you | |
| 7 | know, Ed Stratton would hold these weekly meetings | |
| 8 | and, you know -- and then, you know, in his weekly | |
| 9 | meetings, we would collaborate and Ed, with the team | |
| 10 | leads, you know, would determine -- I don't know if | 4:10:16PM |
| 11 | it was actually Ed Stratton saying, "Okay, you | |
| 12 | should escalate this," or a team lead saying, "This | |
| 13 | is a valid -- a valid document to escalate."  And | |
| 14 | it's not just on -- on system down; we would -- we | |
| 15 | would have -- we would have these weekly meetings to | 4:10:42PM |
| 16 | determine the -- I guess, the status of the case. | |
| 17 | If that's what you're asking. | |
| 18 | Q    And this was -- | |
| 19 | This was a meeting in which you would | |
| 20 | participate, right? | 4:10:58PM |
| 21 | A    Yes. | |
| 22 | MR. PILOTIN:  Objection; vague. | |
| 23 | BY MR. FISCHER: | |
| 24 | Q    And your -- you were permitted to speak in | |
| 25 | the meeting and talk about the case, right? | 4:11:03PM |

Page 218

```
1        A    With my team, yes.                      4:11:05PM

2        Q    Yeah.  And express your own views as to

3   what should happen, right?

4             MR. PILOTIN:  Objection; vague and

5   argumentative.                                     4:11:10PM

6             THE WITNESS:  I would -- I would state the

7   facts was, you know, "This -- this XY and Z -- I did

8   XY and Z.  Now, is there anything else," you know --

9   "has anybody else in this group witnessed or saw

10  this type of issue before?"                        4:11:31PM

11  BY MR. FISCHER:

12       Q    Right.

13            You were seeking guidance in that setting

14  from your -- from the other team members, right?

15       A    Yes.                                     4:11:40PM

16            MR. PILOTIN:  Objection; vague,

17  argumentative.

18            Just hold on for a little bit.

19            THE WITNESS:  I know.  Okay.

20  BY MR. FISCHER:                                    4:11:44PM

21       Q    Would you agree with me that in Exhibit 8

22  there's no evidence that you got permission from Ed

23  Stratton to reach out to Steve Doane?

24       A    That's safe to say.

25       Q    Okay.                                    4:11:53PM
```

Page 219

```
 1    here is the system was going down previously, and it    4:13:08PM

 2    went down again and it came back up, so I just

 3    looked to see if there was, you know, a recurring --

 4    recurring issue.

 5    BY MR. FISCHER:                                         4:13:24PM

 6        Q    So -- so opening the ticket, you were

 7    suggesting that he open a data ticket for the Data

 8    Team because you had seen -- you were recommending

 9    that to him because you had seen a prior ticket that

10    involved a ████ switch; is that right?               4:13:36PM

11        A    That is correct.

12        Q    Okay.

13             Let's go to the next note on this page.

14    It looks like another note that you authored.

15             Would you agree with that?                  4:13:59PM

16        A    Yes.

17        Q    Okay.

18             And you've written:

19                "Talked with Rob, Gateway

20             looks good.  The errors are a               4:14:06PM

21             result of the network."

22        A    Uh-huh.

23        Q    Do you know why you reached that

24    conclusion?

25        A    Yes.  Based on the logs that I gathered.    4:14:18PM
```

Page 221

```
 1        Q    That you analyzed, right?                4:14:24PM

 2        A    Yes.

 3             MR. PILOTIN:   Objection; vague.

 4   BY MR. FISCHER:

 5        Q    And you've -- is --                       4:14:28PM

 6             Is it correct that what follows in this

 7   note is an e-mail -- an e-mail that you've cut and

 8   pasted into the note?

 9        A    Uh-huh, yes.

10        Q    Okay.                                     4:14:49PM

11             And does what you cut and pasted into the

12   note extend all the way until the bottom of page

13   HP30779?

14        A    That is correct.

15        Q    Okay.                                     4:15:19PM

16             If you look back at the top of this note

17   on page HP30777, you've indicated:

18                 "There are two errors on your

19             gateway.  1. result of having one

20             powersupply.  2.  Ethernet link          4:15:34PM

21             down (RESULT of disconnect from the

22             swith [sic]).  Hope that helps."

23             How did you reach those conclusions?

24        A    Through the GUI.

25        Q    What is a GUI?                            4:15:46PM
```

Page 222

```
 1    document, I don't recall stating that there was a        4:46:12PM

 2    document.

 3              Like I said earlier, you know, we would

 4    take it as far as we could possibly take it.

 5    BY MR. FISCHER:                                          4:46:26PM

 6         Q    Based upon your conclusion that you had

 7    taken it as far as you could, correct?

 8              MR. PILOTIN:  Objection; argumentative.

 9              THE WITNESS:  Yes.

10    BY MR. FISCHER:                                          4:46:37PM

11         Q    Coming back to the types of solutions that

12    you were able to find for the customers, I think

13    we've seen from some of the examples we've looked at

14    today, sometimes the recommendation is that they

15    install a patch of some type, correct?                   4:46:58PM

16         A    Based on the stuff that we saw today, yes.

17         Q    Okay.

18              And sometimes you're recommending to them

19    that they change certain settings on their server,

20    correct?                                                 4:47:09PM

21         A    Based in the GUI, what we saw in the GUI,

22    yes.

23         Q    Can you give other examples of types of

24    solutions that you would be offering -- that you

25    would be recommending to clients or customers?          4:47:19PM
```

Page 231

1    Version 6; is that right?                         5:06:10PM

2         A    That is correct.

3         Q    Okay.

4              And this is Version 6 of what?

5         A    █████                                    5:06:14PM

6         Q    Okay.

7              And then would you agree that your advice

8    back to him and your recommendation back to him

9    appears at the top of Exhibit 14?

10        A    Yes.                                     5:06:27PM

11        Q    Okay.

12             And your ultimate recommendation is that

13   you would wait longer, correct?

14        A    Yes.

15        Q    Why is that --                           5:06:39PM

16             Why was that your recommendation?

17        A    Based on his system and looking through

18   the GUI, I think it -- I -- I just thought maybe it

19   would be more prudent to stay where he is.

20        Q    Putting a patch in now might create more  5:06:58PM

21   problems for him?

22        A    I wouldn't say "create more problems," but

23   just -- I don't think, you know -- this is some time

24   ago but, you know, I just don't think moving --

25   moving forward to the higher version is going to get  5:07:13PM

                                                       Page 244

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth; that

6    any witnesses in the foregoing proceedings, prior to

7    testifying, were administered an oath; that a record of

8    the proceedings was made by me using machine shorthand

9    which was thereafter transcribed under my direction;

10   that the foregoing transcript is a true record of the

11   testimony given.

12         Further, that the foregoing pertains to the

13   original transcript of a deposition in a Federal Case,

14   before completion of the proceedings, a review of the

15   transcript [ ] was [X] was not requested.

16         I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this dates

20   subscribed my name.

21

22   Dated: October 13, 2013

23

24                     KELLI COMBS
                       CSR No. 7705

25

                                               Page 291