1
2
3                     UNITED STATES DISTRICT COURT
4                    NORTHERN DISTRICT OF CALIFORNIA
5                            SAN JOSE DIVISION
6
7   ERIC BENEDICT,                        Case No.  13-cv-00119-BLF
8               Plaintiff,
9        v.                              ORDER GRANTING DEFENDANT'S
                                         MOTION TO DECERTIFY FLSA
10  HEWLETT-PACKARD COMPANY,             COLLECTIVE
                Defendant.               [Re:  ECF 413]
11
12
13        This case, which challenges Hewlett-Packard ("HP")'s classification of certain employees

14  as exempt, began as a purported class action and Fair Labor Standards Act ("FLSA") collective

15  action. The Court[1] conditionally certified the FLSA collective, *see* ECF 175, but denied

16  certification of the Rule 23 class, *see* ECF 388. Discovery has closed and HP now asks the Court

17  to decertify the FLSA collective action. For the reasons stated below, the Court GRANTS

18  Defendant's motion.

19  I.       BACKGROUND

20       A.  Procedural Background

21        Defendant is a global corporation that provides information technology products and

22  services around the world. Plaintiff Eric Benedict worked for Defendant as a Technical Solutions

23  Consultant ("TSC") III from April 2011 to February 2012, Benedict ¶¶ 2-3, ECF 310; and Plaintiff

24  David Mustain worked as a TSC II from December 2008 to September 2013, Mustain ¶¶ 2-3, ECF

25  311.[2] Plaintiffs allege that Defendant misclassified them as exempt from overtime pay, and that

26

27  _____
    [1] References to "the Court" encompass actions taken by Judge Koh, to whom this case was
    previously assigned.
28  [2] The Second Amended Complaint names four representative plaintiffs, *see* ECF 258, but Mr.
    Benedict and Mr. Mustain are the only two who remain. Defendant states and Plaintiffs do not

they and their similarly-situated colleagues routinely worked more than 40 hours per week without overtime pay in violation of the FLSA, 29 U.S.C. §§201 *et seq*. SAC ¶¶ 67-77, ECF 258.

On February 13, 2014, the Court conditionally certified the following FLSA collective:

> All persons who were, are, or will be employed by HP nationwide from January 10, 2010, to end of the opt-in period (a) in the Technical Solutions Consultant I, II, or III; Field Technical Support Consultant I, II, or III; or Technology Consultant I, II, or III Job titles, (b) with the HR designation "Individual Contributor," and (c) classified as Exempt from the overtime pay requirements of the FLSA.

*Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-LHK, 2014 WL 587135, at *14 (N.D. Cal. Feb. 13, 2014). Notice was then mailed out and 1,385 individuals ("Opt-Ins") opted in to the collective. *See* Order Granting Stipulation Re Dismissal of Opt-in Plaintiffs at 1 ("Opt-In Dismissal Order"), ECF 354.

Plaintiffs then sought certification of the following state classes under Rule 23(b)(3):

> California Class: All persons employed in California as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2009 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of California.

> Colorado Class: All persons employed in Colorado as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Colorado.

> Massachusetts Class: All persons employed in Massachusetts as a Technical Solutions Consultant I, II, or III by HP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Massachusetts.

Before the Court had ruled on the Motion for Class Certification, the parties stipulated to

contest that Kilricanos Vieira is barred from this collective action, *see* ECF 390, and that Richard Bowders has withdrawn as a representative plaintiff. *See* Lazerson Decl. ¶ 14.

amend the definition of the conditionally-certified collective as follows:

> Opt-Ins who were or are employed (a) in U.S. Technical Solutions Consultant I, II, or III Job titles within the Enterprise Group - Customer Solutions Center, HP Software Support Delivery/ IMBU Support, and/or HP Software Enterprise Security Products organizations; or (b) in U.S. Field Technical Support Consultant I, II, or III job titles within the Enterprise Group – TS AMS Signage – US, and/or Printing and Personal System – Graphics Solutions Business organizations.

("Collective Members") Opt-In Dismissal Order at 3. This revised definition largely mirrors the putative class definitions, but on a nationwide basis and with the addition of Field Technical Support Consultants ("FTSCs"). The revised group includes approximately 130 current and former employees[3] and excludes more than 1,000 of the initial Opt-Ins, whose claims were dismissed without prejudice. *Id.* at 2.

On March 28, 2016, the Court denied certification of the putative state classes because Plaintiffs "failed to carry their burden of demonstrating predominance" and superiority under Rule 23(b)(3). *See* Order Denying Plaintiffs' Motion to Certify Class ("Order Denying Class Certification") at 31, ECF 388.

Discovery closed on April 5, 2016. Plaintiffs reviewed more than 600,000 HP documents and deposed nine Rule 30(b)(6) witnesses. Sagafi Decl. ¶ 7, ECF 419; *see also* Lazerson Decl. ¶ 2, ECF 413-1. Defendant deposed the named Plaintiffs and more than 10 Collective Members. Sagafi Decl. ¶ 7; Lazerson Decl. ¶ 2. On the basis of that discovery, Defendant now seeks to decertify the FLSA collective, while Plaintiff argues that decertification would be improper.

**B. Factual Background**

The exhibits and depositions attached to the parties' briefing establish the following. As described at length in the Order Denying Class Certification, Defendant uses a Job Architecture ("JA") Policy "to organize work and classify employees using a global hierarchy of jobs." *See* Order Denying Class Certification at 2-3. Under the JA, each employee has a Job Title that maps to a Job Function, Job Family, and Job Level. *Id.*; *see also* Exh. A to Sagafi Decl. at HP00000001,

---

[3] The parties disagree on the precise number of Collective Members, with HP claiming that there are 129 and Plaintiffs claiming that there are 135 members. *See* Mot. at 5; Opp. at 1, n.1. This difference does not affect the Court's reasoning.

United States District Court
Northern District of California

ECF 419-1; Def.'s Exh. 42, ECF 414-42. Each Job Title also comes with a Job Level Definition, but these definitions do not necessarily reflect the day-to-day work of Collective Members. *Compare* Exh. A to Sagafi Decl. at HP0000004 (TSC I-IIIs are not "Expert") *with* Def.'s Exh. 43 at 5 (describing a TSC as a "Subject Matter Expert (SME)"), ECF 412-66.

Relevant to this case, each Collective Member is classified as a TSC I, TSC II, TSC III, or FTSC. TSCs and FTSCs all fall under the "Services" Job Function. However, TSCs are in the "Customer Solutions Center – Technical" Job Family, which is "made up of teams that provide remote (offsite) service," *see* Exh. A to Sagafi Decl. at  HP00000001, while FTSCs are in the "Field Technical Support" Job Family, which "focuses on managing the onsite delivering of . . . services," *see* Def.'s Exh. 42 at HP00000006.

Collective Members who are TSCs and FTSCs also come from different business organizations within HP. The TSCs come from (1) HP's Enterprise Group – Customer Solutions Center, (2) HP Software Support Delivery/IMBU Support, and (3) HP Software Enterprise Security Products, while the FTSCs come from either Enterprise Group – TS AMS Signage – US or Printing and Personal System – Graphics Solution Business. Lazerson Decl. ¶ 14; *see also* Opt-In Dismissal. These groups focus on different products and for different customers.

During the relevant time period, Collective Members had at least 104 different direct managers, in part because certain Members had numerous managers. Def.'s Exh. 52 (Rowe Decl.) ¶ 4, ECF 412-82. In addition, Collective Members worked at 21 different locations nationwide, not including 30 Members who telecommuted. *Id.* ¶ 5.  Their salaries ranged from below $40,000/year to more than $100,000/year. *Id.* ¶ 6. Such variation existed even for individuals with the same Job Title in the same location at the same time. *Id.* ¶ 6 (three Collective Members who were TSC IIIs in San Diego in 2013 earned base salaries of $55,393, $92,586, and $103,592).

## 1.  TSCs

Because the parties refer to TSCs' "tiers," which are distinguishable from their division into Is, IIs, and IIIs, and "titles" or "roles," which differ from the "TSC" Job Title, the Court reviews this vocabulary from the Order Denying Class Certification. A TSC's tier generally indicates how many engineers have attempted to address an issue before it comes to him/her. *See*

4

1   Order Denying Class Certification at 5. For example, a Tier 1 engineer is the first TSC to respond

2   to a case, regardless of whether that TSC is I, II, or III, while a Tier 2 engineer generally receives a

3   case after a Tier 1 engineer has been unable to solve it, and so on. *Id.* at 5. In addition, the TSC

4   Job Title also encompasses numerous "functional titles" or "roles," which exist at a level below

5   the JA classification. *Id.* at 8. For example, Collective Members who are TSCs include "TAMs"

6   (Technical Account Managers), *see* Def.'s Exh. 49 at 6, ECF 412-78, "TSSs" (Technical Solution

7   Specialists), *see* Def.'s Exh. 50 at 5, ECF 412-80, "CAs" (Customer Advocates), *see* Def.'s Exh.

8   12 at 31:15-18, and "RSAAs" (Remote Support Account Advocates), *see* Def.'s Exh. 43.

9        The Court now turns to the TSCs' work experience.[4] Collective Members who are TSCs

10   respond to customers' requests for technical solutions. The procedure for responding is dictated by

11   policies and standard practice though, as noted below, some Collective Members regularly follow

12   this practice, while others "might" or "occasionally" follow it. The Court summarizes standard

13   practice and some Collective Members' deviation from it below.

14        According to standard practice, TSCs first review a customer's log files for information on

15   the problem. *See*, e.g., Pls.' Exh. O ("Mustain Pl.") at 66:7-10, ECF 419-15; Pls.' Exh. H ("Chang

16   Pl.") at 115:15-18, ECF 419-8; Pls.' Exh. K ("Ihling Pl.") at 28:22-25, ECF 419-11; Pls.' Exh. L

17   ("Jessen Pl.") at 77:20-78:23, ECF 419-12; *see also* Pls.' Exh. F ("Austin Pl.") at 58:19-25

18   (testifying that he "might" review log files), ECF 419-6; Pls.' Exh. G ("Benedict Pl") at 200:20-23

19   (describing log file review as a possible first step), ECF 419-7.

20        Next, TSCs search knowledge bases, search engines, and internal documentation for

21   known problems and solutions. *See, e.g.*, Austin Pl. at 63:8-15; Benedict Pl. at 134:5-17; Pl.'s

22   Exh. I ("Ford Pl.") at 35:5-12, ECF 419-9. Then, according to standard practice, TSCs test

23   possible solutions in a simulated customer environment. As with reviewing log files, some

24   Collective Members "always" test the solution, *see, e.g.,* Austin Pl. at 86:16-87:3, while others

25   "occasionally" or "often" do, *see, e.g.,* Chang Pl. at 84:24-85:5; Ford Pl. at 90:8-13. Finally, if a

26   TSC cannot find a solution, s/he escalates to the next tier of TSC or to R&D. *See, e.g.,* Benedict

27

28   [4] Though some Collective Members no longer work for Defendant, the Court uses present tense for simplicity.

United States District Court
Northern District of California

1   Pl. at 203:5-16; Chang Pl. at 20:2-6; Pls.' Exh. R ("Shropshire Pl.") at 19:16-22.

2        Some Collective Members describe this work as simple "cut[ting] and past[ing]" from

3   Google, *see* Def.'s Exh. 5 ("Benedict Def.") at 209:4-15, ECF 412-10, while others describe even

4   the first step as "very technical." Austin Pl. at 57:13-19.

5        In addition, several Collective Members who are TSCs worked on tasks not covered by the

6   process described above. For example, Ann Holiday planned workshops for customers and was

7   responsible for assigning accounts to other TSCs, mentoring team members, and proactive

8   "customer advocacy tasks." Def.'s Exh. 43 (Holiday 2010 Performance Review) at 3; Def.'s Exh.

9   44 (Holiday 2011 Performance Review) at 4, ECF 412-68. Ms. Holiday also built "excellent

10  rapport with her customer community" and was "highly respected in her field of expertise." Def.'s

11  Exh. 43 at 4-5; Def.'s Exh. 44 at 4-6. Similarly, Janet Aman also had pro-active duties, including

12  "creating the process for the [*sic*] delivering advisories to [datacenter] customers," "deliver[ing]

13  trainings to all team members," and working on "Proactive Care services." Def.'s Exh. 47 (Aman

14  Accomplishments) at 1, ECF 412-74. And Thomas Chan created a video for customers. Def.'s

15  Exh. 48 (Chan 2014 Performance Review) at 4, ECF 412-76.[5]

16       Other Collective Members describe choosing to work on unique assignments. For example,

17  Rebeka Levin "took it upon [herself]" to create a new orientation program for employees "as a

18  side project." Def.'s Exh. 14 ("Levin Def.") at 18:8-17, 21:20-22:1, ECF 414-14. Ms. Levin was

19  also responsible for tracking response times and escalations for customer tickets and offered

20  recommendations on how to cut down on response time. *Id.* at 39:9-40:6, 40:15-17, 68:16-70:24.

21  Similarly, on his own time, Howard Greenspan reverse-engineered a process to program a tool that

22  enabled customers to send files of any size to a back-end server. Def.'s Exh. 17 ("Greenspan

23  Def.") at 32:1-33:5, ECF 412-24.

24       In addition, Collective Members who were TSCs also testified that their work differed

25  from that of other TSCs. *See* Def.'s Exh. 12 ("Ihling Def.") at 45:6-9; 45:20-23, ECF 414-12.  For

26

27  ---
    [5] Plaintiffs argue that the Court should give evidence taken from performance reviews little weight
    as such reviews "are typically used to highlight exceptional accomplishments and not the day-to-

28  day duties of employees." Opp. at 12, n.8. However, Plaintiffs do not challenge the veracity of the
    performance reviews. The Court affords this evidence the appropriate weight.

United States District Court
Northern District of California

example, Whitney Ihling testified to "beg[i]n[ning] the basic work" when faced with a technical question, but "generally escalat[ing] or elevat[ing] that ticket to an engineer." *Id.* at 31:9-11, ECF 414-12. Ms. Ihling explained that those engineers were "within th[e] Technical Solutions Consultant role just like me, but with a different emphasis" and that "[t]he Technical Solutions Consultant role was a broad umbrella that held . . . the customer advocacy team and also included the more specialized . . . product specialist." *Id.* at 31:12-13, 31:25-32:4. Ms. Ihling's own work included revamping the process for handling defective equipment, *id.* at 32:17-19, 58:16-25, and producing portions of her team's newsletter, Def.'s Exh. 13 (Ihling Performance Review) at 1, ECF 412-18.

Collective Members also experienced different levels of autonomy, creativity, and responsibility. For example, Ken Shropshire and Andrew Kennedy were both Tier 2 engineers, but Mr. Shropshire described his work as nothing more than passing solutions on to customers from Tier 3 engineers without any discretion, Def.'s Exh. 10 ("Shropshire Def.") at 158:8-159:3, ECF 412-14, while Mr. Kennedy "exercise[d] independen[ce] to identify and propose next actions and solutions," Def.'s Exh. 31 (Kennedy 2013 Performance Review) at 3, ECF 412-46.

Collective Members testified that a person's work could vary by his/her role, his/her years of experience, and the complexity of the product. *See* Def.'s Exh. 15 ("Chang Def.") at 29:23-30:2 (her group was considered to be one that handled more complex problems), ECF 412-20; Def.'s Exh. 21 ("Austin Def.") at 34:9-19, 35:15-36:11 (job duties of TSC IIIs varied by "level of knowledge" and years of experience), ECF 412-32.

### 2. FTSCs

Six Collective Members are FTSCs, but the parties have provided minimal information regarding FTSCs. Neither named Plaintiff is an FTSC and Plaintiffs have not sought a Rule 30(b)(6) deposition or document production on the business units for which the Collective Members who are FTSCs worked. Lazerson Decl. ¶ 14. Plaintiffs represent in their Opposition that the parties are in discussions to withdraw the remaining FTSCs from the collective and resolve their claims with HP individually, *see* Opp. at 3, n.2, but the parties have not advised the Court of any withdrawal or dismissal of these Collective Members.

## II.      LEGAL STANDARD

The FLSA authorizes employees to bring a collective action on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b). Though neither the FLSA nor the Ninth Circuit has defined "similarly situated," courts in this circuit generally apply a "two-step approach involving initial notice to prospective plaintiffs, followed by a final evaluation whether such plaintiffs are similarly situated." *Leuthold v. Destination America, Inc*., 224 F.R.D. 462, 467 (N.D. Cal. 2004); *see also Benedict v. Hewlett-Packard Co.,* No. 13-CV-00119-LHK, 2014 WL 587135, at *5 (N.D. Cal. Feb. 13, 2014).

At the initial stage, the Court considers the pleadings and affidavits submitted by the parties to determine whether the proposed class should be given notice of the action. *Santiago v. Amdocs, Inc*., No. C 10-4317 SI, 2013 WL 5444324, at *3 (N.D. Cal. Sept. 30, 2013). The standard "is a lenient one that typically results in certification." *Benedict*, 2014 WL 587135, at *5.

Once discovery is complete, "'the party opposing the certification may move to decertify the class.'" *Id*. at *5 (citing *Adams v. Inter–Con Sec. Systs., Inc*., 242 F.R.D. 530, 536 (N.D. Cal. 2007). At the second stage, the Court considers whether "the claims of the class members are sufficiently alike to allow the Court to efficiently manage the case." *Wren v. RGIS Inventory Specialists,* 256 F.R.D. 180, 212 (N.D. Cal. 2009). The Court "engage[s] in a fact-specific inquiry to evaluate various factors," including "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Id*. at *4 (quoting *Beauperthuy v. 24 Hour Fitness USA, Inc*., 772 F.Supp.2d 1111, 1118 (N.D. Cal. 2011)).

At the second stage, the Court applies a stricter standard than at the initial stage, but a more lenient one than the requirement for class action certification under Rule 23(b)(3). *Benedict*, 2014 WL 587135, at *6 (citing *Lewis v. Wells Fargo & Co*., 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009)). Plaintiffs bear the burden of providing "substantial evidence to demonstrate that [the collective members] are similarly situated." *Santiago,* 2013 WL 5444324, at *3 (quoting *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010). "Ultimately, the decision whether to proceed as a collective . . . turns on whether this device is the superior way of resolving a

8

1   controversy. The benefits to the parties of a collective proceeding need to be balanced against any

2   prejudice to the defendant and any problems of judicial administration that may surface."

3   *Beauperthuy*, 772 F. Supp. 2d at 1118 (citation omitted). "The decision whether to decertify a

4   collective action is within the district court's discretion." *Id.* at 1118.

5   **III.   DISCUSSION**

6        Defendant argues that, based on the record before the Court, the Court must decertify the

7   FLSA collective. Defendant first notes that it has been unable to find any case in which a court has

8   denied certification of a Rule 23 class and then allowed a similarly-defined FLSA collective action

9   to proceed. Defendant concedes that the Court's denial of class certification does not dictate the

10  result of this motion, but argues that the factual findings underlying the Court's prior order apply

11  equally to the opt-in class and demonstrate why decertification is required at this stage. Mot. at 13.

12       In response, Plaintiffs do not offer a case that allows an FLSA collective to proceed where

13  a Rule 23 class was not certified, but they note that "courts have repeatedly rejected attempts . . .

14  to equate FLSA class actions and Rule 23 class actions because . . . [to do so] would effectively

15  ignore Congress' directive." Opp. at 7 (quoting *Flores v. Velocity Express*, *Inc.*, No. 12 Civ.

16  05790, 2013 WL 2468362, at *7 (N.D. Cal. June 7, 2013)).

17       The Court agrees with Plaintiffs that this motion stands on its own, separate from the Rule

18  23 motion, on the basis of evidence specific to Collective Members and pursuant to a more lenient

19  standard. *See, e.g., Flores*, 2013 WL 2468362, at *7; *Villa v. United Site Servs. of Cal., Inc.*, No.

20  12 Civ. 00318, 2012 WL 5503550, at *14 (N.D. Cal. Nov. 13, 2012); *Church v. Consol.

21  Freightways, Inc.*, 137 F.R.D. 294, 305 (N.D. Cal. 1991). With that in mind, the Court turns to the

22  parties' arguments regarding each factor of the second-stage FLSA inquiry.

23       **A.  Factual and Employment Settings**

24       The first factor in the second-stage analysis is "the degree of similarity among plaintiffs'

25  factual and employment settings." *Santiago*, 2013 WL 5444324, at *4 (quoting *Beauperthuy*, 772

26  F. Supp. 2d at 1122). "Courts look at whether plaintiffs had differing job titles or duties, worked in

27  different geographic locations, worked under different supervisors, or allege different types of

28  violative conduct." *Id.* at *4 (citing *Reed*, 266 F.R.D. at 449). The greater the variation, the less

United States District Court
Northern District of California

9

1  manageable an FLSA collective becomes.

2       Defendant argues that the employment settings of the Collective Members vary by product,

3  manager, and location. Opp. at 14 (citing Def.'s Exh. 52 ¶¶ 4-6). In addition, Defendant highlights

4  that Collective Members who are TSCs had a range of functional titles, including Technical

5  Account Manager ("TAM"), Remote Support Account Advocate ("RSAA"), Consumer Advocate

6  ("CA"), and Duty Manager, and included engineers at Tiers 1, 2, and 3, reflecting significant

7  variation in day-to-day work experiences, activities, relationships with customers, and expertise.

8  Defendant notes that the roles of some Collective Members included creating and transferring

9  knowledge, conducting trainings, and taking on special assignments. Defendant also contends that

10  even the Collective Members who worked in "technical support" or "troubleshooting" roles had

11  vastly different factual and employment settings, with some describing routine experiences and

12  others testifying to working on complex issues, building tools, and exercising discretion.

13       Plaintiffs respond that Collective Members are similarly situated with respect to their

14  claims for misclassification by virtue of three simple facts: they were all "employed by HP as

15  TSCs, performed similar duties, and were classified as exempt under the FLSA." Opp. at 6.

16  Plaintiffs argue that Defendant overemphasizes minor variations in location, manager, education,

17  and salary, while ignoring the shared fact that Collective Members who were TSCs performed the

18  same essential function: providing technical support to customers pursuant to standard procedures

19  and practices. *Id.* at 11, 13-14. In addition, Plaintiffs contend that any individual side projects did

20  not constitute Collective Members' primary duties and are therefore irrelevant for classification

21  purposes. Plaintiffs also contest Defendant's characterization of certain employees, such as Ms.

22  Ihling and Ms. Holiday, as primarily non-technical in its Motion, *id.* at 11-12, and argue that the

23  strength of Collective Members' relationships with their customers did not change the substance

24  of their troubleshooting duties, *id.* at 13. Finally, Plaintiffs concede that, "[i]f the Court were to

25  find TSCs assigned RSAA, TAM or other similar duties were not similarly situated, the Court

26  could, within its discretion, remove only those Plaintiffs from the collective." *Id.* at 13, n.9.

27       Having reviewed the cases cited by the parties, the Court finds *Santiago v. Amdocs, Inc.*,

28  No. C 10-4317 SI, 2013 WL 5444324 (N.D. Cal. Sept. 30, 2013) particularly instructive because

United States District Court
Northern District of California

of its similarities to this case. Much like here, *Santiago* considered whether to decertify a conditionally-certified FLSA collective of "current and former Information Technology employees at [a global technology firm]" *Id.* at *1. As here, the employees alleged "that their job duties consisted primarily of providing computer support, trouble shooting, testing related to repairs and problem-solving, and technical services" and that they had been misclassified as exempt. *Id.* at *1. Much like HP, the defendant in *Santiago* used a "global job classification system" to "map" employees into "job families" and "bands" and, much like Plaintiffs, the *Santiago* plaintiffs argued that their family and band classifications negated any need for individual determinations because they correlated to each employee's level of discretion and independent judgment. *Id.* at *2, 5. In other words, the plaintiffs asserted that the global job classification system itself "determined which employees are similarly situated." *Id.* at *5.

The *Santiago* court found the plaintiffs' position unpersuasive. Even assuming that job family reflected "similar education [,] experience and competencies," the court explained that such similarities did not, "on [their] own, establish that all employees within the same Job Family and Band rank are similarly situated." *Id.* at *5. The court also rejected the plaintiffs' reliance on the defendant's blanket classification of the plaintiffs as exempt because the Ninth Circuit has held that such a policy "does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *Id.* at *6 (quoting *In re Wells Fargo Home Mortg. Litig.*, 571 F.3d 953, 959 (9th Cir. 2009)). Instead, the court was persuaded by the purported collective members' actual experience, which showed significant disparities in job duties and employment settings within the same band and family, such as one employee simply running existing applications while another wrote and revised code. *Id.* at *6. The court also found it "significant that class members worked in a variety of locations and settings, with some working at home for some portion of time, and many class members having little to no direct interaction with their supervisors." *Id.* at *6.

Another court in this district similarly rejected a conditionally-certified collective's contention that an employer's job classification scheme offered sufficient evidence of substantial similarity. *Beauperthuy* considered a misclassification claim brought by managers at a nation-wide

gym who argued that their subdivision into three silos, "GMs, OMs, and FMs," sufficed to establish that they "had the same duties and responsibilities as other managers in the same position across all clubs, regions, and states." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1129 (N.D. Cal. 2011). The plaintiffs also contended that because the employer "classified managers as exempt based solely upon their job title without performing any sort of individualized inquiry into each particular manager's job duties," the court should not have to either. *Id.* at 1129.

As in *Santiago,* the *Beauperthuy* court was not persuaded by either argument because deposition testimony "show[ed] that the job duties of managers varied significantly across silos," with some individuals focused on paperwork while others managed trainers and worked directly with clients, and within silos, with individuals "testif[ying] to vastly different roles in the hiring process" and "in disciplining subordinates." *Id.* at 1130. The court concluded that this evidence of actual experience showed that the silo classification itself was insufficient to support a finding that the plaintiffs were similarly situated. *Id.* at 1130. With regard to the blanket classification policy, *Beauperthuy*, like *Santiago*, relied on *In re Wells Fargo* to conclude that "an analysis of what job duties each employee actually performed is more probative than an employer's classification policy when considering whether plaintiffs are similarly situated." *Id.* at 1131.

Returning to the case at hand, the Court finds that, as in *Santiago* and *Beauperthuy*, Plaintiffs' attempt to gloss over significant differences in Collective Members' job duties by relying on their shared Job Title and HP's blanket exemption policy fails to show that they are similarly situated for several reasons.

First, Plaintiffs argue that all Collective Members are classified as TSCs, but this ignores the six remaining Opt-Ins who are FTSCs. Thus, as Defendant correctly argues, even if the Court were to agree that a shared Job Title suffices to show substantial similarity in factual and employment settings, Plaintiffs' argument would weigh in favor of decertifying the collective because it contains disparate Job Titles. *See* Mot. at 25. Though Plaintiffs bear the burden of establishing substantial similarity at this stage, Defendants have provided the only evidence regarding FTSCs on this motion—and that evidence shows that Collective Members who are FTSCs have a different Job Title, belong to a different Job Family, and work for different HP units

than the Collective Members who are TSCs. Perhaps recognizing this disparity, Plaintiffs state that they are working with Defendant to stipulate to the dismissal of the FTSCs but, as noted above, they have not notified the Court of any such resolution.[6]

Furthermore, even if the Court were to focus on TSCs alone, the testimony of Collective Members shows that their work and employment settings also varied. For example, as Defendants correctly identify, one TSC testified to simply acting as a conduit for solutions from a higher-tiered engineer to a customer, *see* Shropshire Def. at 15:8-159:3, while another recalled reverse engineering a process in order to write code for customers, *see* Greenspan Def. at 32:1-33:5, and yet another "exercise[d] independen[ce] to identify and propose next actions and solutions." Kennedy Performance Review at 3. This shows significant disparity in Collective Members' factual and employment settings. *See Santiago*, 2013 WL 5444324 at *6 (noting difference between one employee who ran existing applications and another who wrote and revised code).

Collective Members themselves confirmed that their jobs differed. One TSC, Ms. Ihling, agreed that her primary duties differed from those of others TSCs, while Ms. Chang and Mr. Austin acknowledged that work could vary by an individual's role, complexity of assigned product, and years of experience. *See* Ihling Def. at 45:6-9, 45:20-23; Chang Def. at 29:23-30:2; Austin Def. at 34:9-19, 35:15-36:11.[7] Thus, as in *Santiago* and *Beauperthuy*, Collective Members' actual experience belies Plaintiffs' argument that their Job Title suffices to establish substantial similarity and instead reveals significant disparity.

The Court finds Plaintiffs' reliance on the uniform exemption policy equally unpersuasive. "The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually

---

[6] Plaintiffs suggest that the Court can exercise its discretion to cut out the FTSCs—and even TSCs with certain functional titles, like TAMs and RSAAs. The Court declines to do so, particularly given that the parties have failed to offer a list of Collective Members by Job Title or functional title and that, at the hearing, Defendant represented that doing so would prove difficult.

[7] Plaintiffs devote substantial briefing to challenging Defendant's focus on differences in location and knowledge of internal processes. *See* Opp. at 13-15. The Court agrees that these differences are not dispositive. However, as discussed above, other differences that TSCs describe in their factual and employment settings weigh in favor of decertifying the collective.

United States District Court
Northern District of California

1    performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953,

2    959 (9th Cir. 2009)). "Although *Wells Fargo* dealt with a Rule 23 class action, other courts in this

3    district have extended its reasoning to FLSA cases." *Beauperthuy,* 772 F. Supp. 2d. at 1131. Thus,

4    as in the Order Denying Class Certification, the Court finds that the uniform exemption policy

5    "suggests that HP considered the employees to be similar at least to some degree, but does not

6    obviate the need for individual inquiries into whether or not HP's classification was correct."

7    Order Denying Class Certification at 27. Thus, the Court agrees with Defendant that the first

8    factor weighs in favor of decertifying the FLSA collective.

9        **B. Available Defenses**

10       Under the second factor of the second-stage FLSA inquiry, the Court considers "the

11   various defenses available to the defendants with respect to the individual plaintiffs." *Santiago*,

12   2013 WL 5444324, at *4 (quoting *Beauperthuy*, 772 F. Supp. 2d at 1122). As the Court explained

13   in the Order Granting Conditional FLSA Certification, "[t]he FLSA requires employers to pay

14   covered employees overtime compensation of one and one-half times the regular rate of pay for all

15   hours worked in excess of forty hours per week, unless an exemption applies." *Benedict*, 2014 WL

16   587135, at *4 (citing 29 U.S.C. § 207(a)(1)). Here, Defendant would invoke four exemptions as

17   defenses: the administrative, computer employee, combination, and highly-compensated employee

18   exemptions. *See* Mot. at 15; *see also* Order Denying Class Certification at 28-29.

19       The administrative and computer employee exemptions both include a salary or fee basis

20   minimum. In addition, both exemptions discuss "primary duties," which "means the principal,

21   main, major or most important duty that the employee performs."  29 C.F.R. § 541.700.

22   "Determination of an employee's primary duty must be based on all the facts in a particular case,

23   with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors

24   "include, but are not limited to, the relative importance of the exempt duties as compared with

25   other types of duties; the amount of time spent performing exempt work; the employee's relative

26   freedom from direct supervision; and the relationship between the employee's salary and the

27   wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

28       The administrative exemption applies to individuals whose "primary duty is the

United States District Court
Northern District of California

performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

The computer employee exemption applies to individuals whose primary duty consists of

> (1) [t]he application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications; (2) [t]he design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications; (3) [t]he design, documentation, testing, creation or modification of computer programs related to machine operating systems; or (4) [a] combination of the aforementioned duties, the performance of which requires the same level of skills.

29 C.F.R. § 541.400.

The "combination exemption" applies to employees who "perform a combination of exempt duties," including those outlined in the administrative and computer exemptions. 29 C.F.R. § 541.708. "Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt [computer] work may qualify for exemption." *Id.*

Finally, the highly-compensated employees exemption applies to individuals "with total annual compensation of at least $100,000" who "customarily and regularly perform[ ] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601. Under this exemption, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* As a result, a highly-compensated employee may qualify as exempt even if s/he "does not meet all of the other requirements" for another exemption. *Id.* Courts have read this to require only "that the employee perform one of the exempt duties of an administrative employee." *Alakozai v. Chase Inv. Serv.*, No. CV 11-09178, 2014 WL 5660697 at *11 (C.D. Cal. Oct. 6, 2014); *see also Mamola v. Grp. Mfg. Serv. Inc.*, No. CV-08-1687, 2010 WL 1433491 at *12 (D. Ariz. Apr. 9, 2010).

Defendant argues that in order to determine whether any of these exemptions applies, the Court would have to engage in an individualized inquiry to determine each individual's primary duty. In particular, Defendant points to significant disparities in salary, which it contends are

15

United States District Court
Northern District of California

relevant to both the highly-compensated employee exemption and the general primary duty test. Defendant also notes disparities in the complexity and sophistication of each Collective Member's technical work, which are relevant to the computer employee exemption, as well as the following inquiries for the administrative exemption: "whether they exercise independent judgment and discretion in handling cases and in their problem-solving techniques; the depth of their customer relationships; the extent to which they are responsible for training or transferring knowledge internally and externally; and whether on their particular teams they act as team leads or subject matter experts or handle special projects." Mot. at 18.

Defendant again relies on *Santiago*, which found that differences in the plaintiffs' titles, locations, and duties would have required the court to "engage in individualized inquiries to determine whether each class member was properly classified as exempt." 2013 WL 5444324, at *8. Defendant also offers *Hill v. R+L Carriers, Inc.*, No. C 09-1907 CW, 2011 WL 830546 (N.D. Cal. Mar. 3, 2011), which considered a conditionally-certified collective of city dispatchers and relied on the fact that "some City Dispatchers exercised more discretion than others" to find that "[t]he requirements of the administrative exemption alone evince the necessity of individualized inquiries in this case." *Id.* at *5.

Plaintiffs concede that individualized defenses exist in this case, but argue that, given the number of Collective Members, the individualized defenses would not result in unmanageability. Opp. at 15-16. Instead, Plaintiffs argue, the Collective Members' shared job attributes show that the defenses are generalizable to most of them.

As discussed at length above, the Court disagrees with Plaintiffs that the Collective Members' jobs consisted primarily of shared attributes. Rather, the Court agrees with Defendant that the evidence shows substantial variation in their work—and that, due to this variation, adjudicating Defendant's defenses would require significant individualized inquiries. The Court notes that the evidence shows variation in "the exercise of discretion and independent judgment," *compare* Shropshire Def. at 15:8-159:3 *with* Kennedy Def. at 3. In addition, some Collective Members described work that may "directly relate[ ] to . . . management," *see* Holiday 2010 Performance Review at 3, while others made no mention of such experience. Similarly, many

employees described work that may be characterized as "testing or modification of computer systems or programs," but others stated that they escalated such work to others. *See* Ihling Def. at 31:9-11.

The Court identifies these differences not to reach the merits of any claim, which Plaintiffs correctly argue are not before the Court on this motion. Rather, the Court notes these differences to highlight the numerous individualized inquiries that reaching the merits would necessitate. In other words, much as it found in the Order Denying Class Certification, the Court determines that the wide variety in Collective Members' tasks and responsibilities shows that each individual's "work may or may not qualify as exempt, depending on the employee[']s[ ] specific duties." Order Denying Class Certification at 29. Moreover, "even for the TSCs whose work appears similar but includes both exempt and non-exempt work," including Collective Members like Mr. Greenspan and Ms. Levin who worked on unique "side projects," "the proportion of each varies such that an individualized inquiry would be necessary to determine each employee's primary duty." *Id*. at 30-31. And the need for individualized inquiries is only exacerbated by the fact that the analysis for Collective Members who earned more than $100,000 would involve a different standard than the analysis for those earning less. *See* 29 C.F.R. § 541.601.

Thus, while the Court agrees with Plaintiffs that "the district court has the discretion to determine whether the potential defenses would make the class unmanageable," Opp. at 16 (quoting *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000)), the Court exercises its discretion to find that the potential defenses here would do precisely that. Contrary to Plaintiffs' contention, neither the number of Collective Members (approximately 130), nor the nature of their jobs, which the Court finds to be varied, would make adjudication of the defenses manageable. Thus, this factor also weighs in favor of granting decertification.

### 3. Fairness and Procedural Considerations

Finally, the Court considers the third factor of the second-stage inquiry: "fairness and procedural considerations." *Beauperthuy*, 772 F. Supp. 2d at 1118. Defendant argues that a collective action would be neither fair nor efficient because Plaintiffs can offer no common source of evidence that would address the issues in this case. Instead, Defendant contends, the case would

17

devolve into many "mini-trials" because relying on the testimony of only one or some subset of Members would run the risk of misrepresenting the claims of others.

Plaintiffs respond that the alternative, a multiplicity of duplicative suits, would burden the Court and could risk inconsistent judgments on claims arising from the same events and brought under the same laws. Opp. at 17. Plaintiffs argue that, given the remedial nature of the FLSA, the Court must look "to the purposes of § 216(b) actions under the FLSA: (1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Id.* (quoting Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1264 (11th Cir. 2008)). Plaintiffs note that when faced with "close calls," courts have maintained collective actions due to fairness and efficiency considerations. *Id.* (citing *Falcon v. Starbucks Corp*, 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008)).

The Court again agrees with Defendant. Having determined that the evidence shows wide variation in the responsibilities and tasks of Collective Members, the Court finds that a single trial for all Members would not only be unmanageable and inefficient, but it would also fail to serve the purpose of the FLSA as it would require Plaintiffs to prioritize the claims of certain Collective Members over those of others. As Defendant correctly notes, Plaintiffs have failed to meet their burden of demonstrating that Collective Members are substantially similar such that certain Members could offer representative testimony to cover the experiences of all Members.[8] Thus, the third factor also weighs in favor of granting decertification.

Accordingly, the Court GRANTS Defendant's Motion to Decertify the FLSA Collective Action.

**IT IS SO ORDERED.**

Dated: July 13, 2016

BETH LABSON FREEMAN
United States District Judge

---

[8] Instead, as noted above, Plaintiffs invite the Court to dissect the Collective to exclude FTSCs, RSAAs, and TAMs. While the Court recognizes Plaintiffs' duty to advocate all possible avenues for certification, the Court declines to slice away each problematic subgroup of opt-in Plaintiffs in order to repackage the collective into something more manageable. Such repackaging inevitably would bring with it a whole host of unanticipated consequences not subject to briefing by the parties or this Court's consideration.

United States District Court
Northern District of California